**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

ERIC GOLDSTEIN,
BLAINE ILER,
MICHAEL TURLEY, and
BRIAN TWOMEY

　　　　　　　　Defendants.

Case No. 1:21-cr-00550 (DC)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR
JUDGMENT OF ACQUITTAL OR FOR NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    Somma and SchoolFood ..................................................................................2

    B.    RMSCO ...........................................................................................................4

    C.    Alleged Proximity in Time Between Somma and RMSCO Events ......................5

ARGUMENT ........................................................................................................................6

I.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL UNDER
RULE 29. ...................................................................................................................6

    A.    Legal Standard ................................................................................................6

    B.    The Court Should Grant Judgment of Acquittal on Counts 2, 4, 5, and 7. ..............8

        1.    *The Somma defendants decided to separate and agreed to key
separation terms before the tender hold.* ...................................................10

        2.    *Goldstein agreed to release the second hold only after receiving a
recommendation from his senior staff.* ......................................................15

    C.    The Court Should Grant Judgment of Acquittal on Counts 1, 3, and 6. ..............16

        1.    *The evidence was insufficient to convict on Counts 1, 3, and 6.* ...............17

        2.    *The statute of limitations bars conviction on Counts 1, 3, and 6.* .............43

II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL
UNDER RULE 33. ...................................................................................................45

    A.    Legal Standard ..............................................................................................45

    B.    A New Trial Is Required To Avoid Manifest Injustice. ........................................46

        1.    *The evidence preponderates heavily against the verdict.* ..........................47

        2.    *Additional factors support a finding that the verdict was
unreliable.* ................................................................................................48

CONCLUSION...................................................................................................................56

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Evans v. Jones*, 996 F.3d 766 (7th Cir. 2021)...................................................................53

*Jackson v. Virginia*, 443 U.S. 307 (1979)...................................................................1, 14

*McDonnell v. United States*, 579 U.S. 550 (2016) .......................................8, 24, 30, 37

*Skilling v. United States*, 561 U.S. 358 (2010) ...............................................................50

*Smith v. United States*, 568 U.S. 106 (2013) .................................................................43

*Stirone v. United States*, 361 U.S. 212 (1960)................................................................35

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) ...............................................47, 48

*United States v. Beckman*, 222 F.3d 512 (8th Cir. 2000)................................................53

*United States v. Bornman*, 559 F.3d 150 (3d Cir. 2009) ................................................44

*United States v. Brainard*, 690 F.2d 1117 (4th Cir. 1982).............................................53

*United States v. Brock*, 789 F.3d 60 (2d Cir. 2015).........................................................8

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ...........................................53

*United States v. Cassese*, 290 F. Supp. 2d 443 (S.D.N.Y. 2003) ...........................10, 11

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .........................................8, 38, 42

*United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003).........................................14, 15, 28

*United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005)..............................................34

*United States v. Clark*, 740 F.3d 808 (2d Cir. 2014) ...................................................1, 7

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012).......................................................8

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)................................................7, 8

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) ................................................36

*United States v. Davis*, 103 F. Supp. 3d 396 (S.D.N.Y. 2015).........................................9

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006).....................................................36

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) .................................................45, 46

*United States v. Finnerty*, 474 F. Supp. 2d 530 (S.D.N.Y. 2007).................................................42

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008).................................................8, 38, 39

*United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004) .................................................9

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) .................................................9

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002).................................................8

*United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013) .................................................43, 44

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) .................................................35

*United States v. Irving*, 682 F. Supp. 2d 243 (E.D.N.Y. 2010) .................................................8, 16, 32

*United States v. Jackson*, 368 F.3d 59 (2d Cir. 2004) .................................................7

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995) .................................................36

*United States v. Jones*, 393 F.3d 107 (2d Cir. 2004) .................................................8, 28

*United States v. Kapelioujnyj*, 547 F.3d 149 (2d Cir. 2008).................................................7

*United States v. Khanu*, 675 F. Supp. 2d 55 (D.D.C. 2009) .................................................6

*United States v. Klebig*, 600 F.3d 700 (7th Cir. 2009).................................................53

*United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021) .................................................46

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) .................................................8, 17, 38

*United States v. Mankani*, 738 F.2d 538 (2d Cir. 1984) .................................................7

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) .................................................8

*United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) .................................................35

*United States v. Mitchell*, 172 F.3d 1104 (9th Cir. 1999).................................................42

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991).................................................8

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987) .................................................55

*United States v. O'Keefe*, 825 F.2d 314 (11th Cir. 1987).................................................10

*United States v. Percoco*, 13 F.4th 180 (2d Cir. 2021).................................................17

*United States v. Rafiekian*, 68 F.4th 177 (4th Cir. 2023)........................................................46, 47

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004)....................................................7, 14, 28

*United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992).........................................................36, 43, 44

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) .............................................................46

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020)......................................................... *passim*

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) ........................................................................7

*United States v. Stewart*, 305 F. Supp. 2d 368 (S.D.N.Y. 2004) ...................................................7

*United States v. Taylor*, 464 F.2d 240 (2d Cir. 1972)....................................................................7

*United States v. Torres*, 604 F.3d 58 (2d Cir. 2010).....................................................................20

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015).................................................................7, 8

*United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978).................................................................53

*United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998) ................................................................53

*United States v. Wozniak*, 126 F.3d 105 (2d Cir. 1997)...............................................................35

## STATUTE AND RULES

18 U.S.C. § 3282.............................................................................................................................43

Fed. R. Crim. P. 29 ................................................................................................... *passim*

Fed. R. Crim. P. 33 ................................................................................................... *passim*

## INTRODUCTION

Judicial intervention is necessary to correct wrongful convictions because the evidence was insufficient to establish the critical element of an exchange, or an agreement to an exchange, beyond a reasonable doubt.  The reasonable doubt standard, "by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, . . . symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself."  *Jackson v. Virginia*, 443 U.S. 307, 315 (1979).  To be faithful to this constitutional requirement, reviewing courts "must take seriously [the] obligation to assess the record to determine, as *Jackson* instructs, whether a jury could *reasonably* find guilt beyond a reasonable doubt."  *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014).  A jury could not do so here.

The jury reasonably could have found that it was a bad idea for Blaine Iler, Michael Turley, and Brian Twomey to go into business with Eric Goldstein, but that was not the question before the jury.  Rather, the jury was tasked with deciding the more complex question of whether the government proved, beyond a reasonable doubt, the existence of a *quid pro quo* or, in the conspiracy counts, an agreement to engage in a *quid pro quo*—three Latin words that are not easy, even for trained lawyers, to understand.  The charged offenses all required the government to prove the giving of something of value to a public official ***in exchange for*** a promise to take official action—or an agreement to do so.

The evidence on these elements was insufficient.  That conclusion does not depend on credibility determinations or the weighing of conflicting evidence.  No witness testified to an exchange or an agreed-upon exchange.  No document proved an exchange or an agreed-upon exchange.  The government's proof on this element instead rested on ***inferences*** drawn primarily from ***timing***.  But, when all the evidence is viewed together, the government's urged inferences of

an exchange or an agreement to exchange are unreasonable.  At every turn, the actual evidence fatally undermines the government's nefarious inferences.

The Court should end this case by granting judgment of acquittal pursuant to Rule 29.  At a minimum, because the evidence preponderates heavily against the verdict, and because permitting the verdict to stand would constitute manifest injustice, the Court should grant a new trial under Rule 33.

## BACKGROUND[1]

### A.    Somma and SchoolFood

In 2015, Messrs. Iler, Turley, and Twomey, three experienced food industry professionals, co-founded Somma Food Group LLC ("Somma").  *See, e.g.*, Tr. 1325:21-1331:20 (describing food industry experience), 1458:13-1461:8 (describing Somma) (Twomey).  Somma marketed and supplied food products to various customers, including public school districts.

The New York City Department of Education's Office of Food and Nutrition Services ("SchoolFood") procured food products for the New York City public schools through an approved brand process, which entailed several steps, including: (1) solicitations to hundreds of vendors (called "outreaches"); (2) written vendor submissions designed to ensure the product satisfied nutritional requirements; and (3) taste tests.  Tr. 1028:9-1029:10 (O'Brien).  Once a product met SchoolFood's requirements and received its approval, the New York City Department of Education's Division of Contracts and Purchasing ("DCP") had to approve the product's pricing.  Tr. 409:15-21 (Davis); Tr. 1029:11-18 (O'Brien).  If a product was approved, distributors, who

---

[1]    Except where otherwise indicated, and except for references to the trial testimony of Twomey, Travis, and Goldstein, all evidence cited in this brief was introduced in the government's case.

had contracts to supply food to New York City's public schools, could purchase the approved products and supply those products to the schools.  Tr. 714:20-716:17 (Ascher).

Goldstein was Chief Executive Officer of the Office of School Support Services within the New York City Department of Education ("DOE"), with supervisory authority over SchoolFood. Tr. 234:21-235:1 (Davis).  Goldstein did not have supervisory authority over DCP.  Tr. 239:10-11, 410:7-8 (Davis).

In 2015 and 2016, Somma made several written submissions offering to supply food products to SchoolFood.  Some products were rejected; some were approved.  SchoolFood rejected Somma's 2015 chicken tender submission, DX303, its 2016 chicken patty submission, GX500, and its 2016 chicken nugget submission, DX419.  DCP did not approve Somma's 2016 grass-fed burger submission.  DX466.  There was no evidence that Somma ever asked Goldstein to intervene and overrule these rejections, and no evidence that he did intervene.

Somma ultimately supplied SchoolFood with a custom yogurt parfait, antibiotic free chicken drumsticks, and antibiotic free chicken tenders.  *See, e.g.*, DX349; GX287; DX665; DX477; DX481.  SchoolFood had been seeking a custom yogurt parfait since November 2013, and sent an outreach to hundreds of vendors.  DX5.  Somma was the only vendor that could supply a yogurt parfait that met SchoolFood's standards.  DX349; Tr. 1151:11-14 (O'Brien).  The yogurt parfait also satisfied SchoolFood's desire to purchase locally sourced and produced products. Tr. 263:13-14 (Davis).  Similarly, although SchoolFood sent outreaches to hundreds of food vendors, DX175; DX397, Somma was the only vendor able to supply antibiotic free chicken drumsticks and chicken tenders that met SchoolFood's requirements and became an approved brand.  Tr. 1032:2-10 (O'Brien).  The uncontroverted trial evidence established that Somma's products earned their menu spots on the merits.

3

In spring 2017, after Somma experienced foreign matter problems (bone fragments and metal) with its suppliers, SchoolFood stopped purchasing Somma's products.  Tr. 1113:11-1114:2 (O'Brien).  It was not easy for SchoolFood to fill the void created by the absence of Somma's products.  It took SchoolFood approximately two years to find another supplier of antibiotic free chicken drumsticks and chicken tenders.  Tr. 1032:17-21 (O'Brien).

### B.     RMSCO

Hershel Meisels, whose uncle was a rabbi who certified Kosher beef overseas, conceived of a business idea to import grass-fed beef and discussed this idea with Goldstein.  DX41; DX51 (exhibits admitted in defense case).  Goldstein knew Turley as someone experienced in animal protein from Turley's time at Tyson Foods.  Tr. 1807:22-1808:2 (Goldstein).  Goldstein discussed the beef import idea with Turley, who discussed it with Iler and Twomey.  Tr. 1340:12-23 (Twomey).

After researching the viability of Meisels's business idea and meeting with Meisels in March 2015, DX88 (admitted in defense case), Iler, Turley, and Twomey co-founded the start-up company Range Meats Supply Company, LLC ("RMSCO") with Meisels and Goldstein.  GX37.  Iler, Turley, and Twomey ultimately owned their interests through Somma, which held a 60% interest in RMSCO, and Goldstein and Meisels each owned 20% through their LLCs.  *Id.*

During 2015 and early 2016, RMSCO's founders took various steps to develop the beef import idea, including hiring lawyers at Shutts & Bowen to form RMSCO and draft a Company Agreement; taking business trips to meet prospective suppliers; negotiating with prospective suppliers and customers; coordinating insurance, shipping quotes, and other logistical requirements; and interfacing with regulators regarding import approval.  GX12; GX37; GX231; GX263; GX290.  In October 2015 and May 2016, Somma made $20,000 and $10,000 loans to

RMSCO to cover some of its business expenses associated with this work, primarily legal fees owed to Shutts & Bowen and Debenedetti Majewski.  GX290; GX906; GX907; GX340; DX707.

By summer 2016, RMSCO's efforts to import beef had stalled, GX12; DX469 (admitted in defense case), and Iler, Turley, and Twomey decided to separate Somma from RMSCO. GX535.  RMSCO's Company Agreement required Somma to obtain the written consent of the other members to withdraw from RMSCO.  GX37 ¶ 16.18.  Over several months the members, with the assistance of their lawyers at Shutts & Bowen, negotiated the terms of the business separation and ultimately documented the separation in a Unanimous Written Consent signed by Iler, Turley, Twomey, Goldstein, and Meisels (the "Separation Agreement").  GX42; GX593.  The Separation Agreement provided that Somma would transfer its membership interest to RMSCO and make a payment to RMSCO to cover certain of its outstanding expenses and legal fees.  GX42; GX593.

### C.    Alleged Proximity in Time Between Somma and RMSCO Events

The government's bribery theory was predicated on the argument that certain RMSCO-related events coincided in time with certain issues pending between Somma and SchoolFood. The substantive counts of the Superseding Indictment (Counts 2, 4, 5, and 7) are predicated on the temporal proximity between the Separation Agreement and SchoolFood's decision to lift the second of two holds it had placed on Somma's chicken tenders because of foreign matter complaints.  SI, ECF 45, ¶ 26.  The conspiracy counts (Counts 1, 3, and 6) also are predicated on the proximity in time between (i) Somma's $20,000 loan to RMSCO and SchoolFood's decision to move the first menu date for Somma's yogurt parfait from spring term 2016 to December 17, 2015, SI, ECF 45, ¶ 17; (ii) Somma's $20,000 loan to RMSCO and SchoolFood's decision to move the first menu date for Somma's chicken drumsticks from January 2016 to December 2015 and to

5

serve the drumsticks twice per month starting in January 2016;[2] (iii) the sending of a RMSCO-related PowerPoint to Goldstein and SchoolFood's decision not to assess liquidated damages for Somma's incomplete deliveries of chicken drumsticks, SI, ECF 45, ¶ 18; and (iv) Somma's $10,000 loan to RMSCO and SchoolFood's decision to fast track and approve Somma's chicken tenders, SI, ECF 45, ¶ 19.  The government also argued that a single line in a two-and-a-half-page email attributing a statement to Goldstein established the existence of an illicit "let's do the beef" conspiracy.  *See* SI, ECF 45, ¶ 13.

## ARGUMENT

## I.   THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL UNDER RULE 29.

### A.   Legal Standard

Under Rule 29(a), "the court on the defendant's motion must enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Because the Court reserved decision on defendants' Rule 29(a) motion at the close of the government's case, Tr. 1430:5-11, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  Separately, because defendants renewed their motion after the verdict, Tr. 2173:16-2174:7, under Rule 29(c) the Court must independently decide the motion based on the full trial record if it finds that the evidence in the government's case sufficed.  *See, e.g.*, *United States v. Khanu*, 675 F. Supp. 2d 55, 61 (D.D.C. 2009).  The same sufficiency standard applies to both analyses.  *See id.* at 68.

---

[2]     This alleged *quid pro quo* is not alleged in the Superseding Indictment, but the government argued it to the jury in closing.  *See infra* p.21.  The Superseding Indictment alleges that the Somma defendants told Goldstein they wanted to move up the menu date for the chicken drumsticks, SI, ECF 45, ¶ 14, but the only action it links to the $20,000 payment is the alleged expediting of the yogurt parfait, SI, ECF 45, ¶¶ 15-16.

The inquiry under Rule 29 is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (quoting *Jackson*, 443 U.S. at 318) (internal quotation marks omitted). "The evidence, in other words, must be of such persuasive quality that a jury could reasonably find the essential elements [of the charged offenses] *beyond a reasonable doubt* on the basis of that evidence." *United States v. Jackson*, 368 F.3d 59, 63 (2d Cir. 2004). "The critical point in this boundary is the existence or non-existence of reasonable doubt." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). "If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal[.]" *Id.*; *accord Clark*, 740 F.3d at 811.

In deciding a Rule 29 motion, the court views the evidence "in the light most favorable to the prosecution," and defers "to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (citation omitted). But "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *Id.* "[A] conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994); *see also, e.g.*, *United States v. Starr*, 816 F.2d 94, 99 (2d Cir. 1987); *United States v. Mankani*, 738 F.2d 538, 546-47 (2d Cir. 1984); *United States v. Stewart*, 305 F. Supp. 2d 368, 378 (S.D.N.Y. 2004).

These principles are of paramount importance in cases, like this one, where the government relies principally on inferences from documents and timing—and not on direct evidence from witnesses—to attempt to prove an essential element (here the *quid pro quo* exchange or agreement). *See, e.g.*, *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (reversing conviction and instructing district court to grant acquittal where doing so did not require court to

7

"improperly question a credibility determination" because "even when viewing the evidence in the light most favorable to the government, this is a case in which the trial evidence simply did not permit a finding beyond a reasonable doubt of an essential element of the crime charged"); *United States v. Irving*, 682 F. Supp. 2d 243, 251-52 (E.D.N.Y. 2010) (granting acquittal in case that "did not turn on witness credibility in any meaningful way" and where question was "whether the documentary evidence" and chronology of events "supports the jury's verdicts").

Where, as here, "a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible"; rather, the court must be "satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). The Second Circuit thus has not hesitated to affirm acquittals or to overturn convictions with instructions to grant judgment of acquittal where the inferences urged by the government based on circumstantial evidence did not prove guilt beyond a reasonable doubt. *See, e.g.*, *Valle*, 807 F.3d at 522-23; *United States v. Brock*, 789 F.3d 60, 65 (2d Cir. 2015); *United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012); *United States v. Lorenzo*, 534 F.3d 153, 160-62 (2d Cir. 2008); *United States v. Finnerty*, 533 F.3d 143, 151 (2d Cir. 2008); *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005); *United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004); *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *D'Amato*, 39 F.3d at 1259-60; *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991).

**B.      The Court Should Grant Judgment of Acquittal on Counts 2, 4, 5, and 7.**

Each of the substantive counts requires proof beyond a reasonable doubt of a *quid pro quo*. Jury Instructions, ECF 157, at 30, 46-49, 55, 58, 60-61. Here, that requirement means that the public official "committed or agreed to commit an 'official act' in exchange for" something of value. *McDonnell v. United States*, 579 U.S. 550, 563 (2016) (extortion under color of official

right and honest services fraud); *United States v. Silver*, 948 F.3d 538, 548-49, 551 (2d Cir. 2020) (same); *United States v. Ganim*, 510 F.3d 134, 141, 151-52 (2d Cir. 2007) (federal-program bribery); *see* Jury Instructions, ECF 157, at 21.  The Court further instructed that the "'in exchange for' requirement . . . is not satisfied simply because the offering of a thing of value occurs close in time to an official act; the thing of value must be given at least in part *to procure* the official act." ECF 157 at 22.  "[T]he government must prove that the defendants understood at the time of the *quid pro quo* the particular question or matter to be influenced," *id.*, and the question or matter "must be specific, focused, and concrete," *id.* at 25.

Each substantive count—Counts 2, 4, 5, and 7—is predicated on the allegation that the Somma defendants agreed to transfer Somma's membership interest in RMSCO and to make a payment covering RMSCO expenses in exchange for Goldstein's lifting the second chicken tender hold and agreeing to substitute chicken drumsticks.  SI, ECF 45, ¶¶ 20-26, 30, 35, 37, 41.  No direct evidence established such an exchange.[3]  There is not a single communication in which the Somma defendants or Goldstein linked the separation terms with any official action.  This absence of evidence of an exchange is fatal to these counts.  *See United States v. Frampton*, 382 F.3d 213, 219 (2d Cir. 2004) (affirming judgment of acquittal where there was no direct evidence of a "quid pro quo" under federal murder-for-hire statute); *United States v. Davis*, 103 F. Supp. 3d 396, 404 (S.D.N.Y. 2015) (granting judgment of acquittal where record did not support "an advance . . . bargained for exchange or understanding of a quid-pro-quo" under same statute).

---

[3]     Additionally, with respect to the honest services fraud count, the government is required to "prove that some aspect of the particular *quid pro quo* scheme continued into the statute of limitations period" and that wires were "in furtherance of an ongoing scheme, not merely as the *result* of a completed one."  *Silver*, 948 F.3d at 572-73 (citations omitted).  For the reasons discussed below, *see infra* Part I.C.2, the government has not satisfied this burden.

The government urged the jury to draw inferences based on timing to establish the "in exchange for" element. Tr. 2256:20-22 (arguing that "the final payoff in the fall of 2016" is "one more example where the timing shows the existence of a corrupt agreement"); Tr. 2272:7-9 ("The timing proves, it proves that the Range Meats payoff agreement and Goldstein's decision on SOMMA's food products were connected."); *see also* Tr. 2271:25-2272:3; SI, ECF 45, ¶ 26. For two reasons, the record does not support the government's proposed inference beyond a reasonable doubt. First, the Somma defendants decided to separate from RMSCO and agreed to transfer Somma's interest in RMSCO and to make a payment covering RMSCO expenses *before* SchoolFood put Somma's chicken tenders on hold. Second, Goldstein agreed that the second tender hold should be lifted on November 30 only *after* his senior staff recommended lifting the hold and pressed Goldstein for an immediate decision. *See United States v. O'Keefe*, 825 F.2d 314, 320 (11th Cir. 1987) (affirming grant of acquittal in extortion-under-color-of-right case where government proved that favorable votes followed payments but failed to prove the payments were "in exchange for . . . votes on city matters"); *United States v. Cassese*, 290 F. Supp. 2d 443, 453 (S.D.N.Y. 2003) (rejecting government argument that timing of stock trade after a call supported inference of willful violation of securities law where defendant purchased the stock "in his ordinary way—in the morning, in his own accounts, in normal amounts"), *aff'd*, 428 F.3d 92 (2d Cir. 2005).

### 1.     *The Somma defendants decided to separate and agreed to key separation terms before the tender hold.*

As discussed below, the Somma defendants and Goldstein began discussing the business separation of Somma and RMSCO in August 2016, GX521, negotiated the business terms for several weeks, and exchanged a formal legal document embodying the key terms before the first chicken tender hold.

10

On **August 16**, Goldstein proposed several terms on which the parties ultimately agreed— discharging the existing loans from Somma to RMSCO, covering outstanding Shutts & Bowen fees and unreimbursed travel expenses, and transferring the "Range" brand to RMSCO.  *See id.*

By **September 14**, the Somma defendants planned to transfer Somma's interest in RMSCO, to cover most outstanding legal fees and travel expenses, and to transfer the "Range" brand.  GX529.

On **September 28**, Iler emailed a draft Separation Agreement to Goldstein and Meisels, writing that the Somma defendants were "prepared to finalize everything" on the following key terms: (1) Somma to transfer its interest in RMSCO; (2) Somma to cover most of RMSCO's legal, travel, and entertainment expenses; and (3) RMSCO to release Somma from the non-compete provision.[4]  GX535.

That **same day**, Iler also emailed a draft License Agreement providing that Somma would (4) transfer the "Range" brand to RMSCO and (5) pay 2.5% of its net profits from Range-branded sales to RMSCO.  GX537.

On **September 29**, following complaints of bone fragments in Somma's chicken tenders, SchoolFood imposed the first hold on chicken tenders, GX541, without Goldstein's involvement.  SchoolFood released the first hold on **October 19**, again without Goldstein's involvement.  DX504; DX505.  The RMSCO members, with the assistance of their lawyers, continued working to finalize the formal documentation of the business separation between the first and second chicken tender holds.

---

[4]     The draft Separation Agreement provided that "Section 15.2 of the RMSCO Company Agreement shall be null and void."  GX535.  Section 15.2 of the RMSCO Company Agreement was the "Non-Compete Covenant."  GX37.

On **October 24**, Goldstein emailed a redlined draft Separation Agreement to the Somma defendants with terms substantially similar to the terms Iler had circulated a month earlier. GX545 (attaching draft providing that: Somma transfer its interest in RMSCO; Somma cover RMSCO's legal, travel and entertainment expenses; RMSCO release Somma from non-compete provision; and Somma use best efforts to enter License Agreement).

On **October 27**, SchoolFood received another bone-fragment complaint. GX31. On **October 28**, Goldstein was notified about the complaint as well as a media inquiry from *City Limits*. GX553. Goldstein initially recommended placing Somma's chicken tenders on hold again. *Id.* The **next day**, however, Stephen O'Brien of SchoolFood recommended that they determine whether the chicken tenders at issue were part of the inventory that had been x-rayed following the first hold—"[i]f it was part of the original stock and not run through an x ray then we can lift the hold." GX556. Goldstein agreed with SchoolFood's recommendation. *Id.*[5] When SchoolFood determined that the chicken tenders at issue had been x-rayed, it notified Somma that it was placing the tenders on hold, that the media was inquiring, and that Somma had to address the quality concerns. GX560. On **October 31**, SchoolFood issued the second hold. GX561.

While the second hold was in place, the parties exchanged additional drafts of the Separation Agreement until they finalized documenting the separation.

On **November 12**, Twomey emailed updated draft legal documents along with certificates of formation, and an IRS letter with an Employer Identification Number. GX577.

---

[5] This sequence demonstrates that Goldstein was following his staff's recommendations, and is thus inconsistent with the government's argument that Goldstein used the second hold as leverage in the separation negotiations.

That **same day**, Goldstein wrote that they would eliminate the License Agreement providing that Somma would pay 2.5% of its net profits to RMSCO for Range-branded sales. GX578.

On **November 16**, Goldstein emailed updated draft legal documents replacing the draft License Agreement (which provided that Somma would transfer the "Range" brand to RMSCO and pay 2.5% of its net profits from Range-branded sales to RMSCO), GX537, with an Assignment Agreement providing only that Somma would transfer the "Range" brand to RMSCO.  GX586. This change meant that RMSCO (and its remaining owners, including Goldstein) would forego a future revenue stream from Somma.

On **November 28**, Twomey clarified that the Assignment Agreement should reflect that a trademark had not yet issued for the "Range" marks; rather, an application was pending.  GX593. With that clarification, Twomey emailed Goldstein that the version of the Separation Agreement Goldstein had circulated on November 16 was "good-to-go" and "ready to execute."  *Id.*

On **November 29**, Twomey confirmed that he was circulating the Separation Agreement for signatures.  GX599; *see also* GX42 (final Separation Agreement).[6]

This chronology of evidence, admitted in the government case, reflects a proper separation of business interests, negotiated openly in numerous email exchanges, with the assistance of legal professionals, and formally documented in a Unanimous Written Consent.  The parties reached agreement on the core terms (transferring Somma's interest in RMSCO and making a payment covering RMSCO expenses) *before* the second chicken tender hold.  It would be unreasonable to infer beyond a reasonable doubt that these previously agreed-upon transfers were in exchange for

---

[6]     Later on November 29, Twomey emailed Goldstein and Meisels the Separation Agreement signed by the Somma defendants.  DX535; *see also* DX2001 (stipulation regarding time stamp on DX535).  DX535 and DX2001 were introduced in the defense case.

releasing the chicken tender hold.  The final separation terms were substantially similar to the

terms in the September 28 draft circulated a *month before the second tender hold*:

| Key September 28 Terms (GX535, GX537) | Key Final Terms (GX42) |
|---|---|
| Somma to transfer its units in RMSCO for $100 | Somma to transfer its units in RMSCO |
| Somma to cover RMSCO's legal, travel and entertainment expenses through September 1 | Somma to transfer $66,670.39 to RMSCO[7] |
| RMSCO to release Somma from non-compete | RMSCO to release Somma from non-compete |
| Somma to transfer "Range" brand to RMSCO for $100 | Somma to transfer "Range" brand to RMSCO |
| Somma to pay 2.5% of net profits to RMSCO for Range-branded sales | No licensing fee |

Indeed, the final terms were worse than the September 28 terms for Goldstein because the 2.5%

licensing fee for Range-branded sales by Somma was eliminated, and Somma was projecting

substantial future Range-branded sales.  GX13 at 30 (08/16 Business Overview).  This evidence

does not come close to the "near certitude," *Jackson*, 443 U.S. at 315, required for conviction.

The evidentiary insufficiency likely explains why the government improperly made up the

content of a conversation between Turley and Goldstein in rebuttal summation in an attempt to

create proof of an exchange:  "Once again, they need his help.  You know what happens, October

28 Eric Goldstein puts the tenders -- When he does, right away, who does he call?  Michael Turley.

What does he say?  You know what he said:  Your tenders are on hold, how is that separation

agreement coming?"  Tr. 2496:15-19.  Speculation about the content of conversations cannot fill

fatal gaps in the government's proof.  *See Rodriguez*, 392 F.3d at 547-48 ("Critically absent,

however, is any evidence of the precise contents of the conversations."); *United States v. Ceballos*,

---

[7]     This amount is $2,273.80 less than the sum of the estimated outstanding travel expenses
and the outstanding Shutts & Bowen invoice.  GX530 (estimating $11,660 in travel expenses);
DX527 (Shutts & Bowen invoice for $57,284.19).  DX527 was introduced in the defense case.

340 F.3d 115, 127 (2d Cir. 2003) ("It is a given that Gonzalez was obtaining narcotics from Ceballos, which obviously necessitated conversations. But any suggestion that those telephone conversations also included discussions of bribing an INS official to process illegal aliens for green cards is wholly speculative.").

### 2. Goldstein agreed to release the second hold only after receiving a recommendation from his senior staff.

Timing is not on the government's side for another reason: Goldstein agreed to release the hold on November 30, only *after* his senior staff recommended to release the hold and to authorize substitution of chicken drumsticks, advising that a decision was needed the same day. GX602.

On **November 15**, Somma emailed a corrective action letter to O'Brien. GX585. That same day, O'Brien emailed Dennis Barrett asking to "let me know what is decided." GX584. Barrett responded that "per our discussions with Eric yesterday," they were "asked to wait a couple days." *Id.* O'Brien testified that it was prudent to wait on a decision because of safety concerns and the intense media scrutiny. Tr. 1100:19-25 (O'Brien); *see also* GX571 (11/08/16 email regarding additional media inquiries). Somma's November 15 corrective action letter made clear that Somma needed time to implement its corrective action plan and new quality assurance process. GX585.

On **November 23**, Somma updated O'Brien that it had "completed" running new inventory through the "new QA process." GX594.

On **November 28**, Somma's Gary Hamm emailed O'Brien asking whether SchoolFood would resume serving Somma's chicken tenders in late January. *Id.* O'Brien instructed Hamm to resend the corrective action letter and to ask whether SchoolFood would resume serving tenders. *Id.* Hamm followed up that day with an email to Barrett, O'Brien, and others asking to resume serving chicken tenders on January 30, and attaching another copy of the letter. GX602.

On **November 30**, O'Brien emailed Barrett and wrote that Somma needed "an answer today or they will not be able to meet our menu needs at the end of January." GX605. Barrett then forwarded Hamm's November 28 email to Goldstein, with copies to O'Brien and Armando Taddei, recommending that they sign off on Somma's proposed plan to relaunch tenders in late January and to authorize the substitution of drumsticks. GX602. Barrett advised Goldstein that an answer was needed that day. *Id.*

This November 30 email was the ***first time*** that Barrett and O'Brien had followed up with Goldstein since mid-November. When Twomey emailed Goldstein on November 28 that the Separation Agreement was good to go, Goldstein did not contact the SchoolFood team to release the chicken tender hold. Only ***after*** Barrett emailed Goldstein with this recommendation on November 30 and told him a decision needed to be made the same day did Goldstein agree with the decision to lift the hold and substitute the drumsticks. *See* GX605.[8] Goldstein appropriately followed his staff's recommendation promptly after they advised him a decision had to be made. The timing does not permit the inference of an illicit exchange beyond a reasonable doubt. *See Irving*, 682 F. Supp. 2d at 266 (rejecting government's argument "that the chronology of events . . . support[ed] an inference" of criminal intent where government overlooked events and facts that "undermined" the government's theory, and granting judgment of acquittal).

### C.   The Court Should Grant Judgment of Acquittal on Counts 1, 3, and 6.

No jury reasonably could convict on the conspiracy counts. The only alleged offense conduct occurring after the statute-of-limitations date (October 25, 2016) was the Somma-RMSCO separation and lifting of the chicken tender hold discussed above. That is why the government had

---

[8]      Chicken drumsticks were not substituted for chicken tenders because Somma did not have sufficient drumsticks in inventory, GX600; DX3045, underscoring that a jury could not reasonably find beyond a reasonable doubt that the Somma defendants paid a bribe to obtain substitutions.

to base the substantive counts entirely on that alleged *quid pro quo*.  But, for the same reasons that the government did not prove any *quid pro quo* related to the chicken tender hold, the government failed to prove that any conspiracy to engage in a *quid pro quo* continued past the statute-of-limitations date (October 25, 2016).  And, even putting aside the statute of limitations, no jury reasonably could find the elements of the conspiracy counts—Counts 1, 3, and 6—beyond a reasonable doubt.

> ### *1.     The evidence was insufficient to convict on Counts 1, 3, and 6.*

Each conspiracy count required an agreement to engage in the underlying substantive offense—*i.e.*, an agreement to engage in a *quid pro quo*.  *See, e.g.*, *Lorenzo*, 534 F.3d at 159 ("Where the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statutes." (internal quotation marks and alterations omitted)); *see also United States v. Percoco*, 13 F.4th 180, 187 (2d Cir. 2021) ("[T]he district court instructed the jury . . . that to convict the defendants of conspiracy to commit honest-services wire fraud . . . the jury was required to find the existence of a quid pro quo[.]"), *rev'd on other grounds*, 143 S. Ct. 1130 (2023); Jury Instructions, ECF 157, at 34, 51-52, 63 (instructing that *quid pro quos* were the alleged objects of each charged conspiracy).

In the Superseding Indictment and then at trial, the government offered various (and shifting) articulations of the objects of the alleged conspiracy.  Defendants address each potential object in turn.

17

### a. The release of the second chicken tender hold and authorization of drumsticks substitutions

For the same reasons that the government did not prove a *quid pro quo* related to the release of the second chicken tender hold and authorization of drumsticks substitutions for the substantive counts, *see supra* Part I.B, it did not prove an agreement to engage in such a *quid pro quo*.

### b. Moving the yogurt parfait menu debut to December 17, 2015

There is no direct evidence of an agreement to exchange $20,000 (Somma's transfer to RMSCO in October 2015), GX904, for Goldstein's expediting the menu date for the yogurt parfait to December 2015. Here, too, the government relied on timing to establish the agreed-upon exchange. Tr. 2229:12-13; SI, ECF 45, ¶¶ 15-17. For several reasons—including the uncontroverted evidence that O'Brien, not Goldstein, expedited the parfait in October 2015—no jury reasonably could infer the agreed-upon exchange beyond a reasonable doubt.

*First*, in October 2015, Somma informed SchoolFood that it would not be ready to deliver the parfait until the **spring term of 2016**. On October 8, 2015, Hamm emailed SchoolFood's Meserete Davis and O'Brien that Somma could be ready to deliver the parfait in the spring term of 2016, by late January or early February at the earliest. DX315.

> Q.     And on that date, October 8th, Mr. Hamm is saying if everything moves smoothly, we can be ready late January, early February. So that's the spring term of the school calendar, correct?
>
> A.     Yes.

Tr. 1039:21-25 (O'Brien).[9] On October 16, O'Brien confirmed that the parfait, if approved, would be scheduled for the spring term 2016 menu. DX315; Tr. 1040:1-5 (O'Brien).[10] On October 23,

---

[9]     Months earlier, Turley expressed the view that he wanted the parfait "slated for Fall menu," GX2007, but that was not Somma's view by October 8, 2015.

[10]     When Iler learned about this date, he expressed satisfaction. DX314 ("Good stuff. We can plan around this and make it happen."); *see also* Tr. 1479:8-9 (Twomey) ("Q. Were you satisfied

when SchoolFood again informed Somma about the early spring term menu date, Hamm affirmed

the schedule. GX550. Because of this undisputed evidence of Somma seeking and being satisfied

with a spring term menu date, it would be unduly speculative to conclude beyond a reasonable

doubt that Somma then paid a bribe to move the menu date to December 2015.

   *Second*, on October 30, 2015, O'Brien, **not Goldstein**, moved the parfait menu date to

Thursday, December 17, 2015. DX328. On October 30, O'Brien called Hamm and told him the

"[m]enu date for parfait is Dec 17th" and instructed him to deliver an updated timeline. *Id.*;

Tr. 936:13-23 (Hamm). That same day, O'Brien emailed the updated timeline to SchoolFood staff

and instructed them that the parfait was being expedited as a "NY Local product." GX361.

Starting in September 2015, all school menus had been modified to feature locally grown and

produced foods on Thursdays, pursuant to the New York Thursday initiative. DX358. Neither

O'Brien nor any other witness attributed O'Brien's directive to pressure or advice from Goldstein

regarding Somma's parfait.

   Somma did not request this expedited timeline. Hamm testified:

   Q.    And that was something that SOMMA did because School Food asked it to,
   right?

   A.    Correct.

Tr. 937:13-15 (Hamm). The expedited timeline that SchoolFood requested caused issues for

Somma. Tr. 1048:24-1049:5 (O'Brien) ("Q. Okay. You knew there were some issues along the

way, correct? A. Yes. Q. Because if you planned to have something ready in February and then

---

with the proposed spring menu date? A. Yes, we all were."). This exhibit and testimony were
introduced in the defense case.

you're told December, it requires more work and steps to get it done quickly, true?  Is that fair?

A. Yes.").[11]

The only evidence that Goldstein weighed in on anything in October was an email stating that Goldstein wanted to expedite a local ravioli, which was not a Somma product, Tr. 353:2-7 (Davis), and wanted "to get to 100 percent NY products asap," GX356, which was a SchoolFood goal for New York Thursdays in general.

> Q.     Because the goal is to get as many New York products onto the menu as you could, right?
>
> A.     The goal was to have a New York Thursday that was a hundred percent New York products.

Tr. 1044:11-14 (O'Brien).  The government presented no evidence that Goldstein weighed in on Somma's parfait in October 2015.  Accordingly, the required agreed-upon exchange cannot be inferred beyond a reasonable doubt based on the timing of the $20,000 transfer in October.  *See United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) ("[W]hile we defer to a jury's . . . choice between the competing inferences that can be drawn from the evidence, the jury's inferences must be reasonably ***based on evidence presented at trial***, not on speculation."  (internal quotation marks omitted) (emphasis added)).

*Third*, later documentary evidence confirms that Goldstein did not expedite the parfait in October 2015, around the time of the $20,000 transfer.  SchoolFood, in partnership with the American Dairy Association, scheduled a major event for the public announcement of New York's Local Thursday initiative, which included the Chancellor of the New York City Schools, the New York State Agriculture Commissioner, and other officials.  DX358; DX670.  Somma's yogurt

---

[11]     In the defense case, Twomey testified:  "Q. What happened as a result of being moved up from spring to December?  A. A lot of scrambling to see if we could do it, the timeline was a big part of that."  Tr. 1480:11-15 (Twomey).

parfait was ultimately featured, along with other local dairy products, at this event on December 17, 2015.  DX644.  Days before the event, on December 1, O'Brien emailed that he was "***just informed*** that Eric is fast tracking the parfait for 12/17," GX370 (emphasis added), the menu date that O'Brien had set more than a month earlier.  DX328.  Contemporaneous emails from O'Brien confirm the obvious—the parfait was being expedited for the "local Thursday announcement," GX402, not because of the $20,000 transfer.

The actual evidence shows that the allegations of a corrupt agreement relating to the parfait are complete fiction.  Somma did not ask for the December 17 menu date; SchoolFood did. Goldstein did not move up the menu date; O'Brien did.  The menu date had nothing to do with the loan from Somma to RMSCO; it was dictated by the Local Thursday initiative and, ultimately, the December 17, 2015 public event.

> ### c.   Menuing the chicken drumsticks once in December 2015 and calendaring the chicken drumsticks twice a month going forward

Perhaps recognizing the fatal flaws in its attempt to link the $20,000 loan to the yogurt parfait menu debut, in closing the government claimed that there was also an agreement to exchange the $20,000 loan in October 2015 for Goldstein's alleged actions of menuing the chicken drumsticks once in December 2015 and ensuring that the drumsticks were calendared twice per month going forward—based again on timing.  Tr. 2228:14-2229:15; *see also* ECF 163 at 191 (government closing demonstrative).  No evidence provides the agreed-upon connection whatsoever.  In addition, these allegations appear nowhere in the Superseding Indictment and thus cannot sustain a conviction on the conspiracy counts.  Basing a conspiracy conviction on an alleged

*quid pro quo* that was not referenced in the Superseding Indictment would constructively amend and/or prejudicially vary the Superseding Indictment. *See infra* pp.34-36.[12]

*Alleged menuing of the drumsticks in December 2015.* To prove that Goldstein made the decision to serve Somma's drumsticks on one menu date in December 2015, the government relied on a text message dated October 2, 2015 between Turley and Iler in which Turley said to Iler: "Tell Eric we may need a 'nudge.' Don't want to wait until Jan to launch." GX320; *see* Tr. 2230:1-3 (closing: "I submit that the defendants were talking about both of their products in this text, the parfait and the drumsticks."). Although the government attributed this text message to "defendants" in closing, Twomey was not a party to this text message at all. No evidence connected Twomey to the supposed "nudge." And the government presented ***no evidence*** that Iler (or any other Somma defendant) actually asked Goldstein for a nudge—let alone that anyone connected a nudge to the $20,000 transfer. No evidence proves any conversation with Goldstein on October 2. Although Turley later spoke to Goldstein on October 7, there is no evidence that they discussed moving up the chicken drumstick launch. To the contrary, the evidence shows that by that time Somma was satisfied with the January launch date. *See* GX328 (Hamm 10/7/15 email: "Rolling out in January is not necessarily a bad thing"); GX332 (Turley 10/12/15 email to Goldstein: "Chicken launch set for January.").

Moreover, SchoolFood, ***not Goldstein***, asked Somma if it could supply chicken drumsticks on a single menu date in December. And there is ***no evidence*** that Goldstein had anything to do with SchoolFood's request. In a meeting on October 23, 2015, SchoolFood officials "[i]nquired if Somma might be able to provide SchoolFood with this product for an earlier menu date in

---

[12] Additionally, the Court instructed the jury on the "official actions" that the Superseding Indictment alleged Goldstein to have taken, and making decisions related to the frequency of menu dates was not one of them. *See* ECF 157 at 26.

December." GX550.  No document indicates that Goldstein was involved in that inquiry.  No SchoolFood witnesses attributed this inquiry to pressure or advice from Goldstein.  SchoolFood asked Somma to report back that day on whether it was "in fact possible" for Somma to provide drumsticks on an earlier menu date in December.  *Id.*  Somma responded three days later that it was a "GO" for the earlier date.  GX355.  O'Brien responded, "This is welcome news."  *Id.*  The government's assertion in its closing demonstrative that "Goldstein Expedites Menu Debut of SOMMA's Drumsticks" on October 23, 2015, ECF 163 at 191, is unsupported by any evidence in the record.  The government urged an inference in summation contradicted by its own evidence and unsupported by its own witnesses.

*Frequency of the chicken drumstick menu dates*.  The government likewise failed to prove its new allegation that defendants agreed to exchange $20,000 for Goldstein to menu the drumstick two times per month.  In the lead-up to the drumstick launch, Somma was seeking information from SchoolFood regarding menu frequency.  GX287 (8/17/15 Turley email to Davis:  "If we can get a planned or estimated number of days this product will appear in fall and spring we can dial in both ingredients and line utilization savings.");  GX318 (9/28/15 Hamm email to Davis:  "Do I need to contact Bill and discuss menu frequency for the Drumstix?").  As of October 12, SchoolFood had not provided menu frequency information to Somma.  Somma requested a meeting with SchoolFood.  GX332.  Turley emailed Goldstein on October 12 in advance of the requested meeting:  "Chicken launch set for January. We NEED to make sure we are on all menus 2x per month. With the 'rush' ('we're out of chicken') of this project and then delay until Jan, we have had to re-negotiate with our chicken producer.  As you know it is a tricky proposition when you are doing projections with live animals.  We NEED the volume to make sure we keep our supply."  *Id.*  Goldstein forwarded the email to O'Brien (an action incompatible with an allegedly

corrupt agreement) and added, "If doable, we should do." GX332. O'Brien responded that SchoolFood had already scheduled the drumsticks for two menu dates per month and would let Somma know "this week." *Id.*

No evidence connected Turley's October 12 email about the menu dates to Somma's October 19 transfer of $20,000 to RMSCO. No evidence suggested that Turley was proposing an exchange or that Goldstein understood the email to propose an exchange. No evidence connected the October 12 email to Twomey or Iler, meaning there was no evidence of any agreement with Twomey or Iler. And no evidence demonstrates that Goldstein's "if doable" email was an official act. The government did nothing to show that, in the email, Goldstein "exert[ed] pressure on [O'Brien] to perform an 'official act'" or provided "advice" to O'Brien "knowing or intending that such advice [would] form the basis for an 'official act'" by O'Brien. *McDonnell*, 579 U.S. at 552. And the government did not prove that Goldstein did so on any other occasion either. The government cannot save its conspiracy counts with its unpleaded and unproven allegation regarding the menu frequency of the chicken drumsticks.

### d.   The decision not to impose liquidated damages

The Superseding Indictment alleges that the Somma defendants "used the prospect of the RMSCO business venture" in the form of a PowerPoint presentation "to influence Goldstein to assist [Somma] in resolving its dispute with SchoolFood staff" related to the potential imposition of liquidated damages for Somma's incomplete deliveries of chicken drumsticks. SI, ECF 45, ¶ 18. For several reasons, the evidence is insufficient to support a finding beyond a reasonable doubt of an agreement to engage in this alleged *quid pro quo*.

*First*, the government's case included no evidence that Goldstein made the decision not to impose liquidated damages.

*Second*, the government presented no evidence that either Goldstein or the Somma defendants linked the decision not to impose liquidated damages to the PowerPoint presentation or RMSCO. Instead, the government urged the jury to infer an agreed-upon exchange from Turley's text message asking to forward the PowerPoint to Goldstein and Iler's forwarding of the PowerPoint to Goldstein. Tr. 2237:11-14, 2240:5-20. The record is insufficient to support that inference beyond a reasonable doubt.

In his January 22, 2016 email to Goldstein, Turley advocated against the imposition of liquidated damages on the merits. GX434. He argued to Goldstein that SchoolFood lacked authority to impose liquidated damages directly against Somma because it had no contract with Somma. *Id*. He was right about that. Tr. 718:3-12 (Ascher). He also argued that assessing liquidated damages against the distributors would be "unprecedented and baseless" because the distributors had filled the shorted chicken drumstick orders with substitute chicken products approved by SchoolFood. GX434. He was right about that as well. There is no evidence that SchoolFood had ever imposed liquidated damages when there were approved substitutions. Both Somma and the distributors understood that the distributor contract did not permit liquidated damages when there were approved substitutions. GX431 (1/20/16 Turley email to Driscoll employee: "Will you send me a copy of the relevant contract page or addendum that states distributors are not subject to a fine if they substitute."). On January 20, 2016, Hamm emailed SchoolFood employees:

> We have been informed via the distributor contracts that they cannot be fined for shortages if they substituted a product. We have been in constant communication with the distributors and they have stated all shorted orders were filled with a substituted product.

DX375. Ascher testified that the distributors made the same argument:

> Q.     . . . So that's the same thing that Driscoll was basically arguing to you, correct?

25

A.     Yes.

Tr. 723:3-5 (Ascher).   And Hamm testified to his understanding that there could be no liquidated

damages when there were approved substitutions.

Q.     Okay.  Did you understand that if substitutions were made that there could
be no fine; is that your understanding?

A.     That was my understanding, yes.

Tr. 930:1-4 (Hamm).  Debra Ascher, the SchoolFood employee advocating for liquidated damages,

testified that she was "not privy" to the distributor contract and it was "not in [her] wheelhouse."

Tr. 685:19 (Ascher).[13]

In his January 22 email to Goldstein, Turley "respectfully request[ed] that [Goldstein]

review the facts of this transaction and determine what the proper, contractual recourse should be"

—the very opposite of a bribe.  GX434.  The email is the kind of email that any aggrieved vendor

would send.  No juror reasonably could infer an agreement to pay a bribe from this email.

After sending the email to Goldstein, Turley texted Twomey and Iler:  "Send that ppt to

Eric ASAP since I just put a turd in his in box."  GX2051.  The "since" clause in Turley's text

message reveals that the text was simply a real-time reaction to his unpleasant email to Goldstein

(the "turd").   Iler then sent to Goldstein a PowerPoint presentation documenting the sales

agreement concept, GX437, that they had been discussing since mid-December 2015, GX414.

---

[13]     The distributor contract, introduced in the defense case, confirmed that there could be no
liquidated damages when there were approved substitutions.    Section 2.18.8, entitled
"Substitutions," provided in relevant part:   "DOE central administration *will review all
substitution requests and work with the distributor to approve a viable option* at the same or
lower cost.  *The DOE reserves the right not to approve a substitution and apply applicable
liquidated damages*."  DX553 (emphases added).  When O'Brien asked Ascher to confirm that
liquidated damages were permissible by quoting the relevant contract provision, her response did
not include this provision on "Substitutions."  DX375.

Turley had sent an earlier version of the same PowerPoint presentation to Goldstein on December 18, 2015, **before** any issue with drumstick shortages or liquidated damages.  GX413.[14]

One cannot infer beyond a reasonable doubt from these circumstances an **agreement** between Turley and Goldstein to provide Goldstein something of value **in exchange for** favorable action on liquidated damages.  Turley had already sent a version of the PowerPoint to Goldstein a month earlier on December 18.  The financial terms referenced on the "How the Financials Work" slide in the earlier version were the same as the financial terms in the version sent on January 22. *Compare* GX413, *with* GX437.  Although the January 22 version of the slide lists the ownership of RMSCO, it did not change the financial terms or offer or promise Goldstein any new financial benefit.  The timing, therefore, contradicts the government's proposed inference.  Furthermore, the government presented no evidence that the sales agreement was ever finalized or that Goldstein ever realized a financial benefit, despite the fact that liquidated damages were not assessed.[15]

An agreement by **Iler** to an illicit exchange cannot be inferred here for the additional reasons that Iler's text response embraced Turley's appeal to Goldstein on the merits—"One hell of an email," GX2051—and Iler's email transmitting the PowerPoint to Goldstein made clear that the sales agreement idea would have to be vetted by lawyers:  "We think there will be some things to work out when we get to the attorney stage, but wanted to collaborate first on the business

---

[14]     The government admitted GX413 during the testimony of Agent Cunder, *see* GX1008 (stipulation), but did not publish it to the jury.  GX413 is a December 18, 2015 email and PDF version of the PowerPoint presentation attached to the email.  The December 18 email actually attached a native PowerPoint version of that presentation—not the PDF version that the government used for GX413.  The PDF version of the PowerPoint attachment in GX413 does not contain the speaker notes embedded in the native PowerPoint presentation.  During the defense case, defendants introduced the same December 18, 2015 email and PowerPoint attachment, but with the embedded speaker notes in the attachment.  DX360.

[15]     The defense case proved that the sales agreement was never finalized.  Tr. 1507:23-1508:17 (Twomey); Tr. 1758:20-1759:18 (Travis); Tr. 1949:11-19 (Goldstein).

points." GX437. In other words, it was not an agreement to do anything, but simply an updated document referencing financial terms they had already discussed. *See United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (to sustain conspiracy conviction based on circumstantial evidence, government must offer "facts sufficient to draw a logical and convincing connection between circumstantial evidence of an agreement, and the inference that an agreement was in fact made" (internal quotation marks and citation omitted)).

As for **Twomey**, the government presented no evidence that Twomey **agreed** to bribe Goldstein with the PowerPoint. Twomey did not respond to Turley's text message at all, and did not send the PowerPoint to Goldstein. This failure of proof is likely why the government in rebuttal simply made up the content of Twomey's conversation with Goldstein about the fine: "And you know what happened during that conversation. Use your common sense. It was, Eric, I want to talk about the fine, but before I do, did you get the PowerPoint that Blaine sent?" Tr. 2487:25-2488:3; *see also* Tr. 2245:23-2246:7 (government closing). That speculation is not evidence of a *quid pro quo*. *See Rodriguez*, 392 F.3d at 547-48; *Ceballos*, 340 F.3d at 127.

Furthermore, on **Goldstein's** side, no evidence shows that Goldstein agreed to accept anything of value in exchange for a decision not to impose liquidated damages or conveyed that he would do so. The PowerPoint presentation was simply sent to his rangemeats.com email address. The government introduced no evidence that Goldstein read the email before any decision not to impose liquidated damages. A government official cannot conspire to engage in bribery by doing nothing more than passively receiving an email sent to his inbox. And given the legitimate

reasons for not imposing liquidated damages discussed above, no jury permissibly could infer that

Goldstein accepted a bribe from the mere fact that liquidated damages were not assessed.[16]

### e.    The fast-tracking and approval of the chicken tenders in 2016

The Superseding Indictment suggests that the Somma defendants agreed to transfer

$10,000 to RMSCO in May 2016 in exchange for Goldstein's fast-tracking Somma's chicken

tenders and/or approval of the chicken tenders.  SI, ECF 45, ¶ 19.  The government abandoned this

suggestion at trial.  It did not mention this allegedly agreed-upon *quid pro quo* in closing, and

omitted it from its closing demonstrative of alleged official actions.  *See* ECF 163 at 191.  That is

because SchoolFood, ***not Goldstein***, fast-tracked and approved Somma's chicken tenders, and

DCP, ***not Goldstein***, approved the pricing of Somma's chicken tenders.  DX397; DX477; DX481.

There is no evidence linking Goldstein to any of these official actions.  In addition, there is no

evidence linking the $10,000 transfer to Somma's chicken tenders.  The inclusion of this baseless

suggestion in the Superseding Indictment confirms that the government brought this prosecution

in error, without understanding the relevant facts.

### f.    The alleged "let's do the beef" conspiracy

Using various formulations, the government argued in both opening and closing that the

conspiracy consisted of one overarching agreement that Goldstein would help Somma/cause

SchoolFood to buy Somma products in exchange for Somma's helping Goldstein with/investing

in RMSCO.  *See, e.g.*, Tr. 37:12-15 (claiming in opening that Somma defendants agreed to "help

Goldstein with Range Meats" in exchange for Goldstein making sure that "DOE bought

Somma['s] products like chicken"); Tr. 2209:5 (closing) ("Chicken for beef.  You help me and I'll

---

[16]    Evidence in the defense case established that Goldstein, Barrett, and Taddei collectively decided not to assess liquidated damages.  Tr. 1936:15-22 (Goldstein) ("Q. And did you, Mr. Barrett and Mr. Taddei come to that decision together?  A. We did, yes.").

help you.").  The evidence is insufficient to prove such an agreement (however formulated) beyond a reasonable doubt.  Additionally, the Superseding Indictment did not allege such an overarching agreement to help Somma and any such agreement fails *McDonnell* and *Silver*.

### 1)  The evidence is insufficient.

The government did not prove an overarching "let's do the beef" conspiracy.  The government characterized Iler's July 23, 2015 email, in which he summarized various meetings with different individuals, including a car ride with Goldstein on July 22, as direct evidence of the allegedly corrupt agreement.  Tr. 2209:2-6.  In the email, Iler attributed the following statement to Goldstein:  "I'm going to buy a lot of fucking chicken from you guys, let's do the beef."  GX266.  According to the government, this meant:  "I make sure that the DOE buys your products and in exchange, you invest in my beef business."  Tr. 2208:16-17.[17]  *See also* Tr. 2206:11-15, 2206:24-2207:1, 2272:9-13, 2274:10-11, 2290:1-5.  Elsewhere, the government (implausibly) characterized the word "chicken" as a "stand-in" for "Somma's product, making sure that Somma got paid" and "ensuring that disputes were resolved in favor of Somma."  Tr. 1914:1-7.

The email does not evidence a corrupt agreement by Iler, who expressed confusion in the email about what Goldstein meant, writing in the very next bullet point, "Seemed like he wanted to pitch the chicken to NYC, but it was hard to tell for sure."  GX266.  And the government's attempt to spin Turley's and Twomey's responses to Iler's two-and-a-half-page email into conspiratorial agreements is baseless.  Iler's email began by stating:  "Put together my notes from the trip.  Looks like things will be hectic when I get home."  GX266.  Iler proceeded to recap his meetings and to summarize upcoming tasks and timelines.  Turley responded:  "Nice recap.

---

[17]    It was not Goldstein's beef business.  The Somma defendants owned 60% of RMSCO through Somma, with Goldstein and Mesiels each owning 20%.  GX37.

Thanks.  Twomey and I have it covered."  Twomey responded:  "Yep, we gotcha."  GX266.
Neither of those responses referenced the "let's do the beef" line, and neither supports a conclusion
beyond a reasonable doubt that Turley or Twomey agreed to a supposedly corrupt exchange buried
in one line of an approximately 100-line email.

The government's own evidence fatally undermines its interpretation on the *quid* side that
"let's do the beef" meant "invest in my beef business."  Additional context shows that "let's do
the beef" was a reference to a Chilean beef trade.  The government introduced a text message from
Turley on July 22 just hours after Iler's car ride with Goldstein.  GX2017.  Turley wrote:  "Gotta
do Chile, huh?  Good thing I sent that email."  Iler responded:  "I didn't realize the importance til
I got in the car with Eric."  GX2017.  The government presented no evidence that the Somma
defendants ever agreed to do a Chilean beef trade.

The defense case further destroyed the government's interpretation.  At 9:01 am on July
22, 2015, before the discussion with Iler in the car, Goldstein had proposed a specific Chilean beef
trade in an email to the Somma defendants and Meisels.  DX216.  Turley rejected that proposal in
an email later the same day, after his text exchange with Iler.  DX216.  There was no agreement
to "do the beef."

On the *quo* side, the broader context likewise defeats the government's proposed
interpretation.  Iler certainly did not understand Goldstein to be saying that he would buy Somma's
products.  *See* GX266 ("Seemed like he wanted to pitch the chicken to NYC, but it was hard to tell
for sure").  Indeed, Iler's email laid out the process Somma's products had to go through to get on
the menu, and shows that he understood (and conveyed to Twomey and Turley) that Goldstein had
no role in that process.  *See* GX 266 ("Process is: 1. test approval, 2. Meserete creates spec sheet
for distributors, 3. distributors call us to get our pricing, 4. Meserete gets pricing back and creates

project packet, 4. Chef Stephen approves/rejects project, 5. If approved, goes to Billy to menu and Deb to liaise with distributors on ramp-up, order quantities, etc.").  Iler's email repeatedly referred to SchoolFood's urgent need for chicken products.  He described Davis as saying "We need chicken, like, yesterday" and "Out of supply in September .... Need. Chicken. Yesterday." *Id.* He also relayed Davis' observation that the drumstick was the "primary opportunity due to lack of options (only one other suppliers [sic])." *Id.* In context, Goldstein's reported statement reasonably reflects nothing more than the prospect that SchoolFood would purchase chicken from Somma because it desperately needed chicken products.  The speculative inference that this email established a corrupt agreement cannot be squared with all the evidence. *See Irving*, 682 F. Supp. 2d at 270 (granting acquittal after noting that, when the circumstantial evidence was "viewed from a broader perspective," the government's case was "arguably less than the sum of its parts" because its overall theory "made no sense").

Nor does the remaining circumstantial evidence support the inference beyond a reasonable doubt that the Somma defendants agreed *at any other time* to invest in RMSCO in exchange for a promise from Goldstein to put Somma's products on the menu.  The Superseding Indictment alleges that the conspiracy began in or about March 2015, which notably is months before the July 23 email.  SI, ECF 45, ¶¶ 28, 32, 39.

On the *quid* side, the Somma defendants did not agree to invest in RMSCO in exchange for official action in March 2015 or thereafter.  To the contrary, the government's evidence showed that defendants intended that each RMSCO founder would pay his own business expenses and that RMSCO would borrow money from outside sources to pay for imports until the company was able to generate its own income and cover expenses.  *See* GX227; GX2017.  Indeed, a text message sent the same day as Goldstein's "let's do the beef" comment reflected that they intended to fund

32

RMSCO imports with outside financing (not investment by Somma): "Hershel [Meisels] can get us a 30 day no interest loan through the community. But he has to guarantee it personally"; and Goldstein's brother "does receivables finance. Can hook us up with various options." GX2017. Evidence introduced in the defense case also shows a plan to capitalize RMSCO through initial trading activity, not through investment by the Somma defendants. DX216; DX252; DX285; DX741. There is no evidence that RMSCO was ever capitalized through investment by Somma. When Somma, the 60% owner of RMSCO, loaned money to RMSCO to cover some of its expenses, the Somma defendants expected that Somma would be repaid. GX290 (referencing $20,000 loan "to cover first legal bill and some T&E expenses"); GX906 (referencing $10,000 "short term loan"); GX466 (4/11/16 Iler email: "I think we need to bring some structure to the RANGE books so we can make sure we are reimbursed for 100% of what we front."). Confirming the understanding that these were loans, in connection with the business separation Goldstein asked Somma to forgive the loans to RMSCO. GX521. The fact that the Somma defendants decided to separate from RMSCO, and rejected Goldstein's initial suggestion that Somma simply reduce its membership interest, *id.*, further shows there was no agreement to invest in RMSCO in exchange for official action by Goldstein.

On the *quo* side, the government presented no evidence of an agreement to give Goldstein anything in exchange for putting Somma's products on the menu. The evidence showed that Somma went through the same steps as any other vendor to obtain approved-brand status for its yogurt parfait, chicken drumsticks, and chicken tenders. *See supra* p.3. SchoolFood officials approved Somma's products, and DCP, which did not report to Goldstein, approved the pricing. *See supra* pp.2-3. There is no evidence that Goldstein pressured subordinates to approve Somma products, or that the Somma defendants even asked him to do so. In other cases, SchoolFood

rejected Somma's products.  *See supra* p.3.  There is no evidence the Somma defendants asked Goldstein to intervene and overrule SchoolFood, and no evidence that he did intervene.

**2)      The Superseding Indictment does not allege any such conspiracy.**

The alleged "let's do the beef" conspiracy independently cannot support the convictions because the Superseding Indictment does not allege any such conspiracy.  When, as here, the government fails to prove the offense conduct it actually charged, it cannot defend a conviction under Rule 29 on the basis of a set of facts distinct from those alleged in the indictment.  *See United States v. Chambers*, 408 F.3d 237, 245-47 & 246 n.6 (5th Cir. 2005) (reversing conviction on basis of constructive amendment and granting judgment of acquittal).

The government's overarching "help Somma" theory is a quintessential pre-*McDonnell* as-opportunities-arise and/or stream-of-benefits theory of bribery.  It depends on the invalid theory that Goldstein agreed to take actions to benefit Somma ***in the future as questions or matters arose***.  In both opening and closing, the government repeatedly characterized the alleged promised *quo* from Goldstein in forward-looking, as-opportunities-arise terms.  *See, e.g.*, Tr. 37:12-15 (opening: "Goldstein would make sure that DOE bought SOMMA products like chicken and in exchange the SOMMA defendants would help Goldstein with Range Meats.  That was the corrupt agreement and that's what they did."); Tr. 2209:5 (closing:  "Chicken for beef.  You help me and I'll help you."); Tr. 2206:13-15 (closing:  "Goldstein's promise to take, to ensure that the DOE would serve SOMMA's products and resolve disputes in SOMMA's favor").  So too, in opening and closing the government characterized the Somma defendants' promised *quid* in forward-looking, stream-of-benefits language.  *See, e.g.*, Tr. 37:24-38:1 (opening:  "The promise of future benefits was not all that Goldstein got from the corrupt bargain with the SOMMA defendants."); Tr. 2485:12-14 (closing:  "The bribe is RMSCO . . . . It's the promise of future income.").

34

As defendants repeatedly argued, these arguments are improper.  *See, e.g.*, ECF 101 at 4-15; ECF 143 at 1-5; ECF 150 at 1; ECF 156; 5/22/23 Tr. 35-38; Tr. 1910-14; Tr. 2153.  The Court recognized before trial that the Superseding Indictment does not charge an as-opportunities-arise or stream-of-benefits theory of bribery.  5/22/23 Tr. at 34.  The Superseding Indictment does not allege an overarching *quid pro quo* by which Goldstein agreed he would take actions in the future in exchange for Somma helping him with RMSCO and providing associated benefits in the future. Instead, the Superseding Indictment alleges only that the Somma defendants "provided" benefits to Goldstein and that, "[i]n exchange," Goldstein "used his significant influence as head of SchoolFood to aid" the Somma defendants.  SI, ECF 45, ¶ 12.  In other words, the Superseding Indictment alleged discrete *quid pro quos*—benefits in exchange for actions.  The Superseding Indictment then provided examples of discrete alleged *quid pro quos*.  *Id.* ¶¶ 13-26; *see generally* ECF 101 at 10-12.  Although the government recited the "let's do the beef" line in paragraph 13 of the Superseding Indictment, it did not characterize this line as an overarching *quid pro quo* that covered the remaining allegations.  It merely called this line an "example."  SI, ECF 45, ¶ 13.

Permitting the conviction to stand on a theory that the government proved a conspiracy to engage in one overarching *quid pro quo* would constructively amend the Superseding Indictment in violation of the Grand-Jury Clause of the Fifth Amendment.  An indictment must give a defendant "notice of the core criminality to be proven at trial."  *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) (citation omitted).  A constructive amendment occurs when the government is permitted to "modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury."  *Id.* (citation omitted); *see, e.g.*, *Stirone v. United States*, 361 U.S. 212, 217-19 (1960); *United States v. Hassan*, 578 F.3d 108, 133-34 (2d Cir. 2008); *United*

*States v. Milstein*, 401 F.3d 53, 64-66 (2d Cir. 2005); *United States v. Roshko*, 969 F.2d 1, 5-6 (2d Cir. 1992).

Here, the core of criminality is the alleged *quid pro quo* and/or agreement to engage in a *quid pro quo*. The Superseding Indictment charged defendants with specific *quid pro quos*. That is the core of criminality that defendants prepared to defend. This is why, for example, the first opening statement for defendants (by Twomey's counsel) focused on "three financial transactions." Tr. 41:21-42:3. By the time of trial, the government undoubtedly appreciated the weaknesses in its indictment allegations. So it shifted to a completely different theory of bribery and conspiracy—a different core of criminality.

At a minimum, the government's change in theory prejudicially varied the indictment. A variance occurs "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012); *see, e.g.*, *United States v. Johansen*, 56 F.3d 347, 352 (2d Cir. 1995) (finding prejudicial variance). Unlike a case where the government proves the same scheme alleged in the indictment but proves a wire different from the one alleged, *see United States v. Dupre*, 462 F.3d 131, 140-43 (2d Cir. 2006), the variance here goes to the very essence of the charged counts—the agreement to engage in a *quid pro quo*.

The case history demonstrates the prejudicial nature of the variance. The government could have elected to take its chances with defendants' motions to dismiss the original indictment and for a bill of particulars, which sought the details of each *quid*, *quo*, and date of each alleged agreement. Instead, it chose to supersede with a speaking indictment, and then successfully argued that defendants' motions were moot because the Superseding Indictment identified all the alleged *quid pro quos*. *See* ECF 101 at 4-7 (recounting this history). Defendants then opened on the

discrete *quid pro quos* alleged in the Superseding Indictment.   Sustaining the conspiracy convictions on this new theory would prejudicially vary the Superseding Indictment.

### 3)        This theory violates *McDonnell* and *Silver*.

Finally, and relatedly, an agreement to help Goldstein in exchange for his help with Somma's products at DOE is not an agreement to commit bribery under *McDonnell* or *Silver*.   If the government had actually alleged such a conspiracy in the Superseding Indictment, defendants would have moved to dismiss the Superseding Indictment on this basis.

An agreement to help a company in the future in unspecified dealings with a government agency is not an agreement to commit bribery under *McDonnell* and *Silver*. *See, e.g.*, ECF 101 at 7-15; ECF 143 at 3-4.   The government took the position at trial that "[a]ll of the official actions taken by Goldstein . . . were related to the same specific question or matter, that is, SOMMA's business with the DOE, as contemplated by the Indictment."   ECF 151 at 2.   The Supreme Court rejected this very argument in *McDonnell*.   Like the government here, the government argued in *McDonnell* that "the promotion of a particular business like Star [Scientific]" qualified as a "question or matter."   U.S. Br., *McDonnell v. United States*, No. 15-474, at 48-49 (S. Ct. filed Mar. 30, 2016).   A company's "business," however, is not a discrete, specific question or matter requiring a formal exercise of governmental power that can be tracked on an agenda and checked off as complete.   Rather, the questions or matters the Supreme Court recognized in *McDonnell* were narrow questions requiring concrete decisions:   for example, whether to initiate a study at a Virginia state university of a Star Scientific product or whether to include the product on the health plan for Virginia state employees.   579 U.S. at 570-71.

Under *McDonnell*, whether to lift the chicken tender hold, to give one example, is a sufficiently concrete question or matter.   "SOMMA's business" is not.   ECF 151 at 2.   The government cannot prove a conspiracy to commit the charged offenses by proving that Goldstein

promised to take unidentified future actions "beneficial to the payor"—*i.e.*, Somma.  *Silver*, 948 F.3d at 552-53.  Because the government did not prove any conspiracy to engage in a *quid pro quo* on concrete, specific questions or matters that comply with the governing case law, the Court should grant judgment of acquittal.

> **g.    Supposed concealment and motive evidence does not prove an agreement**

The government's supposed concealment and motive evidence cannot fill the gap for missing proof of an agreed-upon exchange (or, as to the substantive counts, an actual exchange).

As to concealment, the government urged the jury to infer a *quid pro quo* agreement from the supposed fact that "defendants worked together to conceal Goldstein's involvement in Range Meats from the DOE" and "they especially tried to hide the fact that they had made payments from SOMMA to Range Meats."  Tr. 2207:2-7.  But the government's evidence, which mostly concerned alleged concealment from the DOE, was at best probative of an intent to conceal a conflict of interest.[18]  As a general matter, evidence of concealment or consciousness of guilt is "insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt."  *Lorenzo*, 534 F.3d at 161 (internal quotation marks omitted); *see Cassese*, 428 F.3d at 100 (rejecting government's reliance on cherry-picked evidence of concealment that was undercut by other evidence of disclosure and which was "entirely consistent with innocence"); *Finnerty*, 533 F.3d at 151.

In *Finnerty*, the government relied on similar evidence of concealment.  The government argued that a New York Stock Exchange employee's effort to conceal a trade was evidence of an

---

[18]    The government itself argued that the defendants "worked together to hide their connection to one another" in part "because it was a conflict of interest."  Tr. 2222:16-18.

intent to violate the securities laws. *See id.* The Second Circuit, however, noted that the evidence was at best equivocal—showing "that Finnerty knew he had violated an NYSE rule, and tried to cover it up" because it "put him at risk professionally." *Id.* As the Second Circuit reasoned in affirming this Court's judgment of acquittal, a "violation of an NYSE rule does not establish securities fraud in the civil context, let alone in a criminal prosecution," and "an awareness of peril, a guilty conscience or an impulse to cover one's tracks does not bespeak criminally fraudulent conduct within the context of the securities laws." *Id.* (citation omitted). Here, as in *Finnerty*, the government's evidence of purported concealment, even viewed in the light most favorable to the government, merely reflects a desire to avoid professional risk and not an alleged intent to engage in a *quid pro quo* bribery. The same result should follow.

The government's evidence primarily focused on Goldstein's sensitivity about confidentiality at SchoolFood. *See, e.g.*, GX279, GX2000, GX303. For the reasons just discussed, that evidence is not probative of an agreement to engage in bribery—as opposed to an intent to conceal the fact that Goldstein was looking to leave DOE or even to conceal a conflict of interest.

What is more, defendants freely disclosed Goldstein's involvement in RMSCO to myriad individuals and entities. Somma provided Goldstein with business cards. GX235. Somma set up an email account in Goldstein's name, which he used to email third parties, including the U.S. Department of Agriculture and other companies. *See, e.g.*, GX229; *see also* DX695 (introduced in the defense case). Goldstein participated in meetings with third parties for the purpose of developing business for RMSCO. *See, e.g.*, DX178 (introduced in the defense case). He retained lawyers from a large, established law firm, disclosed his and Somma's ownership interest in RMSCO to them, and relied on that law firm to draft agreements with Somma and third parties. *See generally* GX371; GX263; DX218 (introduced in the defense case); *see also* Tr. 1750:1-

39

1761:5 (Travis testimony in defense case concerning invoices and work performed by Shutts & Bowen for RMSCO). Goldstein signed RMSCO company documents in his own name. *See, e.g.*, GX37 at 26, GX42 at 5, GX606 at 2, 4. Iler, Turley, and Twomey ultimately partnered in RMSCO through Somma, eliminating the reasonableness of any inference that they were concerned about creating a connection between Goldstein and Somma. *Compare* GX303, *with* GX37 (RMSCO company agreement as of November 15, 2015 signed by Somma). And Goldstein disclosed his interest in RMSCO for the 2016 fiscal year to the New York City Conflict of Interests Board. GX26 (introduced in the defense case).

Moreover, a *quid pro quo* agreement cannot be reasonably inferred from the nature of Somma's transfers to RMSCO. Somma made the transfers to RMSCO transparently through its bank account, in a way that could be readily followed and traced. *See, e.g.*, GX906, GX907, DX738 (introduced in the defense case). Upon request, Somma investors were entitled to inspect the company's books and records. GX4 ¶ 10.1 ("All books and records of the Company shall be open to inspection by the Members during normal business hours."). And Somma affirmatively disclosed RMSCO's existence and Goldstein's involvement to Somma employees, including Hamm and Kevin Potter. Tr. 864:24-865:8 (Hamm) ("[W]e, as in the people in the company, were told that there's a, this other company is being formed called Range, and Blaine, Michael, Brian, Eric and Hershel were part of this."); GX450 ("Met sales person Kevin Potter."); GX519 (email to Potter and Hamm of agenda including discussing potential RMSCO separation).[19] None of this

---

[19]     Although Hamm did not accurately remember it, there is a photograph of him with Goldstein, Meisels, Iler, and Twomey in a meeting just days after Hamm started at Somma. DX733 (introduced in the defense case). Turley also attended the meeting. Tr. 1458:2-6 (Twomey).

supports an inference that the Somma defendants concealed Goldstein's ownership interest in RMSCO, much less an inference that they entered a *quid pro quo* agreement with Goldstein.

It is also undisputed that Goldstein affirmatively disclosed RMSCO and its membership, Somma's former stake in the company, the loans from Somma to RMSCO, the disbursements from RMSCO to cover legal fees and expenses, and the Separation Agreement to his accountant Joseph Romano in early 2017.  GX616; GX617; GX618; GX627; DX707.  Romano filed a tax return for RMSCO based on the information provided by Goldstein.  GX11; Tr. 479:1-481:12 (Romano). These actions further undermine any possible inference that Goldstein was concealing his ownership interest in RMSCO, Somma's interest in RMSCO, or the monetary transfers from Somma to RMSCO or, yet one step further, that there must have been a *quid pro quo* agreement that Goldstein was trying to conceal.

Finally, the government claimed Somma investor Jeff Richards, whose involvement in Somma's day-to-day activities was minimal, was not told about RMSCO and that the jury should therefore infer that the Somma defendants were concealing a *quid pro quo* agreement.   But Richards emphasized that he did not recall whether he was told about RMSCO and that "this is something that happened eight years ago."  Tr. 173:16-174:2 (Richards).  He also acknowledged that he did not recall his telephone call with Iler when Iler was in Poland with Goldstein. Tr. 179:21-180:4 (Richards).  Richards' testimony does not support a reasonable inference that there was an undisclosed *quid pro quo* agreement.

As for motive, the government's supposed motive evidence likewise cannot compensate for the lack of evidence of a *quid pro quo* agreement.  According to the government, "[t]he defendants all had motives to enter into this corrupt agreement, Goldstein needed money and a

41

viable business" and "[t]he SOMMA defendants needed Goldstein's help with the DOE to make sure that SOMMA, a startup with no track record, would succeed." Tr. 2225:5-12.

Motive, of course, is not an element of the charged crimes. *See generally* Jury Instructions, ECF 157. The government's motive arguments amount to no more than an observation that defendants had a motive to make money. Such motive "evidence" is not probative of whether there was bribery "because almost everyone . . . has a motive to get more money. And most people, rich or poor, do not [commit crimes] to get it." *United States v. Mitchell*, 172 F.3d 1104, 1109 (9th Cir. 1999). For this reason, ambiguous evidence that a defendant stood to gain financially cannot supply evidence of criminal intent that is otherwise lacking. *See Cassese*, 428 F.3d at 102 (rejecting government's reliance on ambiguous "motive" evidence and affirming judgment of acquittal). Relatedly, a motive for financial gain cannot supply proof of a different element. *See United States v. Finnerty*, 474 F. Supp. 2d 530, 544 (S.D.N.Y. 2007) (Chin, J.) (reasoning that evidence of motive could not supply evidence of separate element that defendant deceived customers), *aff'd*, 533 F.3d 143 (2d Cir. 2008). The same is true here; whether the defendants had a motive to make money says nothing or next to nothing about whether there was an agreed-upon exchange.

To the extent the government suggested that Somma was an untested start-up, the evidence does not support that suggestion. The Somma defendants had substantial experience in the food industry and a track record working for one of the largest food manufacturers in the world. *See* Tr. 152:2-5, 153:8-16, 154:4-15 (Richards); 851:12-23 (Hamm). Somma worked with manufacturers who produced food that DOE officials and students liked. *See, e.g.*, Tr. 356:23-24 (Davis testimony that she liked the yogurt parfait); Tr. 925:20-926:2 (Hamm testimony that the chicken tender was a great product, "tasted awesome," and "[k]ids loved it"); Tr. 1049:12-13

(O'Brien testimony agreeing that "students overwhelmingly gave the parfait the thumbs up"). Poultry manufacturers were subject to a highly regulated safety regime and were inspected by federal safety inspectors.  Tr. 791:13-793:4, 793:9-12 795:10-796:24 (Ascher).  Somma's motive to succeed at SchoolFood is far too generic to constitute proof of bribery; if it were otherwise, every new or small company could be said to be motivated to pay bribes.

### 2.    The statute of limitations bars conviction on Counts 1, 3, and 6.

Alternatively, the applicable 5-year statute of limitations bars conviction on Counts 1, 3, and 6.  18 U.S.C. § 3282.  When a defendant raises a statute-of-limitations defense, the government "must prove the time of the conspiracy offense."  *Smith v. United States*, 568 U.S. 106, 113 (2013) (citing *Grunewald v. United States*, 353 U.S. 391, 396 (1957)).  For the conspiracy offenses that do not require an overt act (Counts 1 and 6), the government must prove that "the conspiracy continued past the statute-of-limitations period."  *Id.*  As the Court instructed the jury, a conspiracy continues "until the purpose or objective of the conspiracy is either accomplished or abandoned." Jury Instructions, ECF 157, at 64.  As to the federal-program bribery conspiracy count (Count 3), which requires an overt act, the relevant inquiry is whether the government proved "an overt action in furtherance of the conspiracy charged . . . was committed after October 25, 2016."  *Id.* at 65. With respect to all counts, "[t]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."  *United States v. Grimm*, 738 F.3d 498, 502 (2d Cir. 2013) (assessing alleged purposes of the charged conspiracy in concluding that the statute of limitations had expired); *see also Roshko*, 969 F.2d at 7; *Silver*, 948 F.3d at 572-25 (same with respect to scheme to defraud).

The government did not prove beyond a reasonable doubt any overt acts after October 25, 2016, or that any conspiracy continued past that date.[20]

*First*, to the extent the relevant conspiracy was to give Goldstein something of value in exchange for (a) moving the yogurt parfait menu debut to December 2015, (b) moving the drumstick menu date to December 2015 and placing drumsticks on the menu twice per month, (c) not imposing liquidated damages in January 2016, or (d) fast-tracking and/or approving the chicken tenders in June 2016, those (alleged) conspiracies accomplished their purposes long before October 25, 2016 and thus did not continue to exist as of that date. *See United States v. Bornman*, 559 F.3d 150, 153 (3d Cir. 2009) (holding, with respect to conspiracy to commit federal-program bribery, that "[o]nce those payments had been solicited and accepted with the requisite intent to be influenced, the crime had been committed and the object of the conspiracy accomplished"); *see also Roshko*, 969 F.2d at 7 ("where the object of a conspiracy is to change the immigration status of an alien, the conspiracy terminates when the alien secures the sought-after status").  For the same reasons, no overt act occurred after that date advancing the already accomplished goals of any such conspiracies.  The mere fact that Somma was continuing to sell yogurt, drumsticks, and tenders to SchoolFood after October 25, 2016 does not extend already accomplished conspiracies, as such legitimate business activity would be, at best, "the *result* of a completed conspiracy." *Grimm*, 738 F.3d at 503 (citing *Fiswick v. United States*, 329 U.S. 211, 216 (1946)).

*Second*, to the extent the relevant conspiracy was the more amorphous "let's do the beef" conspiracy by which the Somma defendants allegedly would "invest in [Goldstein's] beef

---

[20]     Of course, if the Court finds the evidence sufficient to prove a conspiracy to engage in a *quid pro quo* related to the chicken tender hold, there would be no statute-of-limitations defense to such a conspiracy.  But for the reasons already stated, there was not sufficient evidence of such a conspiracy.

business" in exchange for "DOE buy[ing Somma's] products," Tr. 2208:16-17; *see supra* Part C.1.f, that (unalleged and invalid) conspiracy likewise had terminated before October 25, 2016. By that date, the Somma defendants had announced that they were no longer continuing to pursue the RMSCO business idea and obviously were not going to invest in RMSCO following the contemplated separation. The Somma defendants and Goldstein first discussed parting ways in August 2016. By October 24, 2016 (more than five years before the Superseding Indictment was returned), the Somma defendants and Goldstein had already agreed to the core separation terms and exchanged drafts of the Separation Agreement containing those terms. *See supra* pp.11-14 (citing GX535, GX537, and GX545). And, by then, those terms included a waiver of Somma's noncompete provision—meaning that Somma could compete with RMSCO with respect to beef. *See* GX545. The Somma defendants' act of announcing a termination of the RMSCO relationship by definition terminated the conspiracy. And no act occurring after October 25, 2016 furthered that conspiracy, because the acts that occurred after that date were aimed at ending the RMSCO relationship.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33.

### A.    Legal Standard

Rule 33(a) authorizes a court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Under this rule, a court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citation omitted). Unlike under Rule 29, the court conducts an "objective" review of the record and is not required to view the evidence in the light most favorable to the government. *Id.* at 134; *see also id.* at 139 n.1 (Walker, J., concurring) ("Consequently, a guilty verdict might survive a Rule 29(c) motion—because a rational jury, viewing the evidence

45

through the government's eyes, could convict—but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational."); *accord United States v. Landesman*, 17 F.4th 298, 331 (2d Cir. 2021) ("[T]he Rule 33 inquiry requires an objective evaluation of the evidence and an assessment of whether the evidence preponderates heavily against the verdict.").

In deciding whether to grant a new trial, a court may weigh the evidence and make credibility determinations. *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. *Id.* at 1414. The court, in its objective review of the "totality of the case," must be "prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" *Id.*

A case that relies on circumstantial evidence and "strained inferences" requires especially close scrutiny under Rule 33. *Landesman*, 17 F.4th at 331; *see also Ferguson*, 246 F.3d at 135-36 (affirming new trial where "circumstantial" evidence of defendant's membership in a criminal enterprise might have been "sufficient[]" under Rule 29 but where the district court reached a "contrary view . . . after weighing the evidence on a Rule 33 motion"). A conviction that rests on "weak inferences, many built upon one another, drawn from narrowly framed circumstantial evidence, without regard to a broader context that substantially undercuts any inculpatory inferences," epitomizes the kind of manifestly unjust conviction that warrants relief under Rule 33. *United States v. Rafiekian*, 68 F.4th 177, 190 (4th Cir. 2023) (affirming new trial).

### B.  A New Trial Is Required To Avoid Manifest Injustice.

The full evidentiary record weighs overwhelmingly against the verdict. The jury got the verdict wrong. At a minimum, the Court should grant defendants a new trial.

46

### 1.      *The evidence preponderates heavily against the verdict.*

For all the reasons discussed above, the evidence was insufficient to convict.  But even if the Court concludes that the government's evidence clears the Rule 29 bar, a new trial is warranted under Rule 33 because the evidence preponderates heavily against the verdict.  The government's urged "inculpatory inferences" rest on the happenstance of timing and isolated documents divorced from their context.  *Rafiekian*, 68 F.4th at 190.  At every turn, the "broader" evidentiary context "substantially undercuts" those "inculpatory inferences." *Id.*  To provide just a few examples:  The full record shows, among other things, that the yogurt parfait was expedited because of the Local Thursday initiative, not because of a bribe.  *See supra* pp.18-21.  That defendants had agreed to the core separation terms before the chicken tender hold.  *See supra* pp.11-14.  That SchoolFood asked Somma to supply its chicken drumsticks for the December 2015 menu date, not the other way around.  *See supra* pp.22-23.  That Goldstein played no role in the approval of Somma's chicken tenders in summer 2016.  *See supra* p.29.   That the decision not to impose liquidated damages was made on the merits and with the agreement of SchoolFood leadership.  *See supra* pp.24-29.  And that defendants were discussing a Chilean beef trade on July 22, 2015, when Goldstein reportedly made the "let's do the beef" comment to Iler, and that defendants rejected that proposed trade that same day.[21]  *See supra* p.31.  The overwhelming weight of the evidence defeats the government's proposed circumstantial inferences of bribery.

To be sure, a court deciding whether the evidence preponderates heavily against the verdict "must defer to the jury's resolution of conflicting evidence." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (internal quotation marks omitted).  But this is not a case involving

---

[21]     Additionally, SchoolFood employees O'Brien, Davis, and Ascher all testified in the government's case-in-chief, and none testified that Goldstein attempted to direct them to ensure that Somma was an approved brand.

conflicting versions of historical facts.  The government asked the jury to **infer** an amorphously defined corrupt bargain from undisputed timing and documents.  A holding that the record preponderates heavily against the government's preferred inferences would not intrude upon the jury's prerogative to make credibility determinations and/or resolve conflicts of fact.

### 2.    *Additional factors support a finding that the verdict was unreliable.*

For the reasons just set forth, the evidence preponderates heavily against the jury's verdict. That is reason alone to grant a new trial.  But under Rule 33 the Court may also take account of additional factors that may have "compromised the reliability of the verdict."  *Archer*, 977 F.3d at 188.

*Food safety evidence and argument*.   Start with the government's heavy focus on inflammatory evidence related to food safety.  Defendants moved to exclude inflammatory evidence regarding harm to children from foreign matter.  ECF 96-1 at 4-8.  The Court denied the motion.  5/22/23 Tr. 19:9-23.  The government seized on this ruling to devastating effect from the outset.  At the beginning of its opening statement (on the first transcript page of opening statement), the government claimed that "Goldstein used his public position to make sure that Twomey, Turley and Iler's food . . . stayed in the schools after plastic, bones and metal were found in the chicken served to schoolchildren and teachers."  Tr. 34:16-20.  The government returned to this theme repeatedly in opening and again in closing and rebuttal.

- "Their food contained foreign objects like plastic and metal," Tr. 38:16-17;

- "One person choked and had to be rescued," Tr. 39:5-6;

- "bones concealed inside the tenders," Tr. 2205:19;

- "Bones and chicken tenders, catastrophe, sleepless nights," Tr. 2258:2-3;

- "And then . . . disaster, DOE staff member Mark Senape bit into a chicken tender that he got from the school lunch line and he choked on a bone.  He needed the Heimlich

maneuver. . . . and then it happened again.  More complaints, blood in the chicken drumsticks, more bone in the chicken tenders," Tr. 2261:4-16;

- "a staff member has choked," Tr. 2262:6-7;

- "Plastic and bone have been found in food products, media attention, a staff member has choked," Tr.2262:25-2263:2;

- "the first time, the second time, the third time that they introduced plastic and metal and bones," Tr. 2493:25-2494:1;

- "Plastic, bones, someone nearly dies from choking, Heimlich maneuver."  Tr. 2496:13-14.

And the government elicited highly inflammatory testimony from Ascher that Somma's products could "kill" children and posed a "threat to life." Tr. 638:22-23, 806:13-15, 821:5-7, 823:10-14; *see also* ECF 135 (mistrial motion reciting prejudicial testimony from Ascher).  The government also speculated in rebuttal, falsely and without any evidentiary basis, that Tyson and Perdue didn't supply antibiotic free chicken tenders to SchoolFood because they tried and found bone and plastic and metal.  Tr. 2494:4-10.[22]

This depiction of the relevant events was unfair and highly prejudicial.  As the Court seemingly acknowledged during its comments related to the Rule 29 motion, the government's argument created "the impression that the other officials were being pressured by Mr. Goldstein to do things that were not in the interest of DOE and the children and the public." Tr. 1376:10-12. The government's opening statement deliberately suggested that Goldstein took actions that undermined the safety of schoolchildren because of bribes, even though in reality SchoolFood's senior leadership agreed with Goldstein's actions.

Ascher's testimony on direct examination also conveyed that misimpression.  Ascher testified that she was "very concerned" and "confus[ed]" about the decision to release the second

---

[22]     The Court sustained the defense's objection to this assertion.  Tr. 2494:11-13.

chicken tender hold on November 30 because she had told O'Brien on the date of "that Heimlich maneuver incident" that "we should not be serving it." Tr. 638:6-639:10. But the evidence showed that Ascher and O'Brien agreed to lift the *first* chicken tender hold *after* the Heimlich incident, with no involvement from Goldstein, DX504; GX31—a fact the government did not elicit on direct examination.

The evidence did not support the government's inflammatory narrative that Goldstein put children's safety at risk. To the contrary, the undisputed evidence showed that Goldstein accepted the recommendation of other DOE officials to release the second chicken tender hold and substitute the drumsticks. *See* GX602; Tr. 1020:2-1021:3 (O'Brien). This evidence is why the government waffled between arguing that Goldstein improperly lifted the hold, on the one hand, and that he waited too long to lift the hold, on the other hand. *Compare* Tr. 34:16-20 (opening), *with* Tr. 2268:16-18 (closing). While the Court gave a limiting instruction regarding the purpose for this evidence, the government used that limiting instruction as a license to repeatedly hammer home the inflammatory food safety evidence, creating a misleading and prejudicial narrative.

*Conflicts of interest evidence and argument*. So too, the government's heavy focus on conflicts of interest obscured the real issues in the case. Government officials do not commit extortion, federal-program bribery, or honest-services fraud by taking official action while having a conflict of interest. Jury Instructions, ECF 157, at 58, 66; *Skilling v. United States*, 561 U.S. 358, 410 (2010). Defendants moved to exclude evidence of conflicts of interest. ECF 96-1 at 11-12; ECF 100 at 3-11; ECF 114 at 5; 5/22/23 Tr. 13-14. The Court denied those motions. 5/22/23 Tr. 16-17. The government likewise seized on these rulings.

In examination and closing argument, the government repeatedly depicted Goldstein's alleged conflict of interest, and his alleged failure to disclose the conflict of interest to DOE

officials, as proof of criminality.  As one example, Goldstein's alleged conflict of interest was the very first topic the government addressed in its rebuttal argument.  Tr. 2479:22-2480:6.  The government spent nearly 30% of its rebuttal argument (6 of 21 transcript pages) on conflicts of interest.  As another example, the government repeatedly questioned Goldstein on this topic even though the questions did not bear on whether Goldstein accepted bribes.  *See* Tr. 1995:17-1996:18, 2001:19-2002:9, 2003:15-21, 2029:17-2030:3, 2031:12-2032:4, 2090:14-2091:6.  Particularly in its arguments regarding supposed concealment, the government repeatedly blurred the line between concealing a conflict of interest and concealing bribes.  *See, e.g.*, Tr. 2484:8-13 (rebuttal: "if this were bona fide, this relationship, they would be shouting from the rooftops about this relationship with Eric Goldstein because Eric Goldstein is the head of School Food.  They would be telling everyone if it were legitimate.  It's not, and that's why they didn't do it.").

The government crossed some lines as well.  After eliciting in its cross-examination of Goldstein that he had discussed the conflicts issue with a lawyer, Geoffrey Travis—doing so despite objections by defense counsel and warnings by the Court about getting into those privileged discussions (that the defense had steered clear of in Travis's trial testimony), Tr. 1721:25-1723:17, 1994:13-1995:16—the government argued, falsely, that there was no evidence Goldstein disclosed the conflict issue to his lawyer.  Worse still, the government cited the absence of testimony on the topic from Travis while knowing full well that defense counsel was constrained from questioning Travis about the topic without waiving privilege.  The government said to the jury in rebuttal, at a time when defendants could not respond:

> You heard some suggestion, some implication that lawyers knew and accountants knew about this relationship.  No, they didn't.  There's no evidence of any of that. They're trying to mislead you into believing that this was all somehow blessed by accountants and lawyers.  No accountant, no lawyer, no one got on that stand and told you that they knew about this corrupt business relationship, that they knew that Eric Goldstein was purchasing food from SOMMA and New York City.  Maybe

they knew about RMSCO, sure. They didn't know the details. They didn't know about what was actually going on. Because had they known, they would have said what everyone else says: What are you guys doing? They're trying to mislead you.

Tr. 2484:18-2485:5.

The government misled the jury into construing the absence of testimony from Travis as evidence that Goldstein didn't disclose the conflict issue to his lawyer. And, as it did with other gaps in the record, the government then filled that gap in the record with naked speculation ("They didn't know the details. They didn't know what was actually going on. Because had they known, they would have said what everyone else says: What are you guys doing?").

To top it off, the government improperly accused defendants (and defense counsel) of misleading the jurors by their "implication that lawyers [and] accountants knew about this relationship." On both scores, however, that evidence was elicited by the government. The evidence that Goldstein told his accountant and lawyer about his business relationship with the Somma defendants was elicited by the government—in direct examination of Goldstein's accountant, Tr. 467:5-20, 472:23-473:2, 477:4-478:3 (Romano), and in cross-examination of Goldstein.

The government's relentless, improper, and incorrect arguments encouraged the jury to find defendants guilty merely because of a conflict of interest, notwithstanding the Court's limiting instruction.

*Improper argument in closing and rebuttal.* The government repeatedly made unfairly speculative, and at times factually incorrect, assertions in closing and rebuttal arguments. The reason it did this is clear: the government lacked proof beyond a reasonable doubt of a *quid pro quo* or agreement to engage in a *quid pro quo*, and thus had to urge impermissibly speculative inferences from the evidence to convince the jury. This was improper.

"[A] prosecutor may argue that the evidence gives rise to an inference, but the suggested inference must be reasonably drawn from the facts in evidence." *United States v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998).  "[A]t some point the inference asked to be drawn will be unreasonable enough that the suggestion of it cannot be justified as a fair comment on the evidence." *Evans v. Jones*, 996 F.3d 766, 778 (7th Cir. 2021) (internal quotation marks omitted) (affirming grant of post-conviction relief based on urged unsupported inference in closing); *accord United States v. Beckman*, 222 F.3d 512, 527 (8th Cir. 2000) ("During closing argument, an attorney's role is to assist the jury in analyzing, evaluating, and applying the evidence.  Arguments that transcend such boundaries are improper." (citations omitted)); *United States v. Casamento*, 887 F.2d 1141, 1190 (2d Cir. 1989) (holding that government closing argument was "improper" where it "appear[ed] to have been based on little more than speculation").

In particular, courts will reverse convictions when the government's urged inferences and characterization of the evidence is less a "fair comment" on the evidence and "instead is more akin to the presentation of wholly new evidence to the jury." *United States v. Vargas*, 583 F.2d 380, 385 (7th Cir. 1978); *see, e.g.*, *United States v. Brainard*, 690 F.2d 1117, 1122 (4th Cir. 1982) (finding plain error and reversing conviction where "the prosecutor went well beyond arguing which inferences were reasonable" when he paraphrased witness testimony to an unfair degree); *United States v. Klebig*, 600 F.3d 700, 720, 719 n.11 (7th Cir. 2009) (reversing conviction where prosecutor's characterization of admitted physical evidence amounted to assertion of "new facts" and where government had defended its comments below as a "fair inference that the jury [could] draw" based on "evidence in the record").

For example, the government repeatedly misstated the evidence or argued facts not in evidence:

- Rebuttal: "You didn't hear from Tyson or Perdue say why [they didn't pursue ABF chicken]. I submit that the reason why is because when they tried to do it, it may have been bones and plastic and metal in their products, so they didn't do it." Tr. 2494:7-10.

  There was no evidence supporting this wildly speculative assertion. The government improperly invited jurors to draw an inference that lacked any evidentiary basis.

- Rebuttal: "Then you heard today, well, burger sales to SOMMA didn't go to RMSCO. Really? Where do you think the $10,000 they transferred to RMSCO, the SOMMA defendants transferred to RMSCO, came from? Where do you think the $66,000 they transferred came from? They came from [sales] of the Range burger." Tr. 2492:17-22.

  This was both incorrect and unsupported. There was no evidence of when Somma first received payments related to the Range-branded burger. At most, the evidence suggested that Somma began selling the Range-branded burger to another school district in July 2016, DX510 (admitted in defense case), after the May 2016 $10,000 payment from Somma to RMSCO. GX906.

- Closing: "You heard testimony that SOMMA did market the Range Meats hamburger to the schools and that it got -- and that was in March 2016, and that it got approved and it got menued." Tr. 2243:7-9. Later, the government told the jury, following a defense objection, that Somma's Range burger was "one of two approved brands, but it was never purchased by the distributors and that's because it was too expensive." Tr. 2256:10-13.

  Neither assertion was accurate. The government presented no evidence that Somma's Range burger ever received final pricing approval from DCP. The evidence showed that only a competitor's burger received pricing approval. DX466. Somma's burger was never available for purchase by New York City distributors.

  In addition, the government repeatedly made up the content of communications between various defendants. For example:

- Closing: "On October 7, Michael Turley had a call with Eric Goldstein. What do you think they talked about? I submit they talked about what was on Michael Turley's mind, expediting the parfait and drumsticks. You can see from the description, they also talk about the trip to Poland. And I submit they probably also talked about something else on Eric Goldstein's mind, the $20,000 payment that Eric Goldstein needs from SOMMA." Tr. 2231:18-25.

- Rebuttal: "Once again, they need his help. You know what happens, October 28 Eric Goldstein puts the tenders -- When he does, right away, who does he call? Michael Turley. What does he say? You know what he said: Your tenders are on hold, how is that separation agreement coming?" Tr. 2496:15-19.

- Rebuttal:  "And you know what happened during that conversation.  Use your common sense.  It was, Eric, I want to talk about the fine, but before I do, did you get the PowerPoint that Blaine sent?"  Tr. 2487:25-2488:3; *see also* Tr. 2245:23-2246:7 (similar in closing).

And the government repeatedly argued unreasonable inferences from documents.  For example:

- Closing:  "What he's communicating is clear.  He will make a decision on their proposal to the DOE about SOMMA's food products after, after they agree to pay him the money that he wants."  Tr. 2268:3-5 (discussing GX586).

- Closing:  "I submit that when your boss tells you: If doable, we should do, what he means is get it done."  Tr. 2233:1-2 (discussing GX332).

- Closing:  "What does Range press mean anyway?  Well, I'll tell you what it means.  It means that Eric is pressing on Range.  He is giving it the full-court press."  Tr. 2263:7-9 (discussing GX2062).  The government offered a contrary (and correct) interpretation of GX2062's reference to "Range press" in its Rule 29 argument, describing it as a reference to "press attention" and "PR advice," further demonstrating the unreasonableness of the inference it urged in summation.  Tr. 1400:2-6, 12-14.

The government's use of "I'll tell you what it means" improperly injected the prosecutor's personal beliefs into closing without qualifying language such as "I suggest" or "I submit." *See United States v. Nersesian*, 824 F.2d 1294, 1328 (2d Cir. 1987) ("[W]e stress that it is a poor practice, one which this court has repeatedly admonished prosecutors to avoid, for prosecutors to frequently use rhetorical statements punctuated with excessive use of the personal pronoun 'I.'" (citation omitted)).

The government's prerogative to argue reasonable inferences from the evidence is not a license to speculate or to misstate the facts.  The sheer volume of improper speculation in the government's closing and rebuttal highlights the weakness of its case and further buttresses the case for a new trial.

*The government's overarching quid pro quo theory.*  Finally, for the reasons already discussed, the government's new arguments regarding its overarching *quid pro quo* theory encouraged the jury to convict defendants on a theory that violates governing case law and that constructively amends and/or prejudicially varies from the Superseding Indictment.  *See supra* pp.34-37.

55

\*     \*     \*

To be clear, the admission of inflammatory evidence related to food safety and conflicts of interest, the government's improper closing and rebuttal argument, and the amendment of and/or variance from the Superseding Indictment are independent grounds for granting a new trial under Rule 33. But, at a minimum, the government's heavy focus on these issues at trial reinforces the conclusion that manifest injustice has occurred. If the government had coherent, persuasive proof of *quid pro quos*, it would not have needed to focus on conflicts of interest and food safety or to speculate in closing argument. And if the government had coherent, persuasive proof of the specific *quid pro quos* alleged in the Superseding Indictment, it would not have shifted its case so substantially to the amorphous one it argued at trial.

## CONCLUSION

For these reasons, the Court should grant judgment of acquittal on all counts or, at a minimum, grant a new trial.

Dated:  July 26, 2023

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK

WILLIAMS & CONNOLLY LLP

Kannan Sundaram
One Pierrepont Plaza – 16th Floor
Brooklyn, NY 11201
kannan_sundaram@fd.org

By: */s/ Tobin J. Romero*
Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
Tobin J. Romero
Amy Mason Saharia (admitted *pro hac vice*)
Zachary K. Warren (admitted *pro hac vice*)
Patrick J. Looby (admitted *pro hac vice*)
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
tromero@wc.com

Neil P. Kelly
52 Duane Street – 10th Floor
New York, NY 10007
Tel: (212) 417-8700
neil_kelly@fd.org

*Attorneys for Eric Goldstein*

*Attorneys for Brian Twomey*

ZUCKERMAN SPAEDER LLP

AKERMAN LLP

Aitan D. Goelman
Daniel A. Braun (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: 202.778.1800
Fax: 202.822.8106
agoelman@zuckerman.com
dbraun@zuckerman.com

Bradley L. Henry
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel: 212.880.3800
bradley.henry@akerman.com

Leila Bijan
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: 212.704.9600
Fax: 212.704.4256
lbijan@zuckerman.com

Michael P. Kelly
Kathleen Hunter Shannon (admitted *pro hac vice*)
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
Tel: 202.393.6222
michael.kelly@akerman.com
kathleen.shannon@akerman.com

*Attorneys for Michael Turley*

Elpitha Lambros (admitted *pro hac vice*)
71 S. Wacker Dr.
Chicago, IL 60606
Tel: 312.634.5714
elpitha.lambros@akerman.com

*Attorneys for Blaine Iler*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on July 26, 2023, I caused a copy of the foregoing Memorandum in Support of Joint Motion for Judgment of Acquittal or for New Trial to be filed electronically with the Court using the Court's CM/ECF system, which will transmit a notice of electronic filing to all counsel of record in this action.

*/s/ Tobin J. Romero*
Tobin J. Romero
WILLIAMS & CONNOLLY LLP
