UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                           :

       - against -                                 :          **<u>OPINION</u>**

ERIC GOLDSTEIN,                                       :          21 Cr. 550 (DC)
BLAINE ILER,
MICHAEL TURLEY, and                              :
BRIAN TWOMEY,
                                                               :
             Defendants.
                                                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**        See last page.

**CHIN, Circuit Judge:**

On June 28, 2023, at the conclusion of a four-week trial, the jury

convicted the four defendants -- Eric Goldstein, Blaine Iler, Michael Turley, and

Brian Twomey -- on all seven counts of the Superseding Indictment.  Tr. 2600-03.

Counts One, Three, Six, and Seven charged all four defendants with,

respectively, conspiracy to commit extortion under color of official right,

conspiracy to commit federal program bribery, conspiracy to commit honest

services wire fraud, and honest services wire fraud.  Counts Two and Five

charged Goldstein only with extortion under color of official right and federal

program bribery.  Count Four charged Iler, Turley, and Twomey with federal

program bribery.  *See* ECF Doc. 45; Tr. 2600-03.  Defendants now jointly move for

a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal

Procedure or, alternatively, for a new trial pursuant to Rule 33.  *See* ECF Doc.

166-1.

For the reasons that follow, the joint motion is denied as to all

defendants, in all respects.

## STATEMENT OF THE CASE

### A.     *The Facts*

Viewed in the light most favorable to the government, with all

reasonable inferences drawn in its favor, the evidence at trial established the

following:

### 1.     *The Defendants*

Goldstein was the head of the Office of School Support Services of

the New York City Department of Education (the "DOE"), which included the

food program for the New York City public schools ("SchoolFood").  Tr. 78, 1145.[1]

---

[1]      Goldstein was also in charge of the DOE's school bus and athletics programs.  Tr. 78.

2

SchoolFood fed 1.1 million school children and had an annual budget of nearly $500 million. Tr. 225, 1145.

Iler, Turley, and Twomey were co-owners of SOMMA Food Group LLC ("SOMMA"), a start-up company offering food products to school systems. Tr. 851, 855; GX 4, 19 at 3. They co-founded SOMMA in 2015. Tr. 1458-61.

2.    *SOMMA's Business with SchoolFood*

Starting in the spring of 2015, SOMMA sought to do business with SchoolFood and submitted products to SchoolFood for its consideration. Eventually, three of SOMMA's products were approved and served to school children: a yogurt parfait, antibiotic-free chicken drumsticks, and antibiotic-free chicken tenders. Tr. 252, 256; GX 250, 287, 500; DX 303, 349, 419, 477, 481.

A fourth product (grass-fed burgers) was initially approved but ultimately was not purchased by distributors because of the pricing. Tr. 252, 613-14; DX 466. SOMMA did not sell its products directly to SchoolFood. Rather, once products were approved by SchoolFood, the pricing had to be approved by the DOE's Division of Contracts and Purchasing ("DCP"). Once the pricing was approved, distributors with contracts to supply food to DOE could purchase the

3

approved products and supply them to SchoolFood.  Tr. 409, 614, 714-16, 1029; GX 507.

SchoolFood stopped doing business with SOMMA in April 2017, at least in part because foreign matter -- bone and metal -- was found in its chicken tenders.  Tr. 1113-14.

### 3.    *RMSCO*

In the spring of 2015, Iler, Turley, and Twomey had discussions with Goldstein and his "good friend" Hershel Meisels about possible business opportunities in the food industry.  Tr. 1804, 1807-09.  Goldstein had known Turley when the latter worked at Tyson Foods, and spoke with him about "potential business opportunities," and Turley brought in Iler and Twomey for the discussions.  Tr. 1807-09.  They eventually spoke about the possibility of starting a business together importing grass-fed beef.  Tr. 46-47, 1340; DX 41, 51.

Iler, Turley, Twomey, Goldstein, and Meisels soon created Range Meats Supply Co. ("RMSCO"); at the outset Goldstein and Meisels each owned 20% of RMSCO through their limited liability companies, while Iler, Turley, and Twomey owned 60% through SOMMA.  Tr. 47, 50; GX 37 at 23, 437 at 9.  During 2015 and early 2016, RMSCO took steps to develop the beef importing idea,

4

including taking trips to meet prospective beef suppliers, meeting with regulators, and hiring lawyers.  GX 12, 231, 263, 290.

Accordingly, at the same time that Goldstein was head of SchoolFood and the ultimate decisionmaker with respect to the purchase of food for New York City public schoolchildren, he was partnering in a beef import business with individuals who were seeking to do and eventually were doing business with SchoolFood.

The beef import business, however, did not materialize.  On the other hand, SOMMA had some success as it was able, by the summer of 2016, to place its yogurt parfait and chicken drumsticks on the SchoolFood menu, and SchoolFood had also approved Somma's chicken tenders.  Tr. 894-95, 1690.  Iler, Turley, and Twomey became concerned about the "optics" of their partnership with Goldstein, and they decided "to separate from RMSCO."  Tr. 1690-94; GX 520.  Their concerns were exacerbated when Goldstein approached SOMMA and asked it to hire his brother and pay him $100,000 a year.  Tr. 891.  Gary Hamm, SOMMA's vice president of marketing, Tr. 853-54, described Twomey's reaction: "Brian was really upset about it and said we weren't going to do that, and he's like, we're just going to give him the company [RMSCO] to go away."  Tr. 891.

5

An agenda prepared by Turley in August 2016 for a SOMMA meeting included an item entitled "Range and the Rabbit," which posed the following: "The goal? Where does it fit?  Coordination and communication.  Conflicts?  Unravel? Payoff?"  GX 519 at 1-2. [2]

      The relationship between Goldstein and Iler, Turley, and Twomey did not, however, unravel for another several months, although there were discussions back and forth.  Tr. 1698-99.  It was not until after November 28, 2016 -- after foreign objects had been found in SOMMA's chicken tenders, they were placed on hold, and SOMMA asked Goldstein to intercede -- that Iler, Turley, and Twomey finalized an agreement to give up their interests in RMSCO.  As part of the agreement, which became effective on that date, SOMMA agreed: to transfer its 60% interest in RMSCO to Goldstein; to transfer ownership of the RMSCO trademarks to RMSCO; to pay RMSCO's 2017 tax bill; and to forgive any outstanding loans.  GX 42.  On December 8, 2016, SOMMA wired $66,670.39 to RMSCO; at that point Goldstein owned 80% of RMSCO.  *Id.*, GX 903.

      Goldstein did not disclose his partnership in RMSCO to the DOE's Ethics Officer.  Tr. 495, 523, 1995 (Goldstein admitting that he did not tell anyone

---

[2]    Iler, Turley, and Twomey and others at SOMMA referred to Goldstein in their internal communications as "Roger," "Roger Rabbit," or "the Rabbit."  Tr. 859.

at SchoolFood that he was in "a business relationship" with Iler, Turley, and

Twomey), 1996.[3]  Although Goldstein had disclosed other potential conflicts of

interest on behalf of himself and other SchoolFood staff to the Ethics Officer, he

never informed her that he was an owner of RMSCO or that he was partners

with Iler, Turley, and Twomey, even though they (through SOMMA) were doing

business with the DOE.  Tr. 523.

        The New York City Conflict of Interest rules provided, *inter alia*,

that: employees could not use their positions to "financially benefit" themselves

or their family members; they could not "accept anything valued at $50 or more

from anyone they [knew was] doing or seeking to do business with the City;"

and they could not own any part of a business that they knew was doing

business with or receiving a benefit from the City.  GX 45-A.[4]  The Conflict of

Interest rules also provided that employees faced with a possible conflict of

interest had to disclose the matter to the Conflict of Interest Board.  *Id.*  Goldstein

---

[3]      Although Goldstein contended in his testimony that "[a]ll the decisions I made
were always [to] the benefit of the DOE, that was my goal," Tr. 1997, he acknowledged
that his decisions benefitted SOMMA as well, Tr. 1996-98.

[4]      On cross-examination, Goldstein acknowledged that the Conflict of Interest rules
prohibited employees from using their positions to benefit any one with whom they
had a financial or business relation.  Tr. 1999-2000.

did not disclose to the Ethics Officer or the Conflict of Interest Board his interest
in RMSCO or his relationship with Iler, Turley, Twomey, and SOMMA.

    4.    *SOMMA's Actions for the Benefit of Goldstein*

        Between March 2015 and December 2016, SOMMA provided
numerous benefits to Goldstein, both through RMSCO and through others.

        For example, SOMMA created RMSCO email accounts, a Range
Meats logo, and Range Meats business cards.  GX 225, 229, 235.  SOMMA
transferred to RMSCO $20,000 on October 19, 2015; $10,000 on May 13, 2016; and
$66,670.39 on December 8, 2016.  GX 911.  Goldstein had an ownership interest in
RMSCO when these transfers were made.

        SOMMA also made payments to others that benefited Goldstein.
On October 21, 2015, Iler wired $7,000 from RMSCO's bank account to
Goldstein's divorce lawyer.  Tr. 1249; GX 340.  The same day, Iler wired
$12,588.45 to Shutts & Bowen, a law firm that provided legal services to RMSCO,
of which the contact partner was Goldstein's "buddy."  *Id.*, GX 618 at 8, 904.[5]  On
May 13, 2016, Twomey wired $3,000 from RMSCO's bank account to Goldstein's
father's bank account; the $3,000 was soon withdrawn from Goldstein's father's

---

[5]    Shutts & Bowen did the legal work for RMSCO, not SOMMA, and thus RMSCO,
not SOMMA, was responsible for the fees.  Tr. 1637-39, 1697-98.

account and deposited into Goldstein's personal checking account.  GX 492, 900 at 16, 904 at 36, 909.

And, as noted above, eventually Iler, Turley, and Twomey transferred their 60% interest in RMSCO to Goldstein and provided him with other consideration as well (including $66,670.39) when they finally agreed to end the relationship.

### 5.   *SOMMA's Requests to Goldstein for Official Assistance*

On several occasions, SOMMA asked Goldstein for assistance in his official capacity as the head of SchoolFood.  For example, Iler, Turley, and Twomey asked Goldstein to help in expediting the placement of their products on the menu.  In an iMessage chat on August 24, 2015, Turley and Iler had the following exchange:

Turley:     Talked to Roger.  He's going to bust balls tomorrow. . . .

Iler:         Yessss

. . . .

Iler:         Parfait and chicken?

Turley:     Parfait.  I haven't talked to Stephen [O'Brien] about chicken so I didn't bitch about that.  I used the official angle of 'you asked a vendor to do something.  We overdelivered.  And to boot we gave you a solution that

9

is 'Made in NY'.  This needs to be slated for Fall menu. And we're being slow played with maybe in Jan.'

Turley:     His first response was 'Dennis [Barrett] needs to nut up and tell Stephen what to do.'

. . .

Iler:       Haha love it!  True New Yorker.  No bullshit.  Shoots straight.

GX 2007.[6]  And in a text message on October 2, 2015, Turley wrote to Iler:

Tell Eric we may need a 'nudge'.  Don't want to wait until Jan to launch.

GX 320.

SOMMA also asked Goldstein to assist in pricing issues.  For example, on September 1, 2015, within minutes after receiving an email from Barrett about a pricing issue for SOMMA's chicken legs, Turley emailed Goldstein for assistance -- without copying Barrett.  Goldstein responded by asking Turley for permission to share the email with Barrett.  GX 297.

When SchoolFood threatened to impose liquidated damages for chicken drumstick shortages, SOMMA went to Goldstein for assistance.  In an email exchange among Turley, Iler, Twomey and Hamm on January 20, 2016,

---

[6]      Stephen O'Brien and Dennis Barrett were senior SchoolFood officials; O'Brien reported to Barrett and Barrett reported to Goldstein.  Tr. 960-63.

Turley wrote: "Whoever talks to Roger first, this needs to [be] addressed." GX 431. Two days later, Turley wrote Goldstein an email regarding "drumstick shorts," saying:

> My apologies for bubbling this up to you, but we have been unable to resolve with the SchoolFood team and are fearful of where this path is leading us.

GX 434. Turley did not copy the other members of the "SchoolFood team." As Turley testified, SOMMA went to Goldstein because it was "our hope" that Goldstein would be able to reverse the fine. Tr. 1628.

After SOMMA's chicken tenders were put on hold because foreign objects were found in them, GX 533, Turley wrote an email to Goldstein on October 31, 2016 advising of the steps SOMMA was taking to address the issue. Turley was en route to New York City to meet with the SchoolFood team, and he wrote to Goldstein: "I don't expect that you would be at that meeting, so I wanted to make you aware of the most recent and important developments." GX 653. Turley did not copy anyone else on the SchoolFood team, but he forwarded the email to Twomey and Iler and others at SOMMA, explaining: "Setting expectations, heading off anything that may bubble up, and hopefully influence any meeting that happens before we get there . . . ." *Id.*

11

SOMMA repeatedly sought assistance from Goldstein because it understood he was the "ultimate decision maker" at SchoolFood. Tr. 861-62; *accord* Tr. 1628 ("Q  You went to Goldstein because Mr. Goldstein was the ultimate decision maker at [SchoolFood] and you knew that, right?  A [Twomey] That's fair."). At one point, Iler reported to a SOMMA investor that "Eric has [] made some very clear statements to me that it is our business to lose." GX 265 at 3. The DOE business was critical to SOMMA, as DOE was SOMMA's biggest customer in 2015 and 2016. Indeed, as Hamm testified: "It was really our only customer." Tr. 856; *see also* Tr. 1622-23 (Twomey testifying that New York City was SOMMA's "largest customer," "[b]y a significant magnitude").

### 6.   *Goldstein's Assistance to SOMMA*

In response to SOMMA's requests, Goldstein did take official action to its benefit. Indeed, Goldstein acknowledged at trial that he "stepped in" and made "decisions" that benefited SOMMA. Tr. 1996-98. For example, after Goldstein received an email from Turley in October 2015 requesting that SOMMA's drumstick be placed on the menu twice a month (instead of once a month), Goldstein wrote to Barrett and O'Brien, saying: "If doable, we should do [it]." GX 332. O'Brien responded: "Got it." *Id.*

12

In December 2015, Goldstein expedited the placement of SOMMA's yogurt parfait on the SchoolFood menu.  GX 370 (O'Brien advising the SchoolFood team: "I was just informed that Eric is fast tracking the parfait for 12/17"); *see also* Tr. 990 (O'Brien testifying that Eric wanted to expedite New York products, even if that meant a menu change).

In January 2016, Goldstein intervened to stop SchoolFood staff from imposing a fine following SOMMA's shortages of drumsticks.  Tr. 87 (Goldstein Opening Statement: "When the bureaucracy went too far and started threatening [SOMMA] with a fine and put it out of business, a fine that Eric thought was unjustified and unprecedented, Eric stepped in to ensure that the DOE didn't shoot itself in the foot by putting out of business a vendor it relied on."); *see* GX 433, 434.

In the fall of 2016, after the foreign objects were found in SOMMA's chicken tenders and SOMMA's chicken tenders were put on hold twice, SOMMA suggested substituting its drumsticks for the chicken tenders while it was taking steps to address the problem.  GX 585.[7]  SOMMA also proposed that its chicken

---

[7]     SchoolFood decided (with Goldstein's concurrence) to put a second hold on SOMMA's chicken tenders on October 28, 2016.  GX 553.  The same day, Goldstein gave Turley a "heads up" about the situation.  GX2060.  Yet, when Turley wrote to Goldstein

tenders be returned to the menu in January 2017. *Id.* On November 30, 2016,

SchoolFood approved SOMMA's proposal, with Barrett advising the SchoolFood

team: "Let's move ahead with their plan.  I have discussed with Eric and he

agrees."  GX 600 at 1-2.

### 7.    *The Links Between the Benefits to Goldstein and His Actions on Behalf of SOMMA*

There were clear links between the benefits SOMMA provided to

Goldstein and official actions he took for SOMMA's benefit.  For example, on

July 9, 2015, Twomey emailed Goldstein and asked him to share information

about SOMMA's antibiotic-free chicken products with members of the Urban

School Alliance, a group consisting of large school districts (including New York

City) that came together in an effort to leverage their purchasing power.  GX 252;

Tr. 1792, 1795.  A few hours later, Twomey emailed Goldstein a proposed

partnership agreement for RMSCO.  GX 254.  The next day, Goldstein directed a

SchoolFood employee to send DOE information to Turley related to chicken

---

three days later at his DOE email address to officially seek his assistance, he did not
reveal that they had already communicated about the issue. GX 559 ("Good morning
Eric. I hope this finds you well. I am sure by now you are aware of the situation
regarding our new product on your menus. . . .").

14

procurement.  GX 257.  Later that morning, Turley emailed Iler and Twomey saying "Eric delivered FIRST THING this morning."  GX 255.

On July 23, 2015, Iler reported to Turley and Twomey that Goldstein had said to him "I'm going to buy a lot of fucking chicken from you guys, let's do the beef," GX 266, a reference to an understanding that in exchange for ensuring that SchoolFood would purchase a lot of chicken from SOMMA, Iler, Turley, and Twomey would invest in and support the beef business that Goldstein was starting with them and that he clearly wanted.

In a text exchange on August 4, 2015, Iler, Turley, and Twomey talked explicitly about how, strategically, to take advantage of Goldstein's desire to proceed with the beef business to get him to help SOMMA with its chicken business:

|        |        |
|--------|--------|
| Twomey: | Who's going to Poland with Eric?  It seems like we need to get a note of support and plan asap. |
| Turley: | Agreed.  He just texted me to ask if I was in. |
| Iler: | Pretty sure I'm in. |
| . . . | |
| Twomey: | Okay cool Blaine.  Would you shoot him a note and tell him that?  Itinerary looks good kind of message. . . . |

| | |
|---|---|
| Turley: | I told him I think Blaine really wants to go.  We need to be excited about it. |
| Twomey: | TOTALLY!!! |
| . . . | |
| Iler: | Brian you good to handle RANGE?  Obviously Eric is pressing hard |
| Turley: | PLEASE |
| Twomey: | No problem |
| Iler: | Should we consider telling Eric that we have submitted chicken docs? |
| Turley: | Not on this call.  He needs to know we're focu[s]ed on this. |
| Iler: | Good point |
| Twomey: | Agreed |

GX 2026; *see also* GX 2042 ("Way to step up.  Good signal to Eric.").

On October 12, 2015, Turley emailed Goldstein saying "we NEED to make sure we are on all menus 2x per month." GX 332.  Goldstein forwarded the email to O'Brien, writing "[i]f doable, we should do [it]."  O'Brien responded "[g]ot it."  *Id*.  About a week later, on October 20 and 21, 2015, Iler initiated three wire transfers: $20,000 to RMSCO; $7,000 to Goldstein's divorce lawyer; and

16

$12,588.45 to Shutts & Bowen.  GX 340.  Less than a week after the wire transfers, on October 26, 2015, SOMMA's drumstick was expedited so that it would debut in December.  GX 336, 355 (moving debut date from January 14, 2016 to December 14, 2015).

      On January 20, 2016, after SOMMA had failed to provide the required quantity of drumsticks, SchoolFood advised SOMMA that it would impose a fine, which would be imposed on distributors who could then seek reimbursement from SOMMA.  GX 433.  Two days later, on January 22, 2016, Turley emailed Goldstein (at his DOE email) seeking his assistance and arguing against the fine.  GX 434.  Less than 20 minutes later, Iler sent an email to Goldstein (at his RMSCO email, copying Meisels, Turley, and Twomey) with the subject line "RANGE / SOMMA Working Together" and transmitting a set of PowerPoints outlining "how we see this relationship being structured."  GX 437. The PowerPoints included a slide on "How the Financials Work," including a reference to Goldstein's company receiving 20% of the operating income.  *Id.* at 9. Shortly thereafter, Goldstein "stepped in" and on January 27, 2016, O'Brien informed Turley that there would be no fine.  Tr. 87; GX 441; *see* Tr. 2031-33.  A few weeks later, the RMSCO partnership agreement was finalized.  GX 451.

In the fall of 2016, after the incidents with the foreign objects in SOMMA's chicken tenders, SOMMA made a proposal to substitute its drumsticks for the tenders and to return the tenders to the menu in January 2017. GX 585.  On November 15, 2016, Hamm advised Iler, Turley, and Twomey that he had traded texts with O'Brien, and that O'Brien advised that "[t]he ball is in Eric and Dennis' hands.  He said he is hoping to hear back from them this Friday [November 18] regarding drum substitution and tender launch/next steps."  GX 2064.  But SchoolFood did not respond by November 18 because Goldstein had not yet approved the proposal; as O'Brien testified:  "We were waiting for Eric to sign off that [SOMMA's proposal] was acceptable and that we could move forward with this plan."  Tr. 1149; *see also* Tr. 909 (Hamm explaining that SOMMA understood Goldstein would make the decision).  Goldstein acknowledged at trial that he was "the one who ultimately decided to allow the chicken tenders back into [SchoolFood]."  Tr. 1998.  He still had not approved the proposal as of November 28 and 29.  Tr. 2071-72.

Goldstein had been continuing to negotiate the terms of a separation agreement with Iler, Turley, and Twomey regarding RMSCO.  GX 586, 592 (Goldstein email to Turley and Twomey dated November 25, 2016 saying "Let's

18

get this done and move on").  The separation agreement was finally signed on,

apparently, November 30, 2016.  GX 42.[8]  The same day, SchoolFood approved

SOMMA's proposal, with Barrett advising the SchoolFood team: "Let's move

ahead with their plan.  I have discussed with Eric and he agrees."  GX 600.

On December 8, 2016, SOMMA wired $66,670.39 to RMSCO, which

at that point was 80% owned by Goldstein.  GX 903 at 4.

**B.**    *Prior Proceedings*

On September 27, 2021, the government filed a detailed complaint

alleging that Goldstein, Iler, Turley, and Twomey had engaged in a bribery

scheme between 2015 and 2016.  ECF Doc. 1.  On October 28, 2021, a grand jury

returned an indictment against the four defendants.  ECF Doc. 12.

On May 12, 2022, defendants jointly moved to dismiss the

indictment and for a bill of particulars.  ECF Docs. 40, 41, 42.

On June 16, 2022, a grand jury returned a superseding indictment

(the "Indictment") containing seven counts.  ECF Doc. 45.  Counts One, Three,

---

[8]    The agreement states that it was "Executed and effective on November 28, 2016."
GX 42.  The email exchanges, however, show that the agreement was circulated for
signature on November 29, 2016 and it was apparently signed on November 30, 2016.
GX 599; Tr. 2072-73 (Q  "But the next day the agreement is signed, right, November 30?
A [Goldstein]  I believe so, I don't remember exactly.").

Six, and Seven charged all four defendants with, respectively, conspiracy to commit extortion under color of official right, conspiracy to commit federal program bribery, conspiracy to commit honest services wire fraud, and honest services wire fraud.  Counts Two and Five charged Goldstein only with extortion under color of official right and federal program bribery.  Count Four charged Iler, Turley, and Twomey with federal program bribery.  *See id.*  The Indictment charged a bribery scheme in which Goldstein agreed to take and in fact did take official actions as the head of SchoolFood to ensure that SOMMA's products were approved, to expedite the process for getting SOMMA's products on the DOE menu; and to resolve disagreements.  *Id.* at ¶ 12.  In exchange, SOMMA and Iler, Turley, and Twomey provided monetary and other valuable benefits to Goldstein.  *Id.*  The Indictment described specific examples of exchanges that were part of the bribery scheme.  *Id.* at ¶¶ 14-26.

After the Indictment was filed, the government opposed defendants' motion for a bill of particulars, arguing that the Indictment provided sufficient detail of the allegations.  ECF No. 46 at 19.  The Court (Cogan, *J.*) denied the motion to dismiss and dismissed as moot the motion for a bill of particulars.  Order, Aug. 8, 2022.

The case was reassigned to the undersigned on February 6, 2023.

The parties filed motions *in limine* in April and May 2023. ECF Docs. 88, 96, 97, 98. I heard oral argument on the motions on May 22, 2023, and ruled on some of the motions and deferred ruling on others. ECF Doc. 177. On May 24, 2023, I issued a memorandum decision and order ruling on the remainder of the *in limine* motions as well as other matters that had arisen. ECF Doc. 125.

Trial commenced with jury selection on May 30, 2023. Jury Tr. 1. The government rested on June 12, 2023. Tr. 1307. The defendants made a joint motion pursuant to Rule 29 for a judgment of acquittal. Tr. 1309. I reserved decision both initially and again after giving the parties an opportunity to argue the motion and thinking about the issues overnight. Tr. 1309, 1374-1422, 1430. The defendants presented a defense case, as Twomey and Goldstein (and one other witness, the lawyer Travis) testified. Tr. 1313, 1745, 1781. The defendants rested on June 15, 2023. Tr. 2098-99. With the exception of some document cleanup, the evidence closed that day. Tr. 2099.

The jury returned its verdict on June 28, 2023, finding the four defendants guilty on all counts. Goldstein was convicted on Counts One, Two, Three, Five, Six, and Seven. Tr. 2600-03. Iler, Turley, and Twomey were

convicted on Counts One, Three, Four, Six, and Seven.  Tr. 2600-05.  The

defendants renewed their Rule 29 motion and I deferred decision pending

briefing and argument.  Tr. 2605-06.

The parties thereafter briefed defendants' Rule 29 and 33 motions,

ECF Docs. 166, 169, 171, and I heard argument on the motions on September 18,

2023, at the conclusion of which I reserved decision, ECF Doc. 175 at 39.

## DISCUSSION

### A.   Applicable Law

#### 1.   Rule 29

Rule 29 of the Federal Rules of Criminal Procedure governs motions

for a judgment of acquittal.  Defendants made Rule 29 motions both at the close

of the government's case and again after the jury returned its verdict.  Rule 29(a)

applies to a motion made at the close of the government's case, while Rule 29(c)

applies to a motion made after the verdict.  The standards for the two motions

are substantively the same, but a Rule 29(a) motion must be decided "on the basis

of the evidence at the time the ruling was reserved," Fed. R. Crim. P. 29(b), while

a Rule 29(c) motion is made after the verdict, based on the entire trial record.

22

"A defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (alteration adopted and citation omitted). The court is to "view the evidence presented in the light most favorable to the government," and "all permissible inferences must be drawn in the government's favor." *Id.* (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). The court must "defer to the jury's assessment of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003) (internal citations omitted).

"Moreover, 'the evidence must be viewed in its totality, as each fact may gain color from others.'" *Landesman*, 17 F.4th at 319 (quoting *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005) (internal punctuation omitted)). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Id.* (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (alteration adopted)). Although "it is the task of the jury, not the court, to choose among competing inferences," *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (quoting *United States v.*

*Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)), the court may not let stand "a

conviction based on speculation and surmise alone," *United States v. D'Amato*, 39

F.3d 1249, 1256 (2d Cir. 1994), or one based on "specious inferences," *United States

v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (citation omitted).

The "ultimate question" is whether "any rational trier of fact could

have found the essential elements of the crime had been proved beyond a

reasonable doubt." *Valle*, 807 F.3d at 515.

**2.    *Rule 33***

Rule 33 provides that "[u]pon the defendant's motion, the court may

vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a).  While a district court may grant a new trial if the evidence

does not support the verdict, the Second Circuit has "emphasized that such

action must be done 'sparingly' and in 'the most extraordinary circumstances.'"

*United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (citations omitted); *see also

United States v. Landesman*, 17 F.4th 298, 330-31 (2d Cir. 2021); *United States v.

Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

"[A] district court may not grant a Rule 33 motion based on the

weight of the evidence alone unless the evidence preponderates heavily against

24

the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Archer*, 977 F.3d at 187-88 (citation omitted).  Under the "preponderates heavily" standard, "a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.' To the contrary, absent a situation in which the evidence was 'patently incredible or defied physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.'" *Id.* at 188 (alteration adopted and citations omitted).  There is no manifest injustice "unless the judge is prepared to answer 'no' to the following question:  'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

B.    *Application*

1.    *Rule 29*

        In the Rule 29 prong of their motion, defendants argue that they should be granted judgment of acquittal first, with respect to Counts 2, 4, 5, and 7 (the substantive counts), because the government failed to prove a *quid pro quo,*

Def. Mem. at 8-16, and, second, with respect to counts 1, 3, and 6 (the conspiracy counts), because the government failed to prove conduct occurring after the statute of limitations date (October 25, 2016) and also failed to prove a *quid pro quo*, *id.* at 16-45.

The motion for judgment of acquittal is denied, for the government's evidence was sufficient for a reasonable juror to find the essential elements of each crime beyond a reasonable doubt.  This is so whether considering the evidence that had been presented by the conclusion of the government's case or all the evidence that had been presented by the point both sides rested.

"[B]ribery is generally understood to mean the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions."  *United States v. Avenatti*, 81 F.4th 171, 194 (2d Cir. 2023) (quoting *United States v. Ng Lap Seng*, 934 F.3d 110, 131 (2d Cir. 2019)). The *quid pro quo* is the giving or receiving of something of value *in exchange* for an act.  *See id.*; *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013); *see also United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011) ("A quid pro quo is a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the course of the exercise of his official authority.").  Particularly in

26

cases involving government officials, a jury can "infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." *Bruno*, 661 F.3d at 744 (quoting *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988)).

Here, the government provided ample evidence of an overarching bribery scheme whereby Iler, Turley, and Twomey entered into a potentially valuable joint venture with Goldstein, with Iler, Turley, and Twomey agreeing to provide financial and other support to the new venture and Goldstein agreeing to exercise his official authority at SchoolFood for SOMMA's benefit. The government provided evidence of specific *quid pro quos* in furtherance of the overarching scheme -- instances of SOMMA providing benefits to Goldstein in exchange for his specific official actions for their benefit. Eventually, the bribery scheme evolved, as SOMMA was achieving some success with SchoolFood while it became increasingly clear that RMSCO was going nowhere and Goldstein became more demanding, asking for his brother to be given a $100,000 a year job. At that point, Iler, Turley, and Twomey wanted to end the relationship, and they agreed to give their entire interest in RMSCO to Goldstein, and to provide him

with other consideration as well (including cash), in exchange for his continued support of SOMMA at SchoolFood.

The government proved specific examples of Iler, Turley, and Twomey giving things of value to Goldstein or for his benefit. On three occasions, SOMMA transferred sums of money to RMSCO: $20,000 on October 19, 2015; $10,000 on May 13, 2016; and $66,670.39 on December 8, 2016. On October 21, 2015, Iler wired $12,588.45 to pay RMSCO's bill at the law firm where Goldstein's "buddy" was the contact partner. Goldstein had an ownership interest in RMSCO when these four transfers were made and thus he benefited financially from these payments. There were other payments as well, directly for Goldstein's benefit. On October 21, 2015, Iler wired $7,000 from RMSCO's bank account to Goldstein's divorce lawyer. On May 13, 2016, Twomey wired $3,000 from RMSCO's bank account to Goldstein's father's bank account, which was then withdrawn and deposited into Goldstein's personal account. And Iler, Turley, and Twomey eventually transferred their 60% interest in RMSCO (along

28

with other valuable consideration) to Goldstein as part of their agreement to unravel the relationship.

In return for these concrete and valuable benefits -- and the hope at least initially that RMSCO would develop into a lucrative business -- Goldstein engaged in official acts that benefitted SOMMA and Iler, Turley, and Twomey. Indeed, Goldstein acknowledged that he "stepped in" and made "decisions" that benefited SOMMA. Tr. 1996-98. He interceded at SchoolFood to help SOMMA on scheduling and pricing issues. After receiving an email from Turley in October 2015, Goldstein urged O'Brien and Barrett to place SOMMA's drumstick on the menu twice instead of once a month. GX 332. In December 2015, Goldstein expedited the placement of SOMMA's yogurt parfait on the SchoolFood menu. GX 370. In January 2016, Goldstein intervened to stop SchoolFood staff from imposing a fine following SOMMA's shortages of drumsticks. Tr. 87; GX 433, 434. And in the fall of 2016, after SOMMA's chicken tenders were put on hold because of problems with foreign objects, Goldstein eventually approved SOMMA's plan to substitute its drumsticks for the chicken tenders and return its tenders to the menu in January 2017. GX 585, 600.

The timing of the benefits to Goldstein in relation to the official actions he took is "powerful circumstantial evidence of intent" to engage in a bribery scheme. *United States v. Biaggi,* 909 F.2d 662, 684 (2d Cir. 1990) ("We have recognized, especially with respect to public officials, that evidence of the receipt of benefits followed by favorable treatment may suffice to establish circumstantially that the benefits were received for the purpose of being influenced in the future performance of future duties, thereby satisfying the *quid pro quo* element of bribery."). For example:

-- On July 9, 2015, within hours after Twomey emailed Goldstein a proposed partnership agreement for RMSCO, Goldstein directed a SchoolFood employee to send DOE information to Turley related to chicken procurement. GX 252, 257.

-- In October 2015, about a week after Goldstein wrote O'Brien urging him to put SOMMA drumsticks on the menu twice a month, GX 332, Iler made three wire transfers totaling nearly $40,000 to RMSCO or otherwise for Goldstein's benefit. GX 340, 618.

30

--      A few days after the three wire transfers, SOMMA's drumstick was expedited so that it would debut in December instead of January. GX 336, 355.

--      In January 2016, after the issue of the fine for drumstick shortages arose, Iler emailed Goldstein seeking his assistance.  GX 433, 434.  Less than 20 minutes later, Iler emailed Goldstein a set of PowerPoints explaining how the RMSCO relationship would work, including referencing Goldstein's 20% share.  GX 437.  Shortly thereafter, Goldstein "stepped in" and subsequently O'Brien informed Turley that there would be no fine.  Tr. 87, 2031-33; GX 441.

--      And after the incidents with the foreign objects in SOMMA's chicken tenders, Goldstein delayed approving SOMMA's plan to address the issue until just after the separation agreement was finalized.  As O'Brien testified, "We were waiting for Eric to sign off that [SOMMA's proposal] was acceptable and that we could move forward with this plan."  Tr. 1149.  Goldstein did not "sign off" on SOMMA's proposal until November 30, 2016 -- just after the separation agreement was finalized.

There was other evidence, in addition to timing, of a *quid pro quo* and the intent to engage in a bribery scheme.  On July 22, 2015, Goldstein told Iler

"I'm going to buy a lot of fucking chicken from you guys, let's do the beef." GX 266. The jury could surely have interpreted this comment to mean that Goldstein was going to ensure that SchoolFood would buy a lot of chicken from SOMMA in return for SOMMA's support of RMSCO's new beef business. In a text exchange on August 4, 2015, Iler, Turley, and Twomey talked explicitly about showing enthusiasm for a RMSCO trip to Poland to explore a beef connection ("We need to be excited about it.") and noting that "Eric is pressing hard." GX 2026; *see also* 2042 ("Way to step up. Good signal to Eric.").

There was also evidence of "behavior indicating consciousness of guilt." *Bruno*, 661 F.3d at 744. There were repeated references to "Roger," or "Roger Rabbit," or "the Rabbit" instead of to Goldstein by name.[9] There was the switching back and forth between using Goldstein's official DOE email address and his RMSCO email address. Although Goldstein disclosed other potential (and relatively innocuous) conflicts of interest to the DOE Ethics Officer, he did not disclose his partnership in RMSCO; he never disclosed what was clearly a violation of the City's conflict of interest rules -- that he was in partnership with

---

[9]     On April 15, 2016, Hamm asked his colleagues at SOMMA "What [do] you guys think about the rabbit making a call to Lora [of another school district]?" GX 472. When another employee asked "Who's the Rabbit?," Turley responded: "Obviously if he's using code in an email your question won't be answered in an email." *Id.*

individuals who were doing business with SchoolFood.  Tr. 495, 523, 1995-96.  In
an iMessage exchange on June 6, 2015, because they were going to be meeting
with Goldstein and Meisels about RMSCO and therefore were unavailable to
meet with the SchoolFood team, Turley wrote to Iler:  "I am going to fabricate a
little bit for the protection of Eric."  GX 2000.[10]  On August 26, 2015, Iler and
Turley discussed the need to conceal Goldstein's involvement in RMSCO:  "Need
to limit discussion of range.  Nervous about too many people knowing."  GX
2040.  Iler, Turley, and Twomey recognized that the "optics" of their partnership
with Goldstein was a problem and, eventually, cause to unravel the
arrangement.  Tr. 1691-94; GX 520.[11]

   Goldstein was the chief executive of SchoolFood, an entity with a
half a billion dollar annual budget.  He had a number of SchoolFood officials
reporting to him, including O'Brien and Barrett.  And yet, Iler, Turley, and
Twomey repeatedly went directly to Goldstein with their concerns, bypassing

---

[10] Turley also wrote: "I guess none of that is really a fabrication now that I consider
it . . . Hershel and Eric ARE investors (in a different business)."  GX 2000.
[11] In a September 4, 2015 email, as a follow-up to discussion among Iler, Turley,
and Twomey to change the ownership structure of RMSCO so that SOMMA would
itself own 60% of RMSCO, Turley wrote:  "I am concerned about how [] this changes the
"disclosure" facts for Roger.  It does create a concrete connection.  Kind of a big deal
potentially."  GX 303.

Barrett, O'Brien, and others.  At the same time that SOMMA was negotiating

with Goldstein's senior staff, unbeknownst to them, Iler, Turley, and Twomey

were reaching out directly to Goldstein to intercede.  For example, in an August

24, 2015 text message, Turley reported to Iler that he had "[t]alked to Roger.  He's

going to bust balls tomorrow."  GX 2007.  On September 1, 2015, after receiving

an email from Barrett about a pricing issue, Turley emailed Goldstein for

assistance, without copying Barrett.  GX 297.  In a text message on October 2,

2015, Turley wrote to Iler: "Tell Eric we may need a 'nudge'."  GX 320.  And on

October 28, 2016, Goldstein wrote to Turley to give SOMMA a "heads up" about

the second chicken tender hold.  GX 2060.

 These are not the interactions of a chief executive officer and a

vendor in an arms'-length commercial relationship.  The jury could have

reasonably concluded that the only reason that SOMMA was able to repeatedly

go directly to Goldstein behind the backs of his direct reports and that Goldstein

would reach out to SOMMA -- a vendor -- to give it a "heads up" was that he was

being bribed.

 Defendants offer numerous explanations for why the government

failed to prove a *quid pro quo* or a bribery scheme, including that Iler, Turley, and

Twomey had decided to separate from RMSCO long before the chicken tenders were placed on hold, there was no legitimate basis for a fine, Goldstein's senior staff agreed with SOMMA's proposal to lift the holds, SchoolFood was pressing for New York-sourced products for its New York Thursdays program, and others. These factual arguments were made at trial, however, and the jury did not accept them. While defendants continue to argue the inferences to be drawn from the evidence, I am obliged to "credit every inference that could have been drawn in the government's favor." *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003). There was more than sufficient evidence in the record to support the jury's verdict.[12]

For example, defendants argue that Goldstein's "let's do the beef" comment to Iler referred only to a proposed Chilean beef trade that did not materialize, Def. Mem. at 47, but the jury could very well have concluded that Goldstein was referring not to a specific Chilean deal but to the broader, continuing RMSCO enterprise. In addition, while it is true that Iler, Turley, and

---

[12] The jury was charged that to establish a *quid pro quo*, "the [g]overnment must prove that Messrs. Iler, Turley, and Twomey offered a thing of value in exchange for Mr. Goldstein's promise to take official acts or his performance of official acts as alleged in the [] Indictment. . . . In the context of the charged crimes, a *quid pro quo* equates to a bribe." Tr. 2517-18.

Twomey had started talking about disengaging from RMSCO as early as the summer of 2016, Def. Mem. at 47, they were in no rush and there was no "pressing need to get it done." Tr. 1698-99.  There was no sense of urgency until November 2016, after the second hold was placed on SOMMA's chicken tenders. And while the SchoolFood senior staff apparently did agree with SOMMA's proposal, they needed Goldstein's final approval -- and he withheld it until after the separation agreement was signed.  The jury could have reasonably found that the SOMMA defendants finally agreed to the terms of a separation agreement (which included their promise to provide additional valuable consideration to Goldstein) in exchange for Goldstein's agreement to officially prove their proposal.

Defendants' principal legal argument is that the Indictment does not charge a "let's do the beef" conspiracy.  Def. Mem. at 34.  They argue that the government's theory was that they engaged in "a quintessential pre-*McDonnell* as-opportunities-arise and/or stream-of-benefits theory of bribery." *Id*.  They argue further that the Indictment does not charge an as-opportunities-arise and/or stream-of-benefits theory of bribery, but that instead it charged only discrete *quid pro quos*. *Id*. 34-35.  They argue that permitting the convictions to

stand on an overarching *quid pro quo* theory would result in an unlawful constructive amendment of the Indictment. *Id*. at 35.

I am not persuaded. There was no constructive amendment here, for the Indictment gave defendants "notice of the core criminality to be proven at trial." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997); *see United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (an indictment must "fairly inform[] a defendant of the charge against which he must defend") (internal quotation marks and citation omitted). This argument was raised with respect to the motions *in limine* filed before the trial. At oral argument of the motions, the government asserted:

> MR. POLEMENI: Well, I think, Judge, the primary quid pro quo is the chicken for beef deal. It is the scheme which is I'm going to, Eric Goldstein, I am going to support your business before the DOE, I am going to get your chicken products into the DOE, and you are going to help me with this business.
>
> So it's not that there are just four specific quid pro quos. There is an overarching conspiracy. There is an overarching bribery scheme in this case and we don't want to be --
>
> THE COURT: The four quid pro quos are examples of support for that overarching theory.
>
> MR. POLEMENI: Yes, Your Honor. . . .

> THE COURT:      I mean I agree that you should be able to argue
> your main theory.  That's your main theory.
>
> MR. POLEMENI:  Yes.
>
> THE COURT:      That's the case.  And here are four examples of
> things to prove it up.  I don't have a problem with that.

ECF No. 177 at 35-36.

The Indictment certainly alleged an overarching bribery scheme, as

it alleged that:

> BLAINE ILER, MICHAEL TURLEY and BRIAN TWOMEY provided
> numerous benefits to the defendant ERIC GOLDSTEIN, including
> enticing GOLDSTEIN with potentially lucrative business
> opportunities and making monetary payments to GOLDSTEIN and
> RMSCO for GOLDSTEIN's benefit.  In exchange, GOLDSTEIN used
> his significant influence as head of SchoolFood to aid ILER, TURLEY
> and TWOMEY in [SOMMA]'s business dealings before SchoolFood.

ECF No. 45 at ¶ 12.  The Indictment then provided examples of specific *quid pro*

*quos*:

> Among other things, GOLDSTEIN ensured that SchoolFood
> accepted [SOMMA]'s products for purchase, expedited the approval
> process, and resolved disagreements between [SOMMA] and
> SchoolFood officials in [SOMMA]'s favor.

*Id.*; *see also id.* ¶¶ 14-18 (specific examples).  The Indictment also specifically

charged that Iler reported that Goldstein said to him: "I'm going to buy a lot of

fucking chicken from you guys, let's do the beef."  *Id.* ¶ 13.

38

Hence, the Indictment gave defendants fair notice of the core criminality to be proven in trial.  Further notice was provided by the discussion at the argument of the motions *in limine*, both by the government's argument and my observation that I understood that the government was relying on an overarching theory and would support that theory with specific examples -- as identified in the Indictment.

Nor does *McDonnell* support defendants' position.  In *McDonnell*, the former governor of Virginia and his wife were convicted of bribery for accepting, while McDonnell was in office, $175,000 of loans, gifts, and other benefits from a businessman affiliated with a company that was hoping Virginia's public universities would perform research on a compound used in its products. *McDonnell v. United States*, 579 U.S. 550, 555 (2016).  The government alleged that McDonnell had committed or promised to commit "official acts" in exchange for the loans and gifts, namely, arranging meetings, hosting events, and contacting other government officials to promote the company's products and recommending that they meet with the company's executives.  *Id*. at 555, 563. The Court held that "[s]etting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather

information" did not qualify as "official acts" for purposes of the bribery laws. *Id*.

at 573.

        In the instant case, Iler, Turley, and Twomey were bribing Goldstein

not simply for access, making contacts, or for gathering information, but to

provide them with specific and concrete assistance in actual business

transactions as they sought to and were doing business with SchoolFood.  While

defendants may not have identified at the outset the precise official acts to be

provided, such precision is not required.  As the Court observed in *McDonnell*:

> Under this Court's precedents, a public official is not required to
> actually make a decision or take an action on a "question, matter,
> cause, suit, proceeding or controversy"; it is enough that the official
> agree to do so. . . .  The agreement need not be explicit, and the
> public official need not specify the means that he will use to perform
> his end of the bargain.  Nor must the public official in fact intend to
> perform the "official act," so long as he agrees to do so.  A jury could,
> for example, conclude that an agreement was reached if the evidence
> shows that the public official received a thing of value knowing that
> it was given with the expectation that the official would perform an
> "official act" in return. . . .  It is up to the jury, under the facts of the
> case, to determine whether the public official agreed to perform an
> "official act" at the time of the alleged *quid pro quo*.  The jury may
> consider a broad range of pertinent evidence, including the nature of
> the transaction, to answer that question.

*Id*. at 572-73; *see also United States v. Silver*, 948 F.3d 538, 553 (2d Cir. 2020)

(bribery does not require that "the official 'specify the *means* that he will use to

perform his end of the bargain'"); *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) ("[S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise . . . .").

The *McDonnell* Court also wrote:

> Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant, in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id*. at 573. Here, the official -- Goldstein -- made phone calls, sent emails, and had conversations to pressure other officials on pending matters. Indeed, he did even more, as with respect to some transactions he was the ultimate decisionmaker and made decisions himself for SOMMA's benefit -- on matters actually pending before SchoolFood.

As for defendants' argument that the government was proceeding on an uncharged "as-opportunities-arise" theory of bribery, as noted both before and after trial, I did not think that the government was proceeding on "stream of

41

benefits or opportunities arise theories." ECF No. 177 at 34; *see also* Trial Tr. 2118-19. The Indictment, in my view, was much more specific than alleging that Goldstein merely promised to help SOMMA as opportunities arose. *See Silver*, 948 F.3d at 556 (explaining that an "as opportunities rise" theory is one where "[a]n official accepts a bribe, stating to the payor that she will 'take official acts as the opportunities arise'"). Rather, the Indictment alleged that "Goldstein used his significant influence as head of SchoolFood to aid Iler, Turley and Tomey in [SOMMA's] business dealings before SchoolFood." ECF No. 45 at ¶ 12. Moreover, the Indictment went on to allege how Goldstein provided aid to SOMMA in its business dealings with SchoolFood, as it alleged specific acts that Goldstein performed in exchange for specific benefits.

In any event, as *McDonnell* and *Silver* make clear, there is nothing inherently unlawful about a stream-of-benefits or as-opportunities-arise theory of bribery. The principal issue (as relevant in this case) is whether adequate notice is given to the defendant of the core criminality and the specifics of the alleged bribery scheme. Here, even assuming the government's theory of an "overarching theory of bribery" could be construed as really an as-opportunities-

arise theory, defendants had more than sufficient notice of the core alleged criminality and the specifics of the alleged scheme.

Finally, as to the conspiracy counts, for the reasons set forth above, there was more than sufficient proof of *quid pro quos* and the intent to engage in a bribery scheme. Moreover, as discussed above, the government presented evidence that Iler, Turley, and Twomey executed the separation agreement on or about November 30, 2016, Goldstein finally signed off on SOMMA's proposal on November 30, 2016, and SOMMA wired $66,670.39 to RMSCO on December 8, 2016. Accordingly, the government proved overt acts occurring within the limitations period.

The Rule 29 motion prong of the motion is denied.

**2.     *Rule 33***

In the alternative, defendants move for a new trial pursuant to Rule 33. First, they argue that "[t]he full evidentiary record weighs overwhelmingly against the verdict. The jury got the verdict wrong." Def. Mem. at 46. Second, they contend that other factors render the jury verdict unreliable -- inflammatory evidence and argument about food safety, *id*. at 48-50, inflammatory evidence

and argument about conflicts of interest, *id*. at 50-52, and unfair and improper

argument in the government's closing and rebuttal, *id*. at 52-55.

Second, for the reasons discussed in the Rule 29 section of this decision,

there was more than sufficient evidence in this record to uphold the jury's

verdict. The evidence does not preponderate heavily against the verdict, and

manifest injustice does not result from permitting the verdict to stand. *See*

*Landesman*, 17 F.4th at 330-31; *Archer*, 977 F.3d at 188.

Second, I am not persuaded that any of the "factors" identified by

defendants in their Rule 33 motion "compromised the reliability of the verdict."

*Landesman*, 17 F.4th at 331 (quoting *Archer*, 977 F.3d at 188).

The food safety evidence was highly probative. The presence of

foreign objects in chicken tenders and blood in chicken drumsticks presented

obvious problems for SOMMA, and SOMMA had to push to keep its products

on the menu because of those issues; the evidence showed that Goldstein

provided substantial assistance as SOMMA succeeded in doing so. While the

evidence was arguably "inflammatory" to some extent, the probative value of the

evidence was not outweighed by the danger of unfair prejudice. *See United States*

*v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (prejudice caused by evidence is not

"unfair" if "adverse effect" on defendant merely shows "the fact or issue that justified [the] admission").  The admissibility of the evidence was extensively briefed before trial and I ruled that it was admissible.  ECF No. 177 at 17-20 ("[O]f course, it's prejudicial if there is evidence that children were endangered, but if indeed the government's allegations are true, then perhaps they were in danger. It just seems to me that it is relevant, that the probative value is high.").  Moreover, I gave a limiting instruction when the evidence was first received and again in my final charge to the jury.  Tr. 686, 2560.  And the government limited its evidence in this respect.  For example, the government agreed not to call as a witness, as it had initially contemplated, a DOE employee who had choked on foreign matter in a SOMMA chicken product, agreeing instead to a stipulation to that effect.  GX 1007.  The admission of the food safety evidence is no basis for ordering a new trial.

Likewise, the probative value of the conflict-of-interest evidence substantially outweighed the danger of unfair prejudice.  It was highly relevant that Goldstein was blatantly violating the New York City conflict of interest rules.  That he would disclose other, minor potential conflicts of interest while failing to disclose his entering into a partnership with a vendor doing business

45

with SchoolFood was strong evidence of consciousness of guilt. *See Bruno*, 661 F.3d at 744 (holding that Bruno's attempt to cover up extent of his relationship with individual paying him bribes was evidence of consciousness of guilt). While a conflict of interest may not be, in and of itself, criminal, it can be, as it was here, strong evidence of a corrupt intent. Moreover, the government again limited its evidence in this respect and I gave multiple limiting instructions, including in my final charge. Tr. 443, 535-36, 2559-60.

Finally, I reject defendants' contention that the government made improper arguments in closing and rebuttal. The government did not, at any time, cross the line. It argued reasonable inferences fairly based on the evidence, and its arguments were firmly grounded in the record. *Cf. United States v. Casamento*, 887 F.2d 1141, 1190 (2d Cir. 1989) (holding that government argument was improper where it "appear[ed] to have been based on little more than speculation," and even then that the improper statement did not cause a "deprivation of [defendant's] due process rights").

There is no basis for ordering a new trial.

## CONCLUSION

I sat through almost four weeks of trial and have now carefully reviewed the record and considered the parties' arguments.  In my view, the jury got it right and manifest injustice will not result from letting the jury's verdict stand.  I am "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury's finding that [these] defendant[s are] guilty beyond a reasonable doubt." *Sanchez*, 969 F.2d at 1414.  Accordingly, defendants' motion for judgment as a matter of law or alternatively for a new trial is denied in all respects.

Sentencing is set for Monday, June 10, 2024, at 1 p.m.  Counsel for the parties shall confer and propose a schedule for sentencing submissions, with all papers to be submitted no later than May 31, 2024.

SO ORDERED.

Dated:     New York, New York
           February 12, 2024

                                        DENNY CHIN
                                        United States Circuit Judge
                                        Sitting by Designation

47

**APPEARANCES:**

BREON PEACE, Esq.
United States Attorney for the Eastern District of New York
*By*:     Robert T. Polemeni, Esq.
          Laura Zuckerwise, Esq.
          Andrew D. Grubin, Esq.
          Kaitlin McTague, Esq.
          Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, NY  11201

FEDERAL DEFENDERS OF NEW YORK
*By*:     Kannan Sundaram, Esq.
          Neil P. Kelly, Esq.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY  11201
                  - and -
52 Duane Street, 10th Floor
New York, NY  10007
          Attorneys for Defendant Eric Goldstein

AKERMAN LLP
*By*:     Bradley L. Henry, Esq.
          Michael P. Kelly, Esq.
          Kathleen Hunter Shannon, Esq.
          Elpitha Lambros, Esq.
1251 Avenue of the Americas, 37th Floor
New York, NY  10020
                  - and -
750 Ninth Street, NW, Suite 750
Washington, DC  20001
                  - and -
71 South Wacker Drive
Chicago, IL  60606
          Attorneys for Defendant Blaine Iler

ZUCKERMAN SPAEDER LLP
*By*:     Aitan D. Goelman, Esq.
          Daniel A. Braun, Esq.
          Leila Bijan, Esq.
1800 M Street, NW, Suite 1000
Washington, DC  20036
                    - and -
485 Madison Avenue, 10th Floor
New York, NY  10022
          Attorneys for Defendant Michael Turley

WILLIAMS & CONNOLLY LLP
*By*:     Brendan V. Sullivan, Esq.
          Tobin J. Romero, Esq.
          Amy Mason Saharia, Esq.
          Zachary K. Warren, Esq.
          Patrick J. Looby, Esq.
680 Maine Avenue, SW
Washington, DC  20024
          Attorneys for Defendant Brian Twomey