# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

August 2, 2024

**Via ECF**

The Honorable Denny Chin
United States Circuit Judge
U.S. Court of Appeals for the Second Circuit
40 Foley Square
New York, NY 10007

Re:    **United States v. Eric Goldstein**
       **21 Cr. 550 (DC)**

Dear Judge Chin,

Every day since his arrest nearly three years ago, Eric Goldstein has struggled with the terrifying knowledge that he might be ripped from his children and imprisoned, unavailable in their times of need and unable to provide for them in their dire financial straits. Eric's vulnerable family—███████████████████████████████████████████—has been pushed to the brink of total ruin as a result of Eric's arrest, trial, and conviction. Eric has lost not only an accomplished career, but his well-earned reputation as a dedicated public servant. Having worked tirelessly for 15 years to improve the experiences of millions of New York City public schoolchildren, Eric has been crushed by the realization that all he will be remembered for is his involvement in this case. That this experience might culminate in his incarceration and the certain devastation of his family that would follow is often too much for Eric to bear.

But Eric has persevered and not allowed himself to be overtaken by despair. Since his trial, Eric has dedicated himself to a rigorous program of restorative justice through which he has prioritized what matters: his family, his faith, and his commitment to self-improvement. He has provided for his vulnerable family in its time of unprecedented need. And he has continued to give back to his community and those in even more dire circumstances, just like he uplifted the often underserved and overlooked children of New York City's public schools for so long.

In light of Eric's fundamentally good character, the unique context of the charged offense conduct, the severe punishment Eric continues to endure, the extraordinarily challenging circumstances his family faces, and the disproportionate impact any period of incarceration would have on them, we respectfully submit that a sentence of incarceration in this case would be greater than necessary. Rather, as the law expressly provides for, we submit that a non-carceral sentence including probation, home detention, community service, and continued restorative justice programming—on top of the significant consequences of a felony conviction—would be more than sufficient to satisfy the goals of section 3553(a).

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

**I.        The Section 3553(a)(1) Factors Call for a Non-Carceral Sentence**

> A.        *Eric's Admirable Personal History and Characteristics Warrant Mercy*

In considering the appropriate sentence to impose, among the first factors the Court is instructed to consider are "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). "The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a)." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

Eric has led an accomplished and admirable life defined by his commitment to his family, his friends, and the public schoolchildren of the City of New York. The numerous letters to the Court enclosed with this submission movingly describe a man who has gone above and beyond to support his loved ones, counsel friends in need, and uplift millions of New York City public schoolchildren who passed through the Department of Education's schools during his tenure. These commendable characteristics and remarkable achievements in service of the public good warrant mercy from the Court at sentencing. *See Rita v. United States*, 551 U.S. 338, 365 (2007) (Stevens, J., concurring) (recognizing that public service goes unaccounted for under the Guidelines arithmetic, but may be considered by a sentencing judge under section 3553(a)); *see, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) ("[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."). This is especially true in this case, which calls for Eric's conduct to be weighed against, and viewed in the context of, his long and distinguished career of public service.

> i.        <u>Background</u>

Eric Goldstein was born in New York City in 1968. (PSR ¶ 111.) His parents were both psychologists who served the public in their practices: his father as the director of a state psychological center and his mother as a school psychologist. (*Id.*) They instilled in Eric a commitment to public service.

Eric was raised in the Midwood section of Brooklyn and then the Fresh Meadows section of Queens, along with his younger brother. (PSR ¶ 113.) A stand-out student and athlete, Eric attended New York City public schools for elementary, middle, and high school. (PSR ¶ 131.) As a student athlete who competed against better funded and supported teams from suburban and private schools, Eric was confronted at an early age with the stark disparities in resources, facilities, and opportunities between New York City public schools and those his more affluent competitors attended. As Eric's mother writes:

> Throughout his primary and secondary school education, Eric went to public school and was an honor student. In high school, Eric was part of the then-new to NYC public schools and fledgling Jamaica High School lacrosse team. As there were no other public school lacrosse teams in NYC they had to play against schools on Long Island and private schools.  Eric arrived at school every day by 7

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

am to practice with the team before the school day on an unkempt dirt field strewn with the pebbles and the debris of urban life.[1]

These memories would remain with Eric his whole life and serve as powerful motivation later on in his professional career.

After high school, Eric attended Cornell University, where he studied history and graduated with honors in 1990. (PSR ¶ 130.) An inveterate history buff, after several years working at a consulting firm and a start-up company, Eric pursued and received a master's degree from St. Antony's College at Oxford University, having focused and written a thesis on Middle Eastern foreign policy. (PSR ¶¶ 114, 120.)

Following his time at Oxford, Eric remained in London and returned to the start-up at which he previously worked, a software and business technology firm that was taken private after the dot-com bubble burst in 2001. (PSR ¶ 138.) Eric continued to work in London as a full-time consultant before he and his growing family (*see infra*) moved back to the United States in 2002. (PSR ¶ 137.) Eric's former boss recalls Eric as "a model employee":

What is a model employee these days? Someone who would turn up on time, every time. Someone who would meet every deadline on time and work to an exacting standard. Someone who would always put the team first, even at a disadvantage or inconvenience to himself. Someone willing to travel coach to support the company. Someone who could be trusted, to the penny, when submitting an expense report. Someone who is intelligent and capable and who was always trying to better himself for benefit of his family. Eric was all of these things and an absolute pleasure to work with.[2]

Back in New York, Eric became acquainted with Elliot "Lee" Sander, a former New York City Department of Transportation Commissioner and then Commissioner of the Taxi and Limousine Commission (and future Executive Director and CEO of the Metropolitan Transportation Authority), who identified Eric as "exceptionally bright, ambitious, and of solid character," and interested in public service.[3] At the time, Eric was working for The Conference on Jewish Material Claims Against Germany ("Claims Conference") assisting with Holocaust survivor claims for the return of property and other losses suffered in the Shoah. Mr. Sander recommended Eric to a former colleague who was running the "non-pedagogical activities for the Department of Education," namely the school food, transportation, athletics, and facilities divisions. Eric was hired as Deputy Chief Executive Officer of the Office of School Support Services in July 2003 and in March 2007 was promoted to the Chief Executive Officer role, which he held (except for a brief period in 2008) until July 2018. (PSR ¶ 135.)

As Eric's mother writes:

---

[1]   Ex. A, Ltr. from H. Goldstein.

[2]   Ex. G, Ltr. from E. Brown.

[3]   Ex. I, Ltr. from Elliott Sander.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

I vividly recall that he was proud to be selected for his position. He said that after having gone through NYC public schools and then being able to compare it with the experiences of others from richer or private schools, he could really work to improve the lives of NYC students in ways that he felt were possible, achievable and needed. I know that Eric devoted much of his time working for the DOE and put in very long hours.[4]

    ii.    <u>Career</u>

During his nearly 15 years at the Department of Education, Eric poured his heart and soul into his job. His deep-seated commitment to improving the educational experiences and lives of New York City's public school students shines through the many letters to the Court. As one close friend writes:

[Eric] was passionate about his work at the Department for Education and its positive impact on kids' lives. He would constantly tell me about the efforts he was leading to improve the level of service given to the children, many of whom came from poor, immigrant or difficult backgrounds. I could see the pride Eric took in being able to help these students every day.[5]

A former colleague describes Eric's "long history of uplifting others whether personally or on a large programmatic scale. His dedication to poor and underserved urban youth is remarkable."[6]

Another former executive from the Office of School Support writes:

Eric was an executive dedicated to serving the children of NYC with nutritious food, transportation, and sports programs. At the same time, he served the thousands of people who worked under his leadership. He was an effective leader of an enormous, multi-billion-dollar organization, with agility and skill. . . . He navigated the relationships among various collaborating departments throughout the city and beyond, focusing on improving the experiences of the children in the public school system.[7]

Steven Simon—an accomplished diplomat and foreign service official who Eric met at Oxford and remained close with thereafter—had experience early in his career working in New York City municipal government. As he writes to the Court:

---

[4]    Ex. A, Ltr. from H. Goldstein; *see also* Tr. 1787:1–11 (Goldstein).

[5]    Ex. F, Ltr. from J. Davidson.

[6]    Ex. T, Ltr. from K. Barry.

[7]    Ex. U, Ltr. from G. Pitagorsky.

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

> Over my lengthy career in and out of government service, including my time
> working in two White House administrations, the State Department, the National
> Security Council, the International Institute for Strategic Studies, the RAND
> Corporation, and the Council of Foreign Relations, I have met many well-
> intentioned public servants. I consider Eric Goldstein to be one of the most
> committed to his area of public service—improving the experience of New York
> City public students . . . many of whom received nearly all of their nutrition and
> personal enrichment through the non-pedagogical programs Eric oversaw.[8]

As the letters to the Court consistently reflect, Eric wore many hats and had many
responsibilities during his time at the Department of Education, but Eric always had a particular
dedication to disabled and special needs students. Eugene Sander, an advocate for disabled
children, sums up Eric's commitment to the children he served:

> I work closely with the Department of Education to service our disabled children.
> Often, it has fallen to me to advocate on behalf of a family whose child is not
> approved for service or is not being treated appropriately or to address a systemic
> problem plaguing these children. The unfeeling coldness of many bureaucrats
> would lead me at times to tears. So I would turn to Eric Goldstein and unfailingly
> he would listen, empathize, and find a way to be of help. Throughout the years I
> have had the pleasure of knowing him, I have witnessed him help solve countless
> crises. . . . In times of great pain for families, he went above and beyond to help
> the vulnerable.[9]

### 1.  SchoolFood

Of Eric's many accomplishments during his time at the DOE, a few warrant special
mention. First and foremost was Eric's commitment, as Mark Izeman of the Natural Resources
Defense Council (NRDC) writes, "to improve the quality of public school food in New York
City and around the country for underserved urban schoolchildren."[10]

Eric's work to improve the quality and healthfulness of the food the DOE served daily to
its nearly 1 million students was widespread and innovative. Under Eric's leadership,
SchoolFood introduced salad bars and incorporated more local produce and dairy products, and
meals featuring minimally processed or "whole" foods, including fresh fruits and vegetables,
whole grains, nuts, and proteins—all of which was a dramatic change from the processed and
frozen food items DOE had previously relied upon. *See, e.g.*, Tr. 1119:8–1121:3 (O'Brien).

One of the many initiatives Eric spearheaded was for the use of antibiotic free chicken.
When one of his sons had a serious bout with antibiotic-resistant illnesses, Eric became
concerned about the overuse of antibiotics in livestock and the detrimental effect this could have

---

[8]  Ex. H, Ltr. from S. Simon.

[9]  Ex. P, Ltr. from Eugene Sander.

[10]  Ex. K, Ltr. from M. Izeman.

<u>**United States v. Eric Goldstein**</u>
**21 Cr. 550 (DC)**

on children. *See* Tr. 1793:21–1794:18 (Goldstein). Throughout late 2012 and early 2013, he received detailed scientific guidance from the NRDC about the health effects of antibiotics overuse in the food supply, learning that antibiotic resistant bacteria could form in response and "lead to longer illnesses, more hospitalizations, use of stronger or more toxic antibiotics with greater side effects, and even death when treatments fail." DX 565. These warnings matched Eric's own frightening personal experience with his son.

Eric thereafter worked with the NRDC and Office of School Support leadership to determine how SchoolFood could best leverage its size and position in the market to push suppliers to start providing antibiotic free chicken as part of their school meal offerings. *See* Tr. 1795:1–1801:2 (Goldstein); DX 565; DX 636. Eric's advocacy for this initiative was a huge step forward in raising the quality and healthfulness of public school food offerings. As the Director of the NRDC's New York regional programming writes:

> I first met Eric in 2012 when he served as the Chief Executive Officer of the Office of School Support Services at the NYC Department of Education. At our first meeting, Eric expressed an interest in NRDC assisting his office in providing more environmentally-sustainable and healthier food for the roughly 900,000 students in NYC public schools – the largest school district in the nation. More specifically, he sought NRDC's scientific and legal advice on purchasing chicken – one of the most served food items in the schools – raised without the use of antibiotics. At that time, and still today, the overuse of antibiotics in our food system is one of the major drivers of antibiotic resistance, which occurs when bacteria and other germs develop the ability to defeat the drugs designed to kill them. It is considered a top global public health threat. Having a committed partner enthusiastic about addressing this issue was a tremendous step forward for our efforts to mitigate this widespread public health danger.[11]

Beyond his work elevating the offerings in New York City public school cafeterias, Eric also helped create the Urban School Food Alliance (USFA)—a consortium of the largest public school districts in the country, which could pool the groups' market share and influence to drive demand for (and hopefully stimulate offerings of) healthier school food options for millions of students nationwide. *See* Tr. 965:8–966:1, 1115:17–1116:1 (O'Brien). Mr. Izeman describes how:

> Eric also asked NRDC for our help in creating an alliance of the nation's largest school districts – to be named the Urban School Food Alliance. Eric's vision was that if the largest school districts worked together as an alliance, they could leverage their enormous purchasing power to not only immediately help millions of kids in their districts who rely on school food, but that the Alliance could also push the national marketplace to provide better school food that could be available to all school districts around the country, regardless of their size. . . . Through its varied initiatives, the Alliance has been able to advance significant

---

[11]   Ex. K, Ltr. from M. Izeman.

<u>United States v. Eric Goldstein</u>
21 Cr. 550 (DC)

change and improve public health standards for millions of public school students nationwide.[12]

Mr. Izeman—who collaborated with Eric on several of the initiatives that were central to the trial in this case—provides a glowing assessment of his years working closely with Eric: "Eric Goldstein is a smart, honest, and caring individual who spearheaded unprecedented school food purchasing initiatives in NYC and in other school districts around the country, which drove marked improvements in the lives of countless public school students—many from underserved communities."[13]

A former colleague from the Urban School Food Alliance describes Eric's leadership and advocacy on an issue that might appear boring or unexceptional to outsiders, but which had tremendous tangible benefits for the public school students Eric served:

Eric inspired me by his vision and his belief that tasty and healthier school food for the millions of kids who needed it was not just possible, but doable. This was particularly inspiring because many, if not most, of the public schoolchildren served by Eric's department or the USFA were poor or from disadvantaged communities, and these children received most, if not all, of their sustenance through meals served to them by the public schools Eric uplifted. Eric Goldstein dedicated his professional career to improving the lives of millions of children and their parents who never knew his name.[14]

The care and concern Eric showed for the public school students he served was on particular display when it came to students with disabilities or other special needs. In one anecdote that is representative of the personal time and energy Eric dedicated to solving even localized problems at the individual school level, Motti Heiman (an advocate for special needs children) describes how:

When District 75 Sep opened bilingual classrooms to accommodate about 25 multiple handicapped Yiddish-speaking children no thought was given to their religious requirements for kosher food. Despite experience with other special needs kosher families the NYCDOE never created a protocol for them. So aside from the usual tantrums, the challenge of getting these children dressed, and other morning challenges, parents would have to prepare meals each day to send with their children. We appealed to Mr. Goldstein and unlike others, he responded immediately. When Eric was asked to step in, he did not continue pushing the request under the rug. Instead, he made sure that the right divisions at DOE supplied the necessary food for the children, arranging kosher breakfast, lunch, and snacks. This took off the great burden of the parents, who would need to prepare and pack kosher food for their children, and the great need their children

---

[12]   Ex. K, Ltr. from M. Izeman.

[13]   *Id.*

[14]   Ex. J, Ltr. from P. Fleischer.

have before leaving off to school in the morning. After so many tries, it was Eric who arrived and made sure that what was necessary and appropriate was done. His ears were never closed and his hands never folded despite things being hard to carry through.[15]

Eric's tendency to involve himself in the weeds to fix individual issues when the massive SchoolFood bureaucracy was indifferent or sluggish was criticized at trial. But it was those very qualities—attention to detail, impatience with lingering problems, and follow-through on issues brought to his attention—that produced demonstrable improvements in the school food experience for millions of New York City public school children during his tenure.

2.      Transportation

Eric brought this same tenacity to the even more troublesome area of pupil transportation, which was responsible for busing tens of thousands of students to their schools around the city. One of Eric's key initiatives in this area was to open to public bidding the school busing contracts that had for decades been dominated by companies that were notoriously corrupt and, in some instances, even affiliated with organized crime. *See* Tr. 1791:2–13 (Goldstein). As someone with a deep history in New York City transportation issues, Lee Sander writes that:

> [Eric] was a force for positive change during his time at the New York City Department of Education (DOE). . . . He shared with me how he was confronting powerful and resistant political forces, especially as it related to pupil transportation, where with the support of Mayor Bloomberg and Schools Chancellor Walcott he was putting previously no-bid contracts out to the market, resulting in dramatic cost savings for the public. . . . These institutional hurdles to reform were not just in the bureaucracy. Because of allegations of mob control of some of the school bus operators, and my concern for Eric's safety in trying to reform the system – one of the school bus owners showed up with a gun to negotiations  – I called then Commissioner Ray Kelly of the NYPD, who I was working closely with post 9-11 when I was running the MTA – to keep an eye out for any threats that Eric might be subject to. Despite this resistance, however, I heard numerous positive stories about Eric's performance at the Department of Education from trusted friends, particularly in the area of transportation, who reported that Eric initiated much positive change at the Department.[16]

An executive at the Office of Pupil Transportation confirms this assessment:

> I know working closely with him that Mr. Goldstein is a hard-working, honest, and reliable person who has always shown integrity and professionalism in his work. I have seen this firsthand many times, especially for special education students who are the most vulnerable and for whom Mr. Goldstein was particularly motivated. I specifically recall an instance where a bus route was

---

[15]   Ex. L, Ltr. from M. Heiman.

[16]   Ex. I, Ltr. from Elliott Sander; *see also* PSR ¶ 116.

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

simply not working for the parents and students on the route. While the bus company insisted that the route was working, we were getting too many complaints and one of the parents reached out to Mr. Goldstein. We were called to Mr. Goldstein's office to review the specific stops on the route. Mr. Goldstein then directly spoke to the bus vendor, and we then spoke to the parent again. We split the route, changed the order of the bus stops and had the bus company add a bus which then solved the problem for these parents. Eric's commitment to addressing problems often led him to involve himself in the details to make sure issues for our students were corrected.[17]

Mr. Heiman corroborates how Eric was particularly attuned to the challenges faced by parents of special needs students and was personally committed to helping address their concerns:

Experience has taught me that unfortunately, too often special children's needs are ignored and neglected within the New York City Department of Education bureaucracy. More recently transportation to and from therapy and special schools has been a thorny issue for these parents. Disabled children were assigned bus routes that ignored their specific needs, and even in an emergency, it would take an unconscionably long time to get any response from the busing department. Some hard-pressed parents were even forced to hire their own private transportation. It was in this capacity that I got to know the NYCDOE OPT chief officer, Mr. Eric Goldstein. From the very beginning, he was different. He displayed true concern for each student. He went above and beyond to see to it that every special needs child was assigned a route, timing, and pick-up that fit their needs. He also made sure that sensitive matrons who understood the children's needs were assigned. These are not small tasks and he orchestrated it all to ease the demands of the overburdened parents.[18]

A particularly impacted parent recalls how Eric went above and beyond to help her overcome a difficult transportation issue for her special needs daughter:

I tried contacting the DOE several times, yet my concerns did not seem to concern their departments at all. I finally reached the CEO of food and transportation of the DOE - Eric Goldstein. When we complained to him, his initial response to us was that none of my words were wasted and that he would try with whatever ability he had to make our load easier for me as a parent of a special needs child by providing kosher meals and making sure the transportation meets the requirement of the state with a max of a 90-minute drive to school. His help, concern, and care enabled me with more strength and courage to be there to help my daughter succeed and gain the most out of her childhood. I was able to focus

---

[17]   Ex. M, Ltr. from U. Frankel.

[18]   Ex. L, Ltr. from M. Heiman.

on how I could help her develop, not being pressured to prepare the food and having to be prepared for the inconsistent and unexpected transportation system.[19]

Once again, while at trial Eric was faulted for immersing himself in the minutiae of the sprawling Office of School Support's work, those whose lives were positively impacted by Eric's interventions laud his efforts to this day.

### 3. Public School Athletic League (PSAL)

Eric's third main area of responsibility at DOE was athletics—the realm that first opened his eyes to the staggering disparities between the public schools he attended and the private and suburban schools he competed against. Eric was particularly dedicated to increasing the opportunities and offerings for public school student athletes and improving their ability to carry their achievements through to higher education and beyond. Among other things, Eric helped bring in outside sponsorship to increase funding for facilities, uniforms, equipment, and travel; introduced new sports (such as cricket, badminton, Double Dutch, and girls lacrosse, wrestling, and flag football) to diversify athletic offerings to match the changing New York City public school population; and supported international competition, providing many students their first opportunity to travel outside the United States and experience other cultures. *See* Tr. 1791:14–1792:3 (Goldstein).

As one PSAL administrator writes:

Eric's leadership was all-encompassing, driven by a profound commitment to improving the quality of education for every student athlete. His strategic vision, coupled with his tireless advocacy for equity and excellence, set a new standard for athletic programs across the city. Under his guidance, the PSAL flourished, empowering students to reach their full potential and fostering a culture of inclusivity and achievement. Under his leadership, high school sports in New York City took on a new dimension, simultaneously growing in size and quality.[20]

The investor and entrepreneur Mike Novogratz, who sponsored a wrestling program for talented, at-risk, and underserved student athletes named Beat the Streets, writes about Eric's commitment:

I believe that Eric's ability to connect with our program and students was because, having attended Jamaica High School himself, he understood exactly what it is like for New York City students to be athletically disadvantaged compared to their suburban and rural peers. He was focused on ensuring New York City students have equal opportunity to succeed in athletics. . . . Eric made a tremendous difference to many students in NYC. If I hear any girls talking about

---

[19]   Ex. N, Ltr. from C. Hirsch.

[20]   Ex. R, Ltr. from T. Parker.

wrestling or see them carrying a lacrosse stick or any boys talking about cricket or badminton, I know I have Eric to thank.[21]

A former colleague who worked closely with Eric on student athletics sums up who Eric was as reflected in what Eric did for the millions of students who passed through DOE schools during his tenure:

> Eric cared deeply about making sure that every student who wanted the opportunity to wrestle could have it. . . . He understood the limitations of a high caliber athlete matriculating from New York City to our top national collegiate sports programs, but also how important it was to use sports to provide these kids the opportunity for higher education and achievement they might not otherwise have access to. Eric didn't sit behind his desk, but showed up where the kids were again and again.[22]

      iii.     Family

Eric's impressive commitment to New York City's public schoolchildren has been outmatched only by his dedication to his family. Eric has always been a loving, committed son and brother to his immediate family. As his brother writes, Eric's "reliability knows no bounds – I have always been able to lean on him, not only for practical matters but also for his unwavering emotional support and sagacious guidance."[23] Sadly, Eric's father has suffered from ███████████ ██████ in his later years (PSR ¶ 111), but despite the physical distance between them and his own struggles, "Eric remains steadfast" in helping his parents in whatever way he can. As his brother writes, "He consistently shows up, cherishing the moments he can spend with our father, including our tradition of attending baseball games. These shared experiences hold profound significance as we navigate these unprecedented times, acutely aware of their fleeting nature."[24]

While Eric was a student at Oxford in the early 1990s, he met his future wife, Jolanta, who had come to London from her native Poland to study as well. The couple were married in 1994 and remained in London until 2002, when they returned to the United States. (PSR ¶¶ 114, 118.) They had their first son, ███ in 2002, in trying circumstances. As Eric's mother recalls:

> While they were living in England, with his wife seven months pregnant, Eric and his wife had to briefly return to the US for visa reasons. While they were staying at our house, Eric's wife developed an emergency medical condition that then required her to be hospitalized for two straight months to see if the baby could be saved. All the time she was in the hospital, Eric spent those two months sleeping

---

[21]   Ex. S, Ltr. from M. Novogratz.

[22]   Ex. T, Ltr. from K. Barry.

[23]   Ex. B, Ltr. from Jason Goldstein.

[24]   Ex. B, Ltr. from Jason Goldstein.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

on a chair in the same room with his wife. It was only with God's grace that their son, my grandson, was eventually born.[25]

In 2004, Eric and Jolanta's second son, ███ was born. The family moved to Westchester County and was a close-knit, integral part of the community. As Eric's friend and former colleague Moshe Becker writes:

> I worked as a Rabbi in the local community and Eric inquired about further opportunities to meaningfully engage with his faith. I subsequently met his wife at the time and their sons, all of whom would come to routinely attend Jewish community events, worship, and learning opportunities. Eventually serving on the board of the Westchester Jewish Day School, Eric always sought opportunities to help; his presence at any meeting or event was, without fail, noteworthy and highly valued.[26]

Sadly, while Eric was achieving great things at the Department of Education, his home life was deteriorating. Eric and Jolanta drifted apart and their marriage suffered. (PSR ¶ 118.) On top of these stresses, ███████████████████████████████████████████████

These years were particularly harrowing for the family, ██████████████ just as Eric and Jolanta's marriage was breaking apart. As Jolanta writes:



[25]

---

[25]  Ex. A, Ltr. from H. Goldstein.

[26]  Ex. E, Ltr. from M. Becker.

[27]  Ex. C, Ltr. from Jolanta Goldstein.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

████████████████████████ caused enormous stress, pain, and heartbreak for Eric as he struggled ██████████. Eric's mother recalls that:



Eric's mother describes ████████████████████████████████

████████████████████████████████

Eric's brother recounts how Eric has stepped up countless times ██████████████

---

[28] Ex. A, Ltr. from H. Goldstein.

[29] *Id.*

<u>**United States v. Eric Goldstein**</u>
**21 Cr. 550 (DC)**





Eric has embraced the challenge ▆▆▆▆▆▆▆▆▆▆▆ and has been a source of advice, guidance, and comfort for others in similar situations. Lee Sander writes how:



A close family friend similarly describes how ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



> iv.      <u>Eric's Harrowing Post-DOE Life</u>

In 2018, Eric lost his job at the Department of Education and the last vestige of stability in his life. (PSR ¶ 135.) The next several years—culminating in his arrest and trial in this

---

30   Ex. B, Ltr. from Jason Goldstein.

31   Ex. I, Ltr. from Elliott Sander.

32   Ex. W, Ltr. from L. Montes.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

matter—have seen an escalating series of disasters that have brought Eric and his family to the brink of total ruin. As Mr. Becker describes:

> Sadly, Eric's life can only be described as having unraveled over the past several years. He has lost his prestigious job, his marriage, many friends, and, to a large extent, much of the respect and dignity he deserves. And although Eric is the last person to feel sorry for himself or occupy the role of victim, he has struggled mightily in recent years. Even absent the present case, he has dealt with more than many would be able to handle.[33]

After years of legal wrangling in the couple's highly contentious divorce, around the time Eric lost his job at the DOE, he was awarded custody of ███ Eric needed to move with his son into the home of his parents, where he organized and supervised ████████████████ ███████████████████████████████ Eric's mother writes:

> Eric was and is very close to his son and in 2018 was awarded custody. They both came to live at our crowded house in Port Washington where both of them slept on the couch together even through Eric's firing from the DOE that September. During that time, I saw firsthand Eric's care for his son. ████████████ ████████████████████ Eric made sure that he attended all his tutoring sessions at the local library and spent hours playing basketball and football with him when the weather permitted.

> Eric then entered a period I would describe as temporary homelessness. Due to his unfortunate circumstances, he had to live in a friend's guesthouse in Connecticut and then, for almost two years until the end of the pandemic, lived in three separate hotels with his son in upstate New York. It was an extremely challenging time for everyone, and unimaginably difficult for Eric. But Eric cared for his son in a manner that was exemplary and demonstrated what true dedication to family means.[34]

Following his well-publicized arrest in this case, the beef importing business that Eric had tried to build in the years after he left the DOE collapsed, causing further financial devastation for Eric and his family. (PSR ¶ 134.) Then, just when things felt like they couldn't get worse, ████████████████████████████████████████. (PSR ¶ 118.) ███ As Eric's close friend writes:

> Eric's arrest further pushed the family into turmoil. . . . ██████████████ ██████████████████ has brought the whole family to the verge of the abyss. That this awful

---

[33]   Ex. E, Ltr. from M. Becker.

[34]   Ex. A, Ltr. from H. Goldstein; *see also* PSR ¶ 114.

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

turn of events took place shortly before Eric's trial was a severe blow to everyone. It is difficult to imagine a crueler circumstance.[35]

With ████████████████████ Eric only able to find work as a self-employed food salesman (PSR ¶ 133), ██████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ In the face of this adversity for his family, however, Eric again showed his true character. Despite the years of acrimony and tension with his ex-wife, and despite his own federal criminal indictment and looming trial, Eric took on additional responsibilities to help his family survive. He redoubled his commitment to his sons, fulfilling many of the roles ██████████████████████████. Eric's brother describes how:

██████████████████████████████ Eric plays an important role in his younger son's life. As an example, Eric moved him in and out of college and went back when he had to switch dorm rooms early in the semester. Eric also takes his younger son to see his ailing grandfather and grandmother and visit me and the rest of his family in Florida, which is critical to do in a broken family setting.[36]

Eric has also ████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████

Eric's potential incarceration would be a sentence not only given to him, but also to our family that, as it is, barely keeps up with the harsh realities of life that have been dealt to us. . . . ████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████

---

[35]  Ex. H, Ltr. from S. Simon.

[36]  Ex. B, Ltr. from Jason Goldstein.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**



Eric's brother echoes these fears. Having witnessed ████████████████ █████████████████████████ his brother is terrified of what might happen if Eric were to be incarcerated:

████████████████████████████████ osing Eric would be nothing short of a catastrophe for us all.[38]

B.      *The Nature and Circumstances of the Offense*
        *Warrant a Non-Carceral Sentence*

The Court must also take into account "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). While we acknowledge the jury's verdict and the Court's decision to uphold it, and accept them for purposes of this submission, we believe it is important for the Court to recall the unique aspects of the offenses of conviction in determining the appropriate sentence.

The government's case turned on four purported actions Eric took to benefit Somma. The evidence at trial established that Eric either had no involvement in SchoolFood's decisions or that each of his actions was justified on the merits and that he would have taken the very same steps regardless of whether he received any benefit from Somma—because these actions were the right thing to do in his mind.

*First*, the government claimed that Eric improperly moved up the dates for the initial service of Somma's yogurt parfait and chicken drumsticks in exchange for Somma's $20,000 transfer to RMSCO. But as was made abundantly clear at trial, it was Mr. O'Brien who initially moved the parfait debut date to December 17, 2015, *see* DX 328, and when that date appeared as if it might slip, Eric wanted to maintain it because of the important Local Thursday event that Eric's office had scheduled with the Chancellor of the Department of Education, the New York State Agriculture Commissioner, and the American Dairy Association to promote products with ties to New York State suppliers. *See* Tr. 1882:4–1884:24 (Goldstein); DX 358; DX 667; DX 670; DX 672. Eric expedited non-Somma items for the same event. *See* DX 576. The Court appreciated these facts at trial. *See* Tr. 1375:23–1376:3 (THE COURT: "Fast tracking the parfait, the record to me seems to me to indicate that DOE wanted this done as much as Somma, perhaps more so. You know, there was this December 17th rollout with the chancellor, et cetera, and there was enormous pressure to get it done. I don't see that Mr. Goldstein was leaning on DOE to

---

[37]   Ex. C, Ltr. from Jolanta Goldstein.

[38]   Ex. B, Ltr. from Jason Goldstein.

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

get this done faster for Somma."). There was no documentary evidence that Eric had any involvement in SchoolFood's request to Somma to provide the chicken drumstick starting in December 2015.

*Second*, the government alleged that Eric directed that Somma's chicken drumsticks were to be served twice a month. But the evidence the government presented demonstrated, instead, that after Eric forwarded an email from Mr. Turley regarding the frequency of menuing the chicken drumsticks (and commenting "If doable, we should do."), Mr. O'Brien responded that SchoolFood had already, independently decided to schedule the drumsticks twice a month. *See* GX332 ("The drumsticks are *already* planned to be on 2 times in January." (emphasis added)).

*Third*, the government argued that Eric blocked SchoolFood's imposition of liquidated damages on Somma when it did not fulfill a chicken drumstick order in early 2016, in exchange for a nebulous "reminder" of the potential business opportunity that existed in RMSCO. But as Eric correctly testified and the documentary evidence confirmed, SchoolFood did not have the authority to impose liquidated damages on an approved brand like Somma that did not have a direct contract with the DOE. *See* Tr. 1930:12–25 (Goldstein). Moreover, as Eric testified and the contemporaneous documents reflect,[39] DOE could not impose liquidated damages on distributors when—as in this instance—the distributors substituted another approved item for one that was not fully provided by a supplier. *See* Tr. 1931:1–11 (Goldstein); *see also* Tr. 723:3–5 (Debra Ascher testifying that the distributors argued the same); DX 553. The Court also appreciated this point during trial. *See* Tr. 1376:20–24 (THE COURT: "First of all, it does appear to me that fines were not called for. I mean there were - - an approved substitute was put into place. And there are e-mails that the distributors were saying this has never happened before when there were approved products substituted.").

*Fourth*, the government alleged that Eric improperly lifted the second hold that SchoolFood had placed on serving Somma's chicken tenders after foreign matter was found in these items. But the trial evidence reflected that senior SchoolFood leadership, including Mr. Barrett and Mr. O'Brien, had advocated that Eric take this step and by a date certain so that Somma could restart its supply chain to provide the items in time to serve them on the January 2017 menu. *See* GX 602; GX 605. Indeed, in its decision on the defense's post-trial motions, the Court noted, even while construing the evidence in the light most favorable to the government, that "SchoolFood senior staff apparently did agree with SOMMA's proposal." Doc. 181 at 36.

Constrained by the evidence that each of Eric's purported official actions was justified on the merits, the government in its summations instead argued that this fact didn't matter. *See, e.g.*, Tr. 2247:22–24 ("[I]t simply does not matter whether the actions he took were good or bad, right or wrong."). The government repeated multiple times in its closings that it was irrelevant that Eric would have made the same decision regardless of receiving any benefit. *See, e.g.*, Tr. 2247:25–2248:4 ("It doesn't matter if Goldstein . . . would have taken the same act anyway.").

---

[39] Although the Court did not receive this material into evidence, DOE documents from as far back as 2011 also corroborated that Eric understood that the point of liquidated damages was to ensure that violations were cured, not to punish for late delivery of food, and that liquidated damages could be waived by DOE. *See* DX 1 (not admitted).

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

While those assertions might have been an accurate statement of the law as the Court determined it for purposes of finding guilt or innocence, they fail to account for the specific context of Eric's actions and the highly mitigating fact that he was, in each instance, acting in conformity with the rules, his responsibilities, and his long-held beliefs about what was best for SchoolFood and the children it served. That reality sets this case apart from other corruption cases. Eric's conduct, even if the Court deems it ran afoul of the law, was far less culpable than conduct that involves unwarranted or improper governmental actions that are against the interests of constituents.

## II.     The Sentencing Guidelines Range in the PSR Should Be Disregarded

While the Court is required to calculate and consider the advisory Sentencing Guidelines range in formulating the appropriate sentence in each case, the Guidelines calculation included in Eric's PSR is deeply flawed and should be rejected by the Court. As set forth in more detail in the joint defense submission regarding common Sentencing Guidelines issues, which Mr. Goldstein joins in full, the Probation Department's proposed inclusion of offense level enhancements under U.S.S.G. §§ 2C1.1(b)(1), 2C1.1(b)(2), and 3C1.1 are not supported by the law, the Guidelines provisions, or the trial record. *See* Doc. 201.

In addition, because Mr. Goldstein was not a "public official in a high-level, decision-making position" for purposes of the Guidelines, the Probation Department's proposed offense level enhancement pursuant to U.S.S.G. § 2C1.1(b)(3) should be denied. The Court should disregard and accord no deference to the draconian Sentencing Guidelines calculation of 78–97 months' incarceration in Eric's PSR. (PSR ¶ 149.)

Properly applying the Sentencing Guidelines to the facts of this case under the law of this Circuit, the advisory Guidelines range applicable to Eric is as follows:

1. Base Offense Level: 14 (U.S.S.G. § 2C1.1(a)(1))
2. Specific Offense Level Characteristics: +2 (Abuse of Position of Trust, U.S.S.G. § 3B1.3)
3. Chapter Four Adjustment: -2 (Zero-Point Offender, U.S.S.G. § 4C1.1(a))
4. Total Offense Level: 14
5. Criminal History Category: I (0 points)
6. Guidelines Range: 15–21 months' imprisonment

Regardless of the Guidelines calculation, the facts of this case call for a downward departure or substantial downward variance. This is because the Guidelines range dramatically overstates the seriousness of the offense and because the unique circumstances here are not adequately captured by the Guidelines' mechanical calculations. While the Court need not find "extraordinary" circumstances in order to impose a below-Guidelines sentence, *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc), such circumstances are present in this case.

### A.     *Eric Was Not A "High-Level Decisionmaker" for Purposes of U.S.S.G. § 2C1.1*

The Court should not apply the Probation Department's proposed four-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(3), which is applicable only to "elected public official[s]" and

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

"public official[s] in a high-level decision-making or sensitive position." The government bears the burden of proving the facts necessary to support the imposition of a sentencing enhancement under the Guidelines by a preponderance of the evidence. *See United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011). It has not carried its burden with respect to this enhancement.

Contrary to the PSR's assertions, Eric was not "the ultimate decision maker with respect to the purchase of food for NYC public school children," such that this enhancement should apply. (PSR ¶ 26.) As explained in detail at trial, SchoolFood procured food products through an approved brand process that entailed multiple steps and bureaucratic procedures including: (1) solicitations to hundreds of vendors ("outreaches"); (2) written vendor submissions designed to ensure the product satisfied nutritional requirements; and (3) taste tests. *See, e.g.*, Tr. 1028:9–1029:10 (O'Brien); Tr. 409:6–410:8 (Davis). Once a product met SchoolFood's requirements and received its approval, the Division of Contracts and Purchasing ("DCP"), which was responsible for approving pricing, had to independently approve the product's pricing. *See, e.g.*, Tr. 409:15–21 (Davis); Tr. 759:20–760:11 (Ascher); Tr. 1029:11–18 (O'Brien). Eric did not have supervisory authority over DCP. *See, e.*g., Tr. 410:7–8 (Davis). Distributors, who had contracts to supply food to New York City's public schools, could purchase approved products and supply those products to the schools. *See, e.g.*, Tr. 714:20–716:17 (Ascher). Given these multiple bureaucratic processes that needed to be completed and independent approvals that needed to be secured before any food was purchased for SchoolFood, Eric could not personally decide to have an item purchased by SchoolFood. *See* Tr. 1823:23–25 (Goldstein). Nor could he override a decision by DCP to reject an item on price grounds. *See* Tr. 1824:13–15 (Goldstein). For these reasons, Eric was not "a public official in a high-level, decision-making position" such that U.S.S.G. § 2C1.1(b)(3) applies. *See, e.g.*, *United States v. Stephenson*, 895 F.2d 867, 877–78 (2d Cir. 1990).

Rather, as the trial record established, Eric held a position of "public trust," as defined by the Guidelines as one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. §3B1.3 & Application Note 1. While Eric could weigh in on SchoolFood processes, voice his opinions, set policies and priorities, and focus or draw attention to individual problems—i.e., he could exercise managerial discretion that was accorded considerable deference—he could not unilaterally make decisions on behalf of SchoolFood.

Under the Sentencing Guidelines, a defendant cannot receive an enhancement under both sections 2C1.1(b)(3) and 3B1.3. *See* U.S.S.G. § 2C1.1, Application Note 6. Although subtle, the distinction between these different enhancements can be seen in the Second Circuit's decision in *Stephenson*, in which "the Government argue[d] that Stephenson's position affected national security and involved significant supervisory duties as it required him to evaluate applications for licenses to export high-technology equipment to the Soviet Union and China, among other countries." 895 F.2d at 877–78. The Second Circuit, however, agreed with the district court that Stephenson did not qualify for the version of the "high-level decision-making" enhancement applicable at the time because it found that this provision should apply only to "officials sitting in *high positions* of public trust." *Id.* (emphasis added). Mr. Stephenson's duties—like Mr. Goldstein's—were important and "involved some degree of discretion," *id.*, but not the high-level decision-making power required for U.S.S.G. § 2C1.1(b)(3) to apply. *Cf. United States v.*

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

*Madrid,* 610 F. App'x 359, 364–65, 388–89 (5th Cir. 2015) (per curiam) (affirming application of "position of public trust" enhancement under section 3B1.3 to defendant convicted of bribery and honest services mail fraud offenses who was a member of county executive's "governance team" that "functioned in a similar manner as a board of directors" overseeing the management of federal grant money).

      B.     *The PSR's Guidelines Range Overstates the Seriousness of the Offense*

To the extent the Court applies any enhancement pursuant to the "loss table" at U.S.S.G § 2B1.1, we respectfully submit that the Court should downwardly depart or vary from the resulting Guidelines range because any further inflation of Eric's offense level "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1, Application Note 21(C).

This is because, in addition to the unique factual circumstances around the charged conduct, *see supra* at 17–19, any offense level enhancements resulting from section 2B1.1 would be the product of a Guideline that is not based on empirical evidence, does not reflect the sentencing factors under section 3553(a), and "fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case."[40]

Many judges in this Circuit have lambasted the "utterly ridiculous" loss Guideline because it is "heavily weighted toward increasing the number of enhancement points" as the loss amount increases—"a fact that has been criticized on more than one occasion by this and other courts." *United States v. Black*, 16 Cr. 370 (CM) (S.D.N.Y. Oct. 24, 2019) (McMahon, J.), Doc. 457 at 56:5–16. These courts have strongly criticized the Guidelines' loss enhancement as a measure of the seriousness of an offense and have echoed the "widespread perception that the loss guideline is broken." *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J. concurring); *see also, e.g.*, *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (condemning the "excessive weight on [the loss] factor" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Johnson*, 16 Cr. 457 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) ("[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Ovid*, 09 Cr. 216 (JG), 2010 WL 3940724, at *8 (E.D.N.Y. Oct. 1, 2010) (Gleeson, J.) (criticizing "the illusion of precise calculation created by the ever-expanding fraud guideline"); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (A "black stain on common sense.")

The Guidelines' loss enhancement was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *Corsey*, 723 F.3d at 380. Because the Commission failed to rely on empirical data or national experience in promulgating and amending section 2B1.1, this Court is free to conclude that the application of this guideline "yields a sentence greater than necessary to achieve § 3553(a)'s purposes." *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007). Sentencing judges faced with Guidelines ranges inflated by

---

[40]  A. Ellis et al., *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 CRIM. JUST. 34, 37 (2011).

loss enhancements can correct for the inherent overstatement of culpability by focusing less on the Guidelines range and more on the section 3553(a) factors. *Corsey*, 723 F.3d at 380.

In light of the widespread criticism that the Guidelines approach to "loss" has received from courts, practitioners, academics, and experts, an American Bar Association task force (which included among its members Judges Lynch and Rakoff, and former Judge Gleeson) proposed amendments that would focus less on "loss" and more on "culpability."[41] The task force's report drew particular attention to sentences for first-time, non-violent offenders and recommended an approach more faithful to the Sentencing Commission's enabling legislation, whereby "[i]f the defendant has zero criminal history points under Chapter 4 and the offense was not 'otherwise serious' within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate."[42] *See also United States v. Leitch*, 11 Cr. 609 (JG), 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28, 2013) (noting that the Commission was "was supposed to ensure 'the general appropriateness' of probationary sentences for first-time offenders unless they commit 'crime[s] of violence or . . . otherwise serious offense[s].' Instead, it unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is 'otherwise serious,' and thus no more eligible for a sentence of probation, even when committed by a first-time offender, than would a crime of violence").

Eric's case is a prime example of the "utter ridiculousness" of the loss enhancements. The Probation Department's proposal that the offense level here be increased by 8 levels is entirely divorced from the facts and circumstances of the offenses of conviction (as described in the defense's joint submission and *supra*) and wholly unrelated to the section 3553(a) factors.

C.   *Eric and His Family's Extraordinarily Challenging Personal Circumstances Merit a Downward Departure*

U.S.S.G. § 5K2.0(a)(4) broadly permits a departure where there are characteristics of the defendant or other circumstances that are not adequately captured by the applicable Guidelines range. While in the pre-*Booker* sentencing regime, the Guidelines disfavored departures based on family circumstances except in "extraordinary circumstances," *United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003), even under this mandatory regime, the Second Circuit affirmed a number of downward departures that the trial court found had met this stringent threshold:

> We have found family circumstances to be extraordinary, and hence a permissible basis for departure, where the defendant provided substantial support for two children, his wife spoke limited English and had a limited earning capacity, and his elderly parents were likely to require both physical and financial assistance in

---

[41]   Am. Bar Ass'n, Criminal Justice Section, "A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes" (Nov. 10, 2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf.

[42]   *Id.* at 2.

the near future, *see United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997); where the defendant was the sole support of several young children, one of whom was an infant*, see United States v. Johnson*, 964 F.2d 124, 129–30 (2d Cir. 1992); and where the defendant supported his wife, two children, his paternal grandmother, and his disabled father who depended also on the defendant's physical strength to help him get in and out of his wheelchair, *see United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991).

*United States v. Cutler*, 520 F.3d 136, 164 (2d Cir. 2008).

Eric's uniquely challenging family circumstances fall squarely within the bounds of what the Circuit has recognized as meriting a downward departure. As described above, in the PSR, and in the letters of support, ███████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Such collective punishment would be unwarranted and disproportionate, particularly given the circumstances of Eric's offense conduct.

███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████Given these factors, the Probation Department has agreed that a departure may be warranted in this case. (PSR ¶ 166.)

Moreover, since *Booker* was decided, courts have even greater discretion to consider the impact a sentence may have on a defendant's family and dependents. *See, e.g.*, *United States v. Weisberg*, 07 Cr. 66 (HBS), 2010 WL 3944964, at *10 (W.D.N.Y. 2010) ("Since the Guidelines are just that, advisory guidelines, this Court may consider the impact of this sentence on defendant's family members."). For the same reasons that the Court should impose a downward departure in this case, we respectfully submit that Eric's family circumstances and the devastating effect a period of incarceration would have ██████████████████████████ in particular weigh heavily in favor of a significant downward variance under section 3553(a).

## III.   Incarceration Would Not Advance the Goals of Section 3553(a)(2)

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Cavera*, 550 F.3d at 188. In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

Here, particularly in light of Eric's admirable personal history and characteristics, and the significant punishment and collateral consequences he has already received, a period of incarceration would not further advance the goals of section 3553(a)(2). Rather, a period of incarceration for this individual, in this case, would be greater than necessary.

A.      *Probation, Home Detention, Community Service, and the Collateral Consequences of Public Trial and Felony Conviction Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

As described in the PSR, the letters to the Court, and above, Eric has already been subjected to extensive and wide-ranging punishment as a result of his widely publicized arrest, trial, and conviction in this matter. Eric has been humiliated and villainized in the public consciousness, despite having done so much to benefit the public schoolchildren of New York for more than 15 years. Despite living an otherwise exemplary life, Eric will forever be connected with this case—and the false portrayal of him by the media that resulted[43]—on top of the legal disabilities of having a felony conviction. The public vitriol against Eric has included blatant antisemitism.[44]

---

[43]   *See, e.g.*, C. Moynihan, "School Official Convicted After Students Ate Chicken With Bits of Metal," N.Y. Times (June 28, 2023) (reporting that "Eric Goldstein, who oversaw the feeding of New York schoolchildren, took bribes to allow food with bits of bone and plastic in cafeterias" and prominently featuring a picture of Mr. Goldstein), https://www.nytimes.com/2023/06/28/nyregion/eric-goldstein-somma-chicken.html; P. DeGregory, "Ex-DOE exec convicted of taking bribes, turning blind eye to tainted chicken tenders served to NYC public school kids," N.Y. Post (June 28, 2023), https://nypost.com/2023/06/28/ex-doe-exec-convicted-in-schools-food-bribery-scheme/; J. Marcus, "New York official was bribed and let chicken contaminated with metal be served in school lunches, jury finds," The Independent (June 30, 2023), https://www.the-independent.com/news/world/americas/crime/new-york-eric-goldstein-convicted-b2366904.html.

[44]   *See, e.g.*, Top Comment on New York Post article, *supra* ("Read only the headline and KNEW it had to be a -berg, -stein, or -witz. It's not 'government corruption'. It's typical TRIBE corruption. This society is not theirs, and they don't care how much damage they do to it if there's money in it for them."); Comment on M. Koening, "Ousted NYC education chief dubbed 'Roger Rabbit' is convicted in bribery scheme after accepting $80,000 from food company that served schoolchildren chicken that oozed blood and contained METAL," Daily Mail (June 28, 2023) ("They seem to always be involved in swindling."), https://www.dailymail.co.uk/news/article-12244575/Fired-NYC-education-chief-dubbed-Roger-Rabbit-beams-abattoir-food-company-conspirator.html.

<u>**United States v. Eric Goldstein**</u>
**21 Cr. 550 (DC)**

Moreover, as recounted above and in the letters of support, for the past nearly three years, Eric has lived every day with the terror of possibly being incarcerated and ripped from the family that relies on him. The thought of being incarcerated and unavailable to come to the aid of his son or family has been an agonizing punishment that Eric has struggled with daily.

As Eric's close friend writes in his letter to the Court:

Eric has already been punished by his loss in position, status, and honor, especially in the eyes of his sons. The public press after the jury verdict was worldwide and—having sat through the trial, I can say confidently—wildly inaccurate. Eric Goldstein was portrayed as a heartless monster who endangered the children that he had, in fact, served ably for more than a decade. He will never be able to un-ring that bell in the public consciousness, no matter how inaccurate it might be.[45]

Another close friend concurs that this public humiliation of Eric has been its own intense punishment: "Eric and his family have been devastated already by the mere existence of this case, let alone the trial, flood of publicity, and shame of the verdict. I have seen how pained Eric has been by this experience."[46]

We respectfully ask the Court to consider both the direct consequences of Eric's felony conviction, as well as the collateral consequences of his widely publicized (and overly sensationalized) arrest, public trial, and conviction. Courts in this Circuit regularly find that such consequences are meaningful punishments that lessen the need for imprisonment. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (approving district court's finding that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant" (quotations omitted)); *United States v. Schulman*, 16 Cr. 442 (JMA) (E.D.N.Y. Oct. 6, 2017), Doc. 155 at 39:4–11 (finding that reputational ruin and end of the defendant's professional career was "substantial and meaningful punishment," particularly where the defendant's "emotional well-being has suffered as a result"); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (imposing non-custodial sentence and urging courts to consider the collateral consequences of felony convictions when imposing sentence); *United States v. Collins*, 07 Cr. 1170 (LAP) (S.D.N.Y. Oct. 17, 2013), Doc. 244 at 32:22–33:1 (concluding that "a lengthy prison sentence is not necessary" to advance the goals of section 3553(a)(2) "in light of the collateral consequences suffered" by the defendant); *see also, e.g.*, *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (granting downward variance based in part on "incalculable damage" defendant suffered from "tremendous media coverage of his case," including that defendant "was unflatteringly portrayed as the face of public corruption" and where defendant "and his family . . . endured the expense and emotional cost of two very lengthy, public trials"), *aff'd* 523 F.3d 1258 (10th Cir. 2008).

---

[45]   Ex. J, Ltr. from P. Fleischer.

[46]   Ex. F, Ltr. from J. Davidson.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

These intangible punishments are in addition to the very real and significant restrictions on Eric's liberty that would be part of any non-carceral sentence the Court may impose. As the Supreme Court has explained:

> Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which ever citizen is entitled." (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. §5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48 (2007) (footnote omitted); *see also United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018) (recognizing that "supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty").

A period of home detention would be an additional, significant punishment, particularly for an individual like Eric, who prior to his arrest had never been subject to restrictions on his liberty. Many courts, in various procedural postures, have recognized the "obvious psychological and social impact" of home detention. *See, e.g.*, *United States v. Pennick*, 10 Cr. 191 (RJA), 2016 WL 4089192, at *8 (W.D.N.Y. Aug. 2, 2016), *aff'd*, 713 F. App'x 33, 35 (2d Cir. 2017). The mental and emotional impact of the "hugely restrictive regime of confinement, compliance, intrusion and dependency" that is probation and home detention should not be underestimated. *United States v. Coughlin*, 06 Cr. 20005 (RTD), 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008). With limited exceptions that would require the approval of the Probation Department, Eric would be isolated in his home all day—unable to exercise more than a modicum of the freedom he enjoyed for more than 55 years. *See United States v. Minor*, 440 F. App'x 479, 485–86 (6th Cir. 2011) (noting that "[a] person under 'home detention' is subject to confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences").

Importantly, however, a non-carceral sentence including a period of home detention would allow Eric to continue to work and earn money to support his family at a time of dire financial need. As discussed above and in the PSR, without Eric's earned income, the family ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ould be an unnecessary and overly punitive additional punishment. Perhaps most importantly, receiving a period of home detention instead of custody would allow Eric to continue to give the unique care and support for his son that only he is able to provide. ██████████████████████████████████████████████████████████ █████████████████████████ Allowing Eric to continue to serve in this role—

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

█████████████████████████████████████████████████████████—is a
worthy goal of sentencing.

As discussed in more detail below, a further imposition of community service would require Eric to give back to his community in meaningful ways. Eric has already been volunteering at the Food Bank of the Hudson Valley for several months as part of his programming with the Aleph Institute. Mandating that he continue to do so as a condition of his probation would incorporate this obligation as a further punishment in this case.

If Eric were to unexpectedly fail to comply with any of these conditions, the Court could re-sentence him up to the statutory maximum periods of incarceration. *See* 18 U.S.C. § 3565(a)(2).

For these reasons, a sentence of probation, home detention, community service, and the direct and collateral consequences of Eric's public trial and felony conviction would reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

B. *The Proposed Sentence Would Afford More than Adequate Deterrence*

i. Incarceration Would Not Provide Additional General Deterrence

The significant punishment that would be imposed on Eric if he were subject to probation, home detention, community service, and the myriad consequences of his trial and felony conviction would also serve to promote deterrence of similar conduct. Courts in this District have recognized that "general deterrence is accomplished" through probationary sentences that involve strict monitoring conditions because such sentences "send a clear message that any involvement in" unlawful conduct "will result, at the very least, in a substantial restriction of freedom. *United States v. Ilayayev*, 800 F. Supp. 2d 417, 451 (E.D.N.Y. 2011).

Social science data confirm that more severe sentences are not more effective at promoting general deterrence—particularly in the context of "white collar" offenses. *See* M. Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). Although the "punishment-generating activities of the criminal justice system" may produce some "baseline deterrence effect," there is no indication that deterrence is influenced by an increase or decrease in punishment levels. G. Kleck et al., *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 CRIME & DELINQUENCY 1006, 1032 (2013)

Representative of the data on general deterrence are the results published by the Institute of Criminology at Cambridge University. *See* A. von Hirsch et al., CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH (1999). The report, commissioned by the British Home Office, examined research on penalties in the United States and several European countries and specifically the effects of changes to both the certainty and the severity

27

of punishment. Although the report found correlations between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." *Id.* at 1; *see also* R. Paternoster, *How Much Do We Really Know about Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) (noting that there is "no real evidence of a deterrent effect for severity").

For these reasons, a more severe sentence including a period of incarceration would be unnecessary and would not further advance the general deterrence goals of section 3553(a)(2)(B).

ii.     Incarceration Is Unnecessary To Instill Specific Deterrence

A period of incarceration is entirely unnecessary to specifically deter Eric from unlawful conduct. By the time of his arrest, Eric was no longer in a position in government. His public arrest, trial, conviction, and shaming ensure that he will never again be in a position of authority. Eric's career in public service has been destroyed. And as Eric can attest, the grueling criminal justice process itself (and the financial, emotional, and personal strains it places on defendants and their families) produces significant specific deterrence—he will never engage in conduct that could even be perceived as unlawful. *See, e.g., Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure because "the destruction of the defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process"). Given his admirable qualities and lifetime of law-abiding behavior, a term of incarceration is unnecessary in this case to advance the specific deterrence goals of section 3553(a)(2)(B). *See, e.g., United States v. Ortega*, 09 Cr. 742 (JWB), 2010 WL 2541364, at *2 (E.D.N.Y. June 17, 2010) ("In light of the defendant's good character, specific deterrence is not a major concern.").

Again, the social science data confirm that a period of incarceration would not further specific deterrence. In an extensive study of white-collar offenders (presumably among the most rational of sentenced defendants), no difference in deterrent effects was found as a result of increased sentence severity, including between probation and imprisonment. *See* D. Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Z. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448–49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

C.      *Incarceration Is Unnecessary To Protect the Public*

The same factors and social science data support the conclusion that Eric presents no risk of recidivism and that a period of incarceration is unnecessary to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

     i.      As A First-Time, Non-Violent Offender
                Eric Presents No Risk of Recidivism

As the Sentencing Commission and the policies behind the Sentencing Guidelines make clear, "first offenders are less culpable and less likely to re-offend." U.S. Sent'g Comm'n, *Recidivism and the "First Offender*," at 1, 9 (2004);[47] *see* U.S.S.G. § 4A1.1, Introductory Comment. Accordingly, as the Sentence Commission has written, "they are deserving of reduced punishment." *Recidivism and the "First Offender*," *supra* at 1; *see also* 28 U.S.C. § 994(j).

Sentencing Commission data corroborate this philosophy. Multiple Sentencing Commission studies have proven that first offenders, like Eric, with zero criminal history points are in a wholly unique category of defendants for sentencing purposes—one that is least in need of incarceration to prevent rearrest or reconviction. A 2004 study concluded that "offenders with zero criminal history points have a primary recidivism rate of 11.7 percent . . . substantially lower than the recidivism rates for offenders with only one criminal history point." *Recidivism and the "First Offender*," *supra* at 13. Follow-up studies in 2017 and 2021 confirmed that offenders with zero criminal history points continue to have by far the lowest rates of recidivism, whether measured by rearrest, reconviction, or reincarceration. *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010*, at 26 (2021);[48] U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6–7 (March 2017).[49]

The risk of recidivism for first offenders is even lower when one considers those first offenders, like Eric, who have never been arrested before. The Sentencing Commission has explained that "[f]rom both culpability and recidivism risk perspectives . . . offenders with no prior arrests most strongly meet the conceptual definition of the first offender[,]" and with "their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." *Recidivism and the "First Offender*," *supra* at 17. Even this 6.8% "recidivism" rate overstates the risk of reoffending by first time offenders with no previous arrests. Sentencing Commission data showed that "the re-conviction rate" of such offenders was only 2.5 percent. *Id.* at 14 n.28.

     ii.     Sentencing Commission Data Confirm
                that Eric Presents the Lowest Risk of Recidivism

Eric's already minimal risk of recidivism is reduced even further once his other characteristics are incorporated into the evaluation. Multiple studies by the Sentencing

---

[47] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

[48] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

[49] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

Commission have concluded that "[o]lder offenders [are] substantially less likely than younger offenders to recidivate." U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3 (2017);[50] *see also Recidivism of Federal Offenders Released in 2010*, *supra* at 24. The Sentencing Commission has explained that "[a]ge and criminal history are consistently strong predictors of recidivism," and that "[t]he combined impact of age and criminal history on recidivism is more pronounced." *Recidivism of Federal Offenders Released in 2010*, *supra* at 29. The data bear this out, with multiple Sentencing Commission reports concluding that older defendants with no prior arrests are by far the least likely to reoffend. *Id.*

Each of Eric's other demographic characteristics further buttresses the conclusion that he presents the lowest possible risk of reoffending. Eric is and has been gainfully employed (or in graduate school) his entire adult life. He is more than 50 years old, a college graduate, previously married with strong familial ties, and has no substance abuse issues. Sentencing Commission data make clear that each such characteristic—let alone all in combination with his lack of criminal history—make Eric particularly unlikely to reoffend. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12–13 (May 2004);[51] *The Effects of Aging on Recidivism Among Federal Offenders*, *supra* at 3; *Recidivism of Federal Offenders Released in 2010*, *supra* at 31.

Even the type of offense for which Eric was convicted shows that he presents the lowest possible risk of recidivism. The Sentencing Commission has noted that among the categories of federal offenses, "offenders sentenced for fraud" presented "the lowest rearrest rate." *Recidivism of Federal Offenders Released in 2010*, *supra* at 5. Again, once Eric's age is factored in, the risk of recidivism is reduced even further. Sentencing Commission data confirm that fraud-related defendants who are more than 50 years old present nearly the lowest risk of recidivism in terms of rearrest, reincarceration, and reconviction. *The Effects of Aging on Recidivism Among Federal Offenders*, *supra* at 23.

In light of the reduced culpability and risk of recidivism that older first offenders present, courts frequently impose downwardly variant sentences on defendants with no criminal history. *See, e.g.*, *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (reasoning that because "Criminal History I did not fully account for [the defendant's] complete lack of criminal history, considering it as a mitigating factor was not redundant or improper"); *United States v. Thompson*, 19 Cr. 698 (ER) (S.D.N.Y. Feb. 4, 2021), Doc. 55 at 30:23–31:5 (imposing a non-carceral sentence and noting, *inter alia*, "that this is Mr. Thompson's first offense, he has never been arrested before, it is a nonviolent offense, and we ought to give some level of leniency to first offenders. And while, certainly, Mr. Thompson is not an old man . . . he is not a young man, and studies have shown that it is unlikely that someone in his age group, with no criminal history whatsoever, is likely to recidivate.").

---

[50] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

[51] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

United States v. Eric Goldstein
21 Cr. 550 (DC)

    For all these reasons, a period of incarceration is unwarranted and unnecessary under section 3553(a)(2).

## IV.    A Non-Carceral Sentence Would Be Warranted under Section 3553(a)(3)

    Section 3553(a)(3) instructs the Court to consider "the kinds of sentences available," which—for the Class C and D felonies for which Eric has been convicted—includes probation, home detention, and community service. *See* 18 U.S.C. § 3561(a)(1). Such a sentence would be particularly appropriate for this individual, in this case.

    The Office of Probation and Pretrial Services of the Administrative Office of the United States Courts has described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and real—a 'win-win' proposition for everyone involved." Office of Probation and Pretrial Servs., Admin. Office of the U.S. Courts, *Court & Community: An Information Series About US. Probation & Pretrial Services: Community Service*, at 2 (2007).[52] It recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.* In selecting candidates for community service, Probation advises that while "[n]ot every offender is a good candidate for community service . . . . [c]ourts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence." *Id.*

    Sentencing judges have recognized that community service can serve as a significant punishment. In a fraud case in this District, then-Judge (and now Sentencing Commissioner) Gleeson spoke powerfully about the value of community service as a sanction:

    The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million? [. . .]

    In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

    But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here.

---

[52]   *Available at* https://www.miep.uscourts.gov/downloads/CourtCommunity.pdf.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

> Alternatives to incarceration exist that can carry both the community and this
> Court's condemnation of your conduct but channel it in a way that's more
> constructive, given your significant charitable works and contributions before this
> case, given the extraordinary timing of your cooperation and its nature, given your
> age and your physical circumstances. I don't think the goals of sentencing here
> require you to be incarcerated.
>
> I am placing you on probation for a period of five years. One special condition of
> probation would be that you be in home detention for a period of six months.
>
> Another is that you perform 500 hours of community service. It strikes me that
> you can do some good in your community. You already have. It seems to me you
> deserve it. The combination of circumstances in your case makes you worthy of
> serving your punishment in a manner that's a little more constructive than going
> to jail.[53]

Eric's accomplished career, his dedication to his loved ones, family, friends, and
colleagues, and his deep ties and positive contributions to his community all serve to make him
an ideal candidate for community service as part of his sentence. Eric is a first-time, non-violent
offender with a history of public service and helping others. He has already been performing
community service at the Food Bank of the Hudson Valley. *See* Ex. Z, Ltr. from Rabbi Bryski;
PSR ¶ 141. Continuing this structured, purposeful community service would more appropriately
advance the interests of justice than unnecessary incarceration would.

In addition, for the past year, Eric has been participating in restorative justice
programming through the Aleph Institute, a non-profit, pro bono organization rooted in the
Jewish faith and its moral and ethical teachings, which has worked for decades to promote
alternative criminal sentencing in appropriate cases.[54] As Rabbi Yossi Bryski of the Aleph
Institute writes to the Court:

> We advocate for alternative sentences for individuals in whom we detect a deep
> sincerity and a genuine commitment to achieve meaningful personal growth.
> Further, we only advocate on behalf of individuals who have passed our rigorous
> screening process and programming regimen, and we do not advocate for any
> individual unless we are confident that they do not pose a future threat to
> society.[55]

Since September 2023, Eric has been working closing with Aleph on a multifaceted
regimen of spiritual counseling; weekly group sessions with other criminal justice involved
individuals, which addresses participants' prior behavior and sentencing, deterrence, and

---

[53] Ex. Z. Sent. Tr. 10–12, *United States v. Shamilzadeh*, 04 Cr. 1094 (JG) (E.D.N.Y. Apr. 1,
2008).

[54] *See* Ex. Y, Ltr. from Rabbi Y. Bryski.

[55] *Id.*

<u>**United States v. Eric Goldstein**</u>
**21 Cr. 550 (DC)**

rehabilitation through the lens of Jewish history and teachings; and community service.[56] Rabbi Bryski writes, "We have been impressed by Eric's progress and his commitment to diligently pursuing a path of self-improvement."[57]

In light of Eric's fundamentally good character, his deep commitment to self-improvement and restoration, and his success in the Aleph program to date, and to avoid the devastating effects that any period of incarceration would have on his family, Rabbi Bryski and the Aleph team recommend that Eric be ordered to continue with his Aleph programming, which he could participate in remotely while on any period of home detention.[58] As Rabbi Bryski writes, "We believe that Eric, his family, and his community would be better served by a sentence consisting of a program of community service, spiritual counseling, therapy, and possibly home detention, in lieu of incarceration. Our alternative sentencing proposal would allow Eric to continue his path of growth, while also allowing him to continue to provide crucial support for his vulnerable family."[59]

## V.   A Non-Carceral Sentence Would Not Create Unwarranted Sentencing Disparities

A sentence of probation, home detention, and community service would also be consistent with the sentences imposed on defendants convicted of similar offenses, and would thus not create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Within the Second Circuit, in Fiscal Year 2023, the mean and median sentences for defendants convicted of "bribery/corruption" offenses were 15 and 12 months' incarceration, respectively.[60] For defendants convicted of such offenses in the Eastern District of New York, the mean and median sentences were 13 and 12 months' incarceration, respectively.[61] The data are consistent for 2022, with mean and median sentences for "bribery/corruption" offenses in the Second Circuit of 11 and 6 months, respectively.[62] In 2022 in the Eastern District of New York,

---

[56]   *Id.*

[57]   *Id.*

[58]   *Id.*

[59]   *Id.*

[60]   *See* U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2023 (Second Circuit)*, Tbl. 7, "Sentence Length by Type of Crime," https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/2c23.pdf.

[61]   *See* U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2023 (Eastern District of New York)*, Tbl. 7, "Sentence Length by Type of Crime," https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/nye23.pdf.

[62]   *See* U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2022 (Second Circuit)*, Tbl. 7, "Sentence Length by Type of Crime,"

<u>United States v. Eric Goldstein</u>
**21 Cr. 550 (DC)**

out of 27 cases with convictions for "bribery/corruption" offenses, the mean sentence was 9 months' incarceration, with the median sentence being 0 months' imprisonment.[63] A sentence of probation, home detention, and community service would be well within the range of comparable sentences, particularly when Eric's unique personal situation and the mitigating circumstances of the offense conduct are taken into consideration.

Nor would such a sentence be an aberration. For example, in *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996), an elected Sheriff extorted money from Deputy Sheriffs by threatening to suspend or terminate those who did not pay money towards the Hartford County Association of Deputy and Special Deputy Sheriffs, which the Sheriff used to pay for his personal dues at an expensive country club; travel expenses for himself and his wife; restaurant expenses; Christmas parties; and personal charitable expenses. *See id.* at 653. The Sheriff was convicted after trial of mail fraud and violating the Travel Act. *Id.* Despite a Guidelines range of 33–41 months' imprisonment, the Second Circuit affirmed the district court's downward departure and imposition of a sentence of three months' probation, six months' house arrest, and 500 hours of community service, upholding the district court's determination that the case "differed significantly from the heartland of guideline cases" in light of, *inter alia*, "Rioux's medical condition and charitable and civic good deeds." *Id.* at 663.

Similarly, in *United States v. Samson*, 16 Cr. 334 (JLL) (D.N.J. March 7, 2017), the defendant was sentenced to four years of probation, one year of home detention, and 3,600 hours of community service for his conviction for violating 18 U.S.C. § 666(a)(l)(B) by using his power as the Chairman of the Port Authority of New York and New Jersey to block the PANYNJ's approval of a lease for United Airlines at Newark International Airport until the airline reinstituted service that allowed him to fly non-stop from Newark to his second home in South Carolina. In reaching this sentence, the Court considered the defendant's years of public service and his compromised medical condition as mitigating factors.

While no two cases are exactly alike, the cited statistics and cases make clear that here a probationary sentence with a term of home detention and a significant period of community service would not create "unwarranted" sentencing disparities with similarly situated defendants.

## VI.    The Government Does Not Seek Forfeiture or Restitution and A Fine Should Not Be Imposed

The government has not requested forfeiture or restitution.  Should the government claim that any property or assets are allegedly subject to forfeiture or restitution, we respectfully reserve the right to respond.

---

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/2c22.pdf.

[63]    *See* U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2022 (Eastern District of New York)*, Tbl. 7, "Sentence Length by Type of Crime," https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nye22.pdf.

**United States v. Eric Goldstein**
**21 Cr. 550 (DC)**

Finally, as the Probation Department notes in the PSR, given Eric's severely compromised financial state ███████████████████████, Eric would be unable to pay any fine. (PSR ¶ 147.) Because a fine would advance no legitimate purpose of sentencing and would severely impact his already struggling family, the Court should not impose a fine. *See* 18 U.S.C. § 3572(a).

**VII.    Conclusion**

Eric Goldstein stands before the Court deeply humbled and terrified for his family's future. He understands that the Court must impose a sentence consistent with the law and he remains hopeful that, given his fundamentally good character, the unique context of this case, and the years of public service he dedicated to uplifting New York City's public schoolchildren, the Court will show him mercy and impose a sentence that allows him to continue to provide for and support his vulnerable family.

We join him in this request and respectfully urge the Court to impose a non-carceral—but still substantial—sentence that accounts for all of the good that Eric Goldstein has done and continues to do to this day. We thank the Court for its consideration of this submission.

Respectfully submitted,

/s/

Kannan Sundaram
Neil P. Kelly
Assistant Federal Defenders
(718) 330-1203 / (212) 417-8744

*Counsel for Eric Goldstein*

Enclosures

cc:    Counsel of record